UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DBW PARTNERS, LLC<br>d/b/a THE CAPITOL FORUM,<br>  1629 K Street, N.W.<br>  Suite 300<br>  Washington, DC 20006<br><br>            Plaintiff,<br><br>v.<br><br><br>MARKET SECURITIES, L.L.C.<br>  85 Broad Street, 17th Floor<br>  New York, New York, 10004<br><br>           Defendant. | Civil Action No.<br><br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff, DBW Partners LLC, d/b/a The Capitol Forum ("Plaintiff" or "Capitol Forum"), for its complaint against Market Securities, L.L.C. ("Defendant" or "Market Securities") alleges as follows:

### INTRODUCTION

1. This is an action for direct copyright infringement, contributory copyright infringement, and misappropriation of proprietary information arising from Market Securities' illegal solicitation, receipt, and use of Capitol Forum's copyrighted and proprietary reports.

2. The Capitol Forum is an investigative news and analysis company, in the business of providing time-sensitive and in-depth reports to its subscribers, including investors, industry stakeholders, law firms and policymakers. It publishes a premium internet-based subscription service, releasing anywhere between 30 and 50 reports each month on matters relating to

mergers and acquisitions, consumer protection, government contracts, corporate investigations, and antitrust enforcement. The Capitol Forum's reports are extensively researched and carefully written, often the product of months of work, and its subscribers rely on these reports to make investment and business decisions. Given the respected nature of Capitol Forum and its journalists, the release of its reports will often affect the price of publicly traded stocks—and will do so in a matter of minutes.

3. Capitol Forum's reports constitute a fundamental and competitively significant component of its business. These reports are provided only to its subscribers and to other authorized recipients, and each report contains a copyright notice and disclosure that its contents may not be distributed or reproduced without Capitol Forum's permission.

4. Despite the copyrighted and proprietary nature of Capitol Forum's content, Market Securities has been illegally obtaining, summarizing, and distributing Capitol Forum's analyses. Within minutes of the release of many of Capitol Forum's reports, Market Securities will illegally obtain the report from one or more of Capitol Forum's subscribers, and then republish a summary of that report to its clients, occasionally including verbatim excerpts from the Capitol Forum report, thus obviating the need for potential subscribers to purchase a Capitol Forum subscription.

5. It is a direct copyright violation for the Capitol Forum subscriber to send the copyrighted publications to Market Securities. It is a contributory copyright violation for Market Securities to induce the subscriber's direct violation. It is a direct copyright violation for Market Securities to repackage and summarize the Capitol Forum analyses.

6. Capitol Forum is unaware of the extent of Market Securities copyright violations but is aware that these violations began to occur at least as early as December 2020 and have

continued at least through October 2021 when Capitol Forum first became aware of the violations and issued a cease-and-desist demand to Market Securities.

7.    Market Securities' copyright violations are willful.  It knows: (1) that the Capitol Forum publications are copyrighted; (2) that it is a direct copyright violation for Capitol Forum's subscribers to transmit copyrighted material to it; and (3) that it is a contributory copyright violation to solicit and induce such direct copyright violations.  Market Securities also knows that its subsequent summarization and publication of Capitol Forum's material is prohibited by the copyright laws—and not excepted from copyright protection by the "fair use" doctrine.  Market Securities warns its subscribers—and the public—that its own publications are protected by the copyright laws.  Its website states that it is "the owner or the licensee of all intellectual property rights in this website and in the material published on it. Those works are protected by copyright laws and treaties around the world."  Market Securities is also aware that the Capitol Forum publications it obtains, and copies, bear a similar copyright notice: "Direct or indirect reproduction or distribution of this article without prior written permission from the Capitol Forum is a violation of Federal Copyright Law."

8.    By soliciting and obtaining Plaintiff's copyrighted and proprietary material and by misappropriating the creative and original aspects of Plaintiff's copyrighted and proprietary material, Market Securities has caused significant injury to Capitol Forum, entitling Capitol Forum to compensatory damages and equitable relief, injunctive relief, punitive damages, and statutory damages in the amount of $150,000 per violation, as well as an award of attorneys' fees.

**PARTIES**

9.     Plaintiff DBW Partners LLC is a District of Columbia limited liability company, doing business as The Capitol Forum.  Capitol Forum maintains its principal place of business at 1629 K Street, N.W., Suite 300, Washington, D.C. 20006.

10.    Defendant Market Securities L.L.C. is a Delaware limited liability company and maintains its principal place of business at 85 Broad Street New York, New York 10004.

11.    Market Securities is subject to personal jurisdiction in this court.  Pursuant to the Long Arm Statute of the District of Columbia, D.C. Code Section 13-423, Market Securities has regularly transacted business in the District of Columbia by soliciting and serving clients in this jurisdiction, has caused tortious injury in this jurisdiction, and has derived substantial revenue from services provided in this jurisdiction.  The conduct of Market Securities at issue in this litigation has had an effect in the District of Columbia because its copyright infringement has been expressly aimed at this jurisdiction, which is the place where the copyrights are held.

## JURISDICTION AND VENUE

12.    This action for copyright infringement arises under the Copyright Act of 1976, as amended, 17 U.S.C. § 101 *et seq.* This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 (federal question), 1338 (copyrights), and 1367 (supplemental).

13.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c), in that a substantial part of the events giving rise to the claims occurred in this district, the harm occurred in this district, and defendant is subject to personal jurisdiction in this district.

## STATEMENT OF FACTS

14.    Capitol Forum is an investigative news and legal analysis company dedicated to

informing policymakers, law firms, investors, and industry stakeholders on the effect of government policy on publicly traded corporations and market competition.  Plaintiff invests substantial financial and human resources in generating original and high-quality content for its reports relating to various sectors of the economy.  The value of these reports to Capitol Forum's paid subscribers lies in the high quality of the investigative reporting and analysis and the timeliness with which that analysis reaches its subscribers.

15. Capitol Forum's independent reporting is the product of the full-time effort, skill, and judgment of, among others, analysts, journalists, and lawyers assigned to follow developments in particular markets.  A typical report, for example, may include an in-depth analysis of the market impact of a significant policy or detail a parallel investigation of a major antitrust review.

16. The reports constitute proprietary and economically valuable analysis, and are presented in a manner that is intended to inform, among other things, a subscriber's investment decisions and provide guidance on a myriad of issues.  The high quality and timeliness of Capitol Forum's reporting is also a means of attracting new clients and contributes to Capitol Forum's outstanding reputation in the financial, business, and legal worlds.

17. Plaintiff's reports, intended for its paid subscribers, contain copyright notices and state that they may not be reproduced or distributed without Plaintiff's permission.  All reports and emails issued by Plaintiff contain a copyright notice that states that "Direct or indirect reproduction or distribution of this article without prior written permission from the Capitol Forum is a violation of Federal Copyright Law."

18. Capitol Forum applied for, obtained, and owns valid copyright registrations

in its reports. The relevant copyright registration numbers are as follows: TX0008939090, TX0008941939, TX0008953721, TX0008993172, TX0008996171, TX0009025943, TX0009070990, TX0009032436, TX0009032413, TX0009032843, TX0009031554, TX0009033043, TX0009108744, TX0009094440, TX0009071495, and TX0009082488.

19. Plaintiff's reports are distributed by Plaintiff only to paid subscribers, or to other authorized recipients. All subscribers must execute The Capitol Forum Subscription Agreement ("Subscription Agreement"), which prohibits redistribution of Capitol Forum's content.

20. Capitol Forum's reporting has market impact. It is therefore important to Capitol Forum that the distribution of its reports be limited to its authorized recipients, as distribution of the information to non-authorized recipients would reduce the value of the information to its subscribers.

21. Market Securities is a financial services broker. According to its website, it provides a "wide range of cross-asset execution and advisory solutions to institutional clients including Banks, Asset Managers, Hedge Funds and sell-side firms." In providing its advisory solutions, Market Securities acquires timely market information from various sources and then publishes this information to its clients through the internet. Capitol Forum has recently learned that the Market Securities sources include—albeit illegally—the Capitol Forum publications.

22. Nevertheless, in derogation of the clear copyright notice on each Capitol Forum publication and in violation of the copyright laws, Market Securities has, on information and belief, induced one or more Capitol Forum subscribers to transmit the Capitol Forum publications to it, thereby enabling it to obtain Capitol Forum's copyrighted material. At no time has Capitol Forum provided its subscribers permission to transmit its material to Market

Securities. Nor has Capitol Forum provided Market Securities with permission to obtain its copyrighted material or to copy and republish its protected works.

23. Upon receiving the Capitol Forum material, Market Securities will repackage, copy, and quote the most creative and original aspects of those publications in its own format and will then distribute this repackaged information to its clients. In so doing, Market Securities does not undertake any creative or journalistic efforts of its own to transform Plaintiff's work into something new or different from Capitol Forum's original report. Nor does it add any of its own analysis or contribute any meaningful reporting to Plaintiff's work. Market Securities simply extracts the key information from Plaintiff's reports and repackages that work in a shorter form for a quicker read. The purpose of the Capitol Forum analyses, and the Market Securities' reports are precisely the same: to inform their readers of Capitol Forum's copyrighted and proprietary reporting. This conduct constitutes a direct infringement of Plaintiff's exclusive right under the Copyright Act to reproduce, use, and control its copyrighted works.

24. A comparison of the Capitol Forum publications and the Market Securities publications demonstrate the substantial similarity between the protectable material in the Plaintiff's work and the infringing nature of the Defendant's work. It further demonstrates that the Defendant's publications add little, if any, original information or analysis to Capitol Forum's protectable work. The Capitol Forum publications are attached as Exhibit A. The Market Securities publications are attached as Exhibit B.

25. On October 18, 2021, Capitol Forum released a publication regarding the Qualcomm/Veoneer/Arriver acquisition, beginning with an analysis of whether certain foreign regulatory agencies might "have some latitude" in asserting jurisdiction over the deal. According to Capitol Forum: "the European Commission (EC), national European

authorities, and China's State Administration for Market Regulation (SAMR) do have some latitude to assert jurisdiction over the first or second steps of the transaction."

26. Shortly after the Capitol Forum analysis was released, Market Securities issued an excerpt of the Capitol Forum article, specifically noting that the foreign agencies had such "latitude" in asserting their jurisdiction: "Cap Forum has posted a 9-page article commenting EC, EU-member state regulatory bodies, SAMR and HSR, EC, EU-member states and SAMR might have some latitude to assert jurisdiction over the first or second step of the merger per some lawyers."

27. The October 18th Market Securities publication then proceeded to excerpt and repeat each of the principal analytical factors relating to the potential transaction as addressed in the Capitol Forum article, and in the same order as discussed in the Capitol Forum article. Set forth below are the quotations from the Capitol Forum publication (in bold), followed by the quotations from the Market Securities publication (in italics) regarding these other deal factors:

A. "Vertical" Issues

**Capitol Forum: "The deal to combine Qualcomm's automotive system on a chip (SoC) platform with Veoneer's Arriver software stack would cement an existing vertical relationship**."

*Market Securities: "The merger between QCOM and Arriver touches on verticals."*

B. "Perceived Independence" of SSW Partners

**Capitol Forum: "Whether global antitrust agencies will seek to assert jurisdiction over the first-step deal, and review it as effectively a Qualcomm acquisition of Veoneer—or at least an acquisition of Arriver—will depend in large part on SSW Partners' perceived independence from Qualcomm."**

*Market Securities: "SSW Partners perceived independence from QCOM would drive some regulators to assert jurisdiction or not."*

C. Extent of Relationship with SSW Partners

**Capitol Forum:** "The firm's partners filed incorporation paperwork in Delaware in October 2020, and began talking to potential investors late last year."

*Market Securities: "SSW was formed in October 2020 and began talking to investors for fund raising late last year."*

D. Qualcomm Responsible for SSW Partners' "Obligations"

**Capitol Forum: "If SSW Partners fails to do so, Qualcomm must satisfy those obligations, including by 'making any necessary payments in satisfaction of the required merger payments…and delivering the merger consideration…on behalf of SSW,' the agreement says."**

*Market Securities: "QCOM is on the hook if SSW fails certain obligations to the merger, a backstop, which could make two firms possibly viewed as linked."*

E. "Backstop Arrangement Typical" [**Verbatim Quote**]

**Capitol Forum: "To be sure, the parties could describe that backstop arrangement as typical of a public company deal without financing contingencies to close."**

*Market Securities: "To be sure, the parties could describe that backstop arrangement as typical of a public company deal without financing contingencies to close."*

F. Regulators May Consider a "Two-Step Transaction"

**Capitol Forum: "In one reading, the two-step transaction could be considered a 'warehousing' arrangement described in paragraph 35 of the notice, where an interim buyer acquires the target's shares 'on behalf' of and is 'directly linked' to the ultimate acquirer, which in turn 'often bears the major part of the economic risks,' on the deal. If that's the case, the first-step merger can't close until the commission approves the second step."**

*Market Securities: "EC might consider the two-step transaction as a warehousing arrangement that only allows the first step to close with the 2nd step approved if they see two as one-related party."*

G. Filing in Germany Possible

**Capitol Forum: "EC questions aside, the first-step transaction—as well as the second-step transfer of Arriver—could also trigger national filings, most notably in Germany."**

*Market Securities: "A filing to Germany is a possibility given Arriver's deal valuation"*

H. CMA May Play a Role

9

**Capitol Forum:** "But because SSW Partners has no share of supply of any market, even the CMA's highly flexible jurisdictional test could probably capture only the deal's second step, provided the CMA doesn't view SSW as acting on Qualcomm's behalf."

*Market Securities: "CMA also can possibly step in if SWW is viewed acting on QCOM's behalf."*

I. SAMR Reviews "Driven by Industrial Policy"

**Capitol Forum: "SAMR reviews are often driven by industrial policy, rather than traditional antitrust considerations."**

*Market Securities: "SAMR, often driven by industrial policy, may have some flexibility to review deals that are not meeting the reporting threshold."*

J. Potential "Lockout" Could Raise Vertical Integration Issues

**Capitol Forum: "But that integration could also leave the combined firm's rivals, or even downstream OEMs, increasingly locked out of Qualcomm's SoC platform or Arriver software stack."**

*Market Securities: "While Arriver and QCOM had prior collaborations, HSR can raise some vertical issues under Khan due to the possibility of Arriver rivals being locked out by QCOM."*

K. Parties May Argue Pro-Competitive Aspects

**Capitol Forum: "the companies may pitch the deal as increasing competition by creating a new, stronger—and crucially, more open—rival to Intel."**

*Market Securities: "But parties can also argue it strengthens competition in Advanced driver-assistance systems given other dominant players like Intel/Mobileye."*

28. On October 25, 2021, Capitol Forum released a publication reporting that the staff of the Federal Trade Commission was examining a potential "labor monopsony" issue in Camden, Arkansas, entitled "*FTC Staff Examines Possible Labor Monopsony Issue in Small Arkansas City.*" Market Securities immediately received a copy of this article, and within hours advised its clients that "CapForum is out commenting on FTC staff examining a possible labor monopsony issue in Camden Arkansas." The Market Securities

publication then proceeded to excerpt and repeat each of the principal analytical factors relating to the potential transaction as addressed in the Capitol Forum article, and in the same order as discussed in the Capitol Forum article.

29. The October 25 Capitol Forum article reported that: (1) "the FTC staff is poring over employment data supplied by a third party to determine whether the merger would lessen competition to hire those workers in the Camden area;" (2) that in the past 40 days the staff has deposed Lockheed and Aerojet executives; and (3) that the FTC Bureau of Economics has requested industry data. Market Securities then repeated this material virtually word for word: "FTC staff is poring over employment data by a third party to determine if the merger would lessen competition for workers… In the past 40 days staff attorneys have deposed AJRN and LMT execs and FTC economists continue to request data from industry players." Capitol Forum also reported that it had been informed that the Department of Defense has provided an "all important recommendation on the deal," which was again copied almost verbatim by Market Securities: "The D of D has given the FTC's leadership its all important recommendation on the deal."

30. The Market Securities article (in italics) then proceeded to excerpt and repeat each of the principal analytical factors relating to the potential transaction that were discussed in the Capitol Forum article (in bold), including the following:

A. Labor Monopsony Issues: "A Top Enforcement Priority"

**Capitol Forum: The FTC's "theory of anticompetitive harm—labor monopsony—has in recent years emerged as a growing bipartisan concern that Chair Lina Khan has targeted as a top enforcement priority."**

*Market Securities: "Labor monopsony has in recent years emerged as a growing bipartisan concern that Lina Khan has targeted as a top enforcement priority."*

B.   Department of Defense Influence "Isn't Assured"

**Capitol Forum: "That DOD will be as influential this time isn't assured."**

*Market Securities: "However, that the DOD will be as influential this time isn't assured."*

C.   Monopsony Cases "Rarely Brought"

**Capitol Forum: "The U.S. agencies have only rarely brought merger cases based on labor monopsony concerns. But the Lockheed/Aerojet merger presents the FTC with a prime opportunity to delve into the issue. Lockheed and Aerojet each employ 1,000 people in the Camden region, many of whom are managers, engineers and technicians."**

*Market Securities: "The US regulators have only rarely brought merger cases based on labor monopsony concerns, but this AJRN/LMT can be a prime opportunity to delve into the issue as each company employees about 1000 highly skilled people in Camden.*

D.   Camden Monopsony Case: Not "Clear Cut"

**Capitol Forum: "Not clear cut. The monopsony case in Camden, though, isn't clear cut. For some workers, employment options do exist with other defense contractors: General Dynamics Ordnance and Tactical Systems, ordnance provider Armtec Defense Technologies and Lockheed rival Raytheon have operations in the region, although they employ far fewer people than the merging parties."**

*Market Securities: "However, the monopsony case is not clear cut. Other employment options do exist with other defense contractors such as GD, Armtec, and RTX.*

E.   Labor Demand "Outstrips the Supply"

**Capitol Forum: "Defense contractors' demand for workers outstrips the supply in Camden, which could also counteract any post-merger Lockheed ability to reduce salaries and benefits."**

*Market Securities: "Defense contractors's demand for workers outstrips the supply in Camden, which can counteract LMT's ability to reduce salaries."*

F.   Local Communities Do Not Foresee Adverse Effects

**Capitol Forum: "Camden's business community isn't discussing the merger adversely affecting the labor force's wages and benefits, said James Lee Silliman, the Ouachita Partnership's executive director."**

*Market Securities: "Local communities are also not seeing the merger as an adverse labor event given the two companies producing different products and possible market share gains."*

G. FTC Has Brought Few Monopsony Cases: "FTC's Pursuit Not a Sure Thing"

**Capitol Forum: "Few cases. The FTC's pursuit of a monopsony case against Lockheed/Aerojet is far from a sure thing. Despite the recent public hand wringing by U.S. antitrust enforcers about the harm mergers can inflict on labor markets, they have brought only a few suits in recent years".**

*Market Securities: "The FTC's pursuit of a monopsony case is far from a sure thing given a very small number of actual cases."*

H. Prior Monopsony Divestitures

**Capitol Forum: "In 2018, for example, the FTC demanded that Grifols divest blood plasma collection facilities in three U.S. cities to address antitrust concerns with the Spanish pharmaceutical company's acquisition of Biotest US. Without the divestitures, the agency said, Grifols could reduce fees for plasma donors, who usually didn't travel more than 25 minutes to collection facilities in these cities."**

*Market Securities: "In 2018, the FTC asked Grifols to divest blood plasma facilities in 3 US cities to address its only buyer status."*

**Capitol Forum: "DOJ in 2017 also demanded that Danone divest its Stonyfield Farms business to complete its acquisition of WhiteWave, after concluding that the deal as initially structured would have combined the top two purchasers of raw organic milk in the Northeast, leading to worse contract terms for dairy farmers in the region."**

*Market Securities: "In 2017, the DOJ demanded Danone to divest Stonyfield Farm to acquire WhiteWave as the merger would make Danone the only purchaser of raw milk in the Northeast."*

I. Prior Monopsony Lawsuits: "Rarely Litigated"

**Capitol Forum: "Monopsony cases are very rarely litigated. One exception is DOJ's successful 2016 suit to block Anthem's proposed acquisition of rival health insurer Cigna, where the department not only argued that the merger would harm competition in health insurance markets but also would give the merged company more bargaining leverage over hospitals and doctors in negotiating reimbursements."**

> *Market Securities:* "While monopsony cases are rarely litigated, one exception is DOJ's 2016 suit to block Anthem's merger with Cigna on more bargaining leverage over hospitals and doctors."

31.     Because the Market Securities articles are not available publicly, Capitol Forum is not aware of the number of times that Market Securities has violated its copyright protections. It is aware, however, that such infringement began at least as early as December 2020. The full extent of Market Securities' copyright violations will be determined in discovery.

32.     The conduct of Market Securities is not protected by the "fair use doctrine," which is the defense that infringers routinely assert when they are caught in a willful copyright violation. Over 40 years ago, the United States Court of Appeals for the Second Circuit, in *Wainwright Sec., Inc. v. Wall St. Transcript Corp.,* 558 F.2d 91, 95-96 (2d Cir. 1977), held that even though there can be no copyright in the news itself, such as the actions of a particular corporation, copyright law clearly protects the author's "analysis and interpretation of events," including, *as here,* the manner in which the author "structures his material and marshals facts, his choice of words, and the emphasis he gives to particular developments." The Second Circuit held that the summarization of a copyright holder's financial reports is not protected by the fair use doctrine and constitutes copyright infringement. *Wainright* has been consistently and routinely followed since it was decided in 1977, including by courts in the District of Columbia.

33.     Defendant's infringement of Plaintiff's copyrights is willful. Market Securities knows that its actions constitute copyright infringement and has otherwise acted with reckless disregard of the high probability of infringement. It posts a copyright notice on its own website, and the Capitol Forum publications that it obtains bear a similar copyright notice.

34.     Upon information and belief, Market Securities has profited, and continues to profit, from its infringing publications.

## COUNT I
### (Direct Copyright Infringement)

35. Each of the preceding paragraphs 1 through 34 is hereby incorporated herein by reference.

36. Capitol Forum owns a valid copyright in its proprietary reports, and all of its publications transmitted to its subscribers are protected by the copyright laws.

37. Defendants have infringed Plaintiff's copyright in its proprietary reports by copying and distributing content from the reports to its own clients without Plaintiff's consent or authorization.

38. The copying of Plaintiff's reports is substantial in quantity and quality and reduces the economic value of the reports. Defendant has appropriated the most creative, original and significant portions of the reports and analyses, which represent a substantial investment of time, money and labor.

39. Defendant has continued to infringe Capitol Forum's copyright and has no intention to cease and desist such infringing activities.

40. Defendant's acts of copyright infringement, as alleged above, are causing Capitol Forum irreparable injury and will continue to do so unless restrained and enjoined.

41. Defendant's conduct is in violation of the copyright owner's exclusive rights of reproduction, preparation of derivative works, and distribution under 17 U.S.C. §§ 106(1), (2), and (3).

42. Defendant's copyright violations were willful. It knows it has been committing copyright violations and has otherwise acted with reckless disregard of the high probability of infringement.

43. As a direct and foreseeable consequence of these acts, Plaintiff has been and

continues to be damaged, and Plaintiff is entitled to statutory damages of $150,000 per violation, or actual damages and Defendant's profits, as well as its costs and reasonable attorneys' fees pursuant to 17 U.S.C. §§ 504, 505.

## COUNT II
### (Contributory Copyright Infringement)

44. Each of the preceding paragraphs 1 through 43 is hereby incorporated herein by reference.

45. Capitol Forum owns a valid copyright in its proprietary reports, and all of its publications transmitted to its subscribers are protected by the copyright laws. It is a direct copyright violation for a Capitol Forum subscriber to transmit the Capitol Forum publications to any other party. It is a contributory violation for any person or entity to solicit or induce a direct copyright violation.

46. Defendant, by encouraging, inducing, and causing Capitol Forum subscribers to provide such reports or the contents of those reports to it, has engaged in the contributory infringement of a copyrighted work. Defendant has materially contributed to the direct copyright infringement of third parties and Defendant had actual or constructive knowledge of the infringement by one or more third party recipients of Plaintiff's copyrighted reports.

47. Upon information and belief, Defendant has continued to infringe Capitol Forum's copyright by encouraging, inducing, and causing Capitol Forum subscribers to send it the copyrighted reports and has no intention to cease and desist such infringing activities.

48. The contributory copyright violations committed by Defendant were and continue to be willful. Defendant's acts of copyright infringement, as alleged above, are causing Capitol Forum irreparable injury and will continue to do so unless restrained and enjoined.

49. As a direct and foreseeable consequence of these acts, Plaintiff has been and continues to be damaged, and plaintiff is entitled to statutory damages of $150,000 per violation, or actual damages and Defendant's profits, as well as its costs and reasonable attorneys' fees pursuant to 17 U.S.C. §§ 504, 505.

## COUNT III
### (Misappropriation of Proprietary Information)

50. Each of the preceding paragraphs 1 through 49 is hereby incorporated herein by reference.

51. Through substantial efforts and at a significant cost to Capitol Forum, Capitol Forum gathers, analyzes and reports breaking news to its subscribers in a timely fashion through its reports.

52. The newsworthy information that Capitol Forum gathers, analyzes and reports is valuable to many of its customers in large part because of its time-sensitive nature.

53. Defendant's practice of copying and distributing the content of Capitol Forum's reports constitutes actionable misappropriation because:

(i) Capitol Forum prepares the analysis contained in their reports at considerable cost and expense;

(ii) the value of the analysis is highly time-sensitive;

(iii) Defendant's use of the analysis constitutes free riding on Capitol Forum's efforts to prepare it;

(iv) Defendant's use of the analysis is in direct competition with the analysis offered by Capitol Forum to the extent that they both disseminate information to investors for making investment decisions; and

(v) the ability of other parties to free ride on Capitol Forum's efforts will substantially threaten Capitol Forum's incentive to continue to invest in its investigative reporting at the same level.

54. Defendant's conduct has damaged Capitol Forum while unjustly enriching itself and will continue to do so unless enjoined.

55. Defendant's actions were undertaken in bad faith, maliciously, willfully, wantonly, and in disregard of Capitol Forum's rights.

56. As a consequence of Defendant's misappropriation of hot news, Capitol Forum is entitled to injunctive relief and compensatory and punitive damages, in an amount to be determined at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays as follows:

1. That the Court issue a declaration: (1) that Defendant has engaged in direct copyright infringement; (2) that Defendant has engaged in contributory copyright infringement; and (3) that the Defendant has misappropriated Capitol Forum's proprietary information;

2. That the Court issue a declaration that Defendant's acts and conduct set forth in the above prayer were willful;

3. That the Court issue an injunction, pursuant to 17 U.S.C. § 502 and the equity jurisdiction of this Court, directing that the Defendant, its agents, employees, or representatives, and all persons in privity therewith, are prohibited and permanently restrained from using the Capitol Forum's proprietary reports and from publishing, selling, marketing, or otherwise distributing

any copies of any material which has been derived in any manner by violation of Capitol Forum's copyrighted and/or proprietary rights;

4. That the Court award Capitol Forum compensatory damages, restitution and disgorgement, and punitive damages, as well as statutory damages for Defendant's copyright infringement and contributory copyright infringement in the amount of one hundred and fifty thousand dollars ($150,000) for each act of infringement pursuant to 17 U.S.C. § 504;

5. That the Court require Defendant to pay Capitol Forum the costs of this action, pursuant to 17 U.S.C. § 505, including reasonable attorneys' fees; and

6. That the Court award such other and further relief as this Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

DATED: May 13, 2022                    Respectfully submitted,

                                       WILLIAMS LOPATTO, PLLC

                                       _____
                                       JOHN B. WILLIAMS (D.C. Bar No. 257667)
                                       1629 K Street, N.W., Suite 300
                                       Washington, DC 20006
                                       Tel: (202) 277-8435
                                       jbwilliams@williamslopatto.com

                                       *Counsel for Plaintiff*