THE CAPITOL FORUM

Vol. 9 No. 359     October 18, 2021

# Qualcomm/SSW Partners/Veoneer: Jurisdictional, Substantive Questions Loom Over Autonomous Driving Tech Proposal

A $4.5 billion bid from Qualcomm (QCOM) and investment firm SSW Partners to acquire Swedish auto tech company Veoneer (VNE) raises a host of jurisdictional and substantive issues that together create timing and outcome questions around the deal, industry sources said.

SSW Partners through the October 4 agreement will acquire Veoneer, and shortly thereafter divest the company's Arriver software unit to Qualcomm. The investment firm will then seek a buyer for Veoneer's active safety and restraint control automotive components segments, which are the company's sole revenue-generating businesses.

One reading of the deal's novel structure is that it's geared toward preventing Qualcomm from acquiring legacy auto components businesses it has no interest in owning. But there's another explanation—it's a strategy to avoid the global merger notifications that would be required if Qualcomm were to acquire Veoneer outright. That would be a boon to Qualcomm, which has faced monopolization charges in most major jurisdictions, and has an otherwise checkered reputation amongst global competition agencies.

Nonetheless, the merging parties see the first-step SSW Partners acquisition of Veoneer as requiring only U.S. antitrust and certain European foreign direct investment clearances, sources said. And Qualcomm's follow-on acquisition of Arriver is also well-positioned to avoid non-U.S. competition filings, as the software unit doesn't generate any revenue, the sources said.

Nonetheless, the European Commission (EC), national European authorities, and China's State Administration for Market Regulation (SAMR) do have some latitude to assert jurisdiction over the first or second steps of the transaction, lawyers told *The Capitol Forum*. And if SAMR, in particular, moves to do so, it could lead to a lengthy, geopolitically tinged review of a deal that would see a U.S. firm acquiring non-U.S. technology that could ultimately play a meaningful role in the future of autonomous driving.

Chinese industrial policy questions aside, the deal to combine Qualcomm's automotive system on a chip (SoC) platform with Veoneer's Arriver software stack would cement an existing vertical relationship, and in turn raise innovation and foreclosure questions. And because both the first and second-step transactions require HSR notifications, those questions could face close scrutiny at the FTC, where Chair Lina Khan has implemented an aggressive approach to merger review characterized by renewed interest in non-horizontal theories of harm in dynamic markets.

© 2021 The Capitol Forum. Direct or indirect reproduction or distribution of this article without prior written permission from The Capitol Forum is a violation of Federal Copyright Law.

Perhaps speaking to some uncertainty around the deal's path, Qualcomm said in the press release announcing the transaction that it expects to close the deal only sometime in 2022.

Nonetheless, the deal partners are targeting a close to the first-step transaction as soon as the merger agreement's inside date—April 4, 2022—sources said. The agreement's outside date, however, can be extended up to 12 additional months, to April 4, 2023.

**Deal structure.** Qualcomm inked its deal for Veoneer after winning a bidding war with Canadian auto parts supplier Magna (MGA), which agreed on July 22 to purchase the Swedish company for $31.25 per share in cash. Qualcomm on August 5 submitted its own $37 per share offer, and Veoneer accepted that proposal on October 4.

The lead-up to the deal could provide some insight into its structure.

Qualcomm CEO Cristiano Amon said in an August 5 letter detailing his proposal to acquire 100% of Veoneer's outstanding shares that the offer didn't raise "material regulatory clearance concerns." But during the diligence period, Amon said, Qualcomm would "work with Veoneer and its advisors to explore ways to minimize the timetable associated with regulatory filings and to limit the number of [required] worldwide filings."

An outright Qualcomm acquisition of Veoneer would have triggered a bevy of global merger control notifications—the companies in 2020 generated $23.5 billion and $1.37 billion in revenue, respectively, and both have significant sales in Europe, China, and the Americas.

But enlisting SSW Partners changed the equation—the investment firm generates no revenues, meaning that its acquisition of Veoneer shouldn't trigger EC and SAMR notification obligations. Not only that, but because Arriver itself generates no revenue, the investment firm's subsequent sale of the business to Qualcomm could also avoid filing requirements in those jurisdictions.

Whether the deal structure is driven primarily by a desire to minimize required merger notifications—or instead that's merely its effect—the strategy could help Qualcomm duck competition reviews from European and Chinese competition agencies at which its track record is far from sterling.

The EC, for its part, fined Qualcomm $1.13 billion in 2018 for abusing its smartphone chip dominance, and $272 million in 2019 for predatory pricing. Chinese authorities in 2015 fined the company $975 million over its patent licensing practices, and in 2018 declined to approve its proposed $44 billion acquisition of Dutch chipmaker NXP (NXPI). And the FTC in 2017 sued Qualcomm for allegedly monopolizing mobile phone semiconductor markets.

© 2021 The Capitol Forum. Direct or indirect reproduction or distribution of this article without prior written permission from The Capitol Forum is a violation of Federal Copyright Law.

Against that backdrop, any acquisition the company proposes would be expected to attract extremely close scrutiny from global competition agencies, lawyers said. The deal's structure, however, could—at least in theory—help Qualcomm avoid those reviews.

**SSW Partners.** Whether global antitrust agencies will seek to assert jurisdiction over the first-step deal, and review it as effectively a Qualcomm acquisition of Veoneer—or at least an acquisition of Arriver—will depend in large part on SSW Partners' perceived independence from Qualcomm.

The investment firm, based in New York City, is headed by three principals: Eric Schwartz, who also leads private family investment firm 76 West Holdings, Joshua Steiner, the chairman of Castleton Commodities, and Antonio Weiss, who previously served as Lazard's global head of investment banking. Weiss was also a counselor at the Treasury Department during the Obama administration—a role he took after Senator Elizabeth Warren (D-MA) opposed his nomination to be the department's third-ranking official.

The firm's website lists just one entry under its "news" section—the Qualcomm press release announcing the Veoneer deal. And the partnership's limited track record, and the fact that Qualcomm brought the firm into the transaction after it telegraphed its intent to limit its merger filing obligations, raises the prospect that global agencies could view SSW Partners as effectively acting as Qualcomm's agent.

But the story isn't quite that straightforward. Importantly, although the Veoneer deal is the investment firm's first, it wasn't created solely for purposes of the transaction—the firm's partners filed incorporation paperwork in Delaware in October 2020, and began talking to potential investors late last year, sources said.

And while its ramp-up has been gradual, the partnership has been exploring potential investments since the start of the year, the sources said. Perhaps most importantly, the firm has independent sources of financing for the Veoneer transaction, and its capital for the purchase isn't tied to Qualcomm, the sources said.

Nonetheless, there are some clear links between the two firms—perhaps most notably Qualcomm's commitment, per the October 4 merger agreement, to take all actions necessary to cause SSW Partners to perform its obligations under the contract. If SSW Partners fails to do so, Qualcomm must satisfy those obligations, including by "making any necessary payments in satisfaction of the required merger payments…and delivering the merger consideration…on behalf of SSW," the agreement says.

*© 2021 The Capitol Forum. Direct or indirect reproduction or distribution of this article without prior written permission from The Capitol Forum is a violation of Federal Copyright Law.*

To be sure, the parties could describe that backstop arrangement as typical of a public company deal without financing contingencies to close. Nonetheless, Qualcomm's guarantee of SSW Partners' obligations could paint the firms as linked—a fact that may in turn raise questions at the FTC, EC, and SAMR as to whether the first-step deal is, in effect, a Qualcomm acquisition of Veoneer—or at least of Arriver.

**EC, national questions.** Of those three jurisdictions, the EC, through its Consolidated Jurisdictional Notice, has by far the most transparent guidance on evaluating the question.

In one reading, the two-step transaction could be considered a "warehousing" arrangement described in paragraph 35 of the notice, where an interim buyer acquires the target's shares "on behalf" of and is "directly linked" to the ultimate acquirer, which in turn "often bears the major part of the economic risks," on the deal.

If that's the case, the first-step merger can't close until the commission approves the second step. That scenario would apply here if the first-step transaction were viewed either as a Qualcomm purchase of Veoneer or if SSW's involvement in the onward sale of Arriver to Qualcomm is viewed as a warehousing arrangement.

That said, SSW Partners is meaningfully more independent of Qualcomm than is typical of the warehousing arrangements that have drawn past EC pushback, for example, Canon's (CAJ) 2016 purchase of Toshiba Medical Systems.

On that front, the merging parties could present their deal as consistent with paragraphs 30 to 32 of the notice, which considers the first step of a two-step transaction non-notifiable—meaning it can close even if the second step is notifiable—provided the subsequent sale is "agreed between the different purchasers in a legally binding way," and there's no uncertainty about the second-step division of assets occurring "within a short time period."

EC questions aside, the first-step transaction—as well as the second-step transfer of Arriver—could also trigger national filings, most notably in Germany, where a deal is notifiable provided it's valued at more than 400 million euros, the involved parties' aggregate turnover exceeds 500 million euros, at least one firm has German revenue over 50 million euros, and the target is "significantly active" in Germany.

Veoneer doesn't break out its German revenues, but in 2020 generated $559 million in European sales. Given Germany's strength in auto markets, that points toward significant Veoneer revenue in the country. The company also employs 466 associates across four German engineering sites.

4

*© 2021 The Capitol Forum. Direct or indirect reproduction or distribution of this article without prior written permission from The Capitol Forum is a violation of Federal Copyright Law.*

And Germany's FCO could have a real substantive interest in the deal, as domestic OEMs like Volkswagen and Daimler have significant stakes in the ultimate transition to autonomous driving.

Then there's the UK CMA, which has been ambitious in asserting jurisdiction over deals using its notoriously flexible share of supply test, and has otherwise established itself as one of the world's most aggressive antitrust enforcers. But because SSW Partners has no share of supply of any market, even the CMA's highly flexible jurisdictional test could probably capture only the deal's second step, provided the CMA doesn't view SSW as acting on Qualcomm's behalf.

In any event, the CMA can't, post-Brexit, refer the deal up to the European Commission for review under Article 22. But—where the EC can't establish original jurisdiction—Germany should be able to, bringing into play a possible review transfer to Brussels.

Not only that, but due to a recent guidance change the bloc's member states—even if they lack jurisdiction—can ask the commission to investigate deals that don't meet their notification thresholds but threaten to "significantly affect competition." That means that competition authorities in member states like Italy and France, which represent domestic auto OEMs and are clearly open to using that procedure, could seek to refer either step of the transaction upwards.

Those referrals don't happen in a vacuum: if the EC is interested in a deal, it can lobby national agencies to do so. That's what led to France's Article 22 referral of Illumina's $8.1 billion acquisition of Grail earlier this year. And here, the two-step transaction could pique the EC's interest, given not only Qualcomm's track record, but also the commission's ongoing review of Arm's proposed acquisition by Nvidia (NVDA), a key Qualcomm rival in the automotive SoC market.

**SAMR flexibility.** Although avoiding EC jurisdiction would be a win for the merger partners, the more pressing threat is probably SAMR, given Qualcomm's history in China, not to mention the agency's typically lengthy and geopolitically tinged reviews of U.S. outbound investments.

SAMR reviews are often driven by industrial policy, rather than traditional antitrust considerations. And recent U.S. sanctions preventing Chinese companies from buying vital American-made tech components have led to even greater SAMR scrutiny of deals that could extend U.S. leadership in dynamic markets or thwart China's efforts to evade U.S. export controls.

Those concerns are especially pronounced where U.S. firms like San Diego-based Qualcomm—or for that matter, New York City-based SSW Partners—acquire non-U.S. tech firms like Stockholm-based Veoneer, or when deals implicate a key arena of U.S.-China competition like autonomous driving.

5

© 2021 The Capitol Forum. Direct or indirect reproduction or distribution of this article without prior written permission from The Capitol Forum is a violation of Federal Copyright Law.

SAMR had already commenced its review of Magna's bid for Veoneer, and on September 27 [publicized](#) the filing under its simplified review process. That deal seemingly qualified for simplified review because the companies had only a small horizontal overlap in the global advanced driver-assistance systems (ADAS) sensor market, the authority said.

That means the agency is well aware of the recently announced Qualcomm transaction. But because neither SSW Partners nor Arriver generate revenue in China, neither the first nor the second step of the new deal is obviously notifiable.

SAMR also typically follows—although not necessarily to the letter—European tests for merger reportability. And if the EC doesn't view either step of the deal as reportable, SAMR may gain comfort that they're similarly non-notifiable in China.

That said, SAMR does have some flexibility to review deals that don't meet its reporting thresholds: Article 6 of its Merger Review Interim Provisions provide that the agency can review those mergers "if the facts and evidence…show that the concentration…may have the effect of excluding or restricting competition."

To be sure, SAMR has always been cautious in asserting jurisdiction over transactions falling below its formal thresholds, Beijing-based antitrust lawyers said. But this situation—especially in light of questions around whether the companies structured their deal at least in part to avoid Chinese notification obligations—does create at least some uncertainty, they said.

"Given Qualcomm's antitrust history with Chinese regulators, it will be difficult for them to skip SAMR's eyes," one of the attorneys said.

**HSR uncertainty.** Although it's not clear whether the first or second step deals will draw European or Chinese reviews, the merger agreement explicitly identifies HSR clearance as a condition to the first-step transaction's close.

That should send the deal to the FTC, which will in turn face a threshold question: whether to review the first step as a functional equivalent of Qualcomm acquiring Arriver—or Veoneer outright—or instead simply as SSW Partners acquiring Veoneer.

The latter deal, of course, raises no antitrust issues, as SSW Partners is a financial buyer with no current investments. But when confronted with a two-step transaction in which the second step raises competition questions, the agency often reviews the two steps in tandem, and won't clear the first transaction until it's comfortable with the second, lawyers said. The commission could be even

6

*© 2021 The Capitol Forum. Direct or indirect reproduction or distribution of this article without prior written permission from The Capitol Forum is a violation of Federal Copyright Law.*

more likely to take that position here, in an environment where Chair Khan has increasingly pulled out various stops to make dealmaking more difficult.

In that same respect, unlike the typical intertwined transaction, the first step transaction here isn't contingent on the second receiving HSR clearance. And unless the FTC views SSW Partners as effectively acting as Qualcomm's agent, there's little obvious harm that comes from the investment firm acquiring Veoneer. Not only that, but allowing the first step of the deal to close won't preclude the FTC from conducting a substantive investigation into the follow-on Qualcomm/Arriver transaction, which requires its own separate HSR filing.

One other factor: Qualcomm needn't wait until the SSW Partners/Veoneer tie-up closes before notifying the Arriver transaction to the FTC. In fact, the company almost certainly won't do so.

To be sure, there's limited incentive to file it in the very near term, given the April 4 inside date for the first step deal's close. But Qualcomm could file its notification either simultaneously with or at some point after SSW Partners files HSR for Veoneer—but well before that first-step deal could close—which could in turn allow the FTC to investigate the second step while allowing the HSR waiting period to expire on the first.

**Substantive questions.** The FTC's approach to that question will rest in part on whether it views the Qualcomm/Arriver transaction as raising meaningful antitrust questions. The deal is vertical in nature, and would combine Snapdragon Ride, Qualcomm's autonomous driving system on a chip (SoC) platform, with the Arriver software stack, which includes perception and drive policy software.

Qualcomm and Veoneer have an existing relationship on that front, after in August 2020 announcing an autonomous driving collaboration powered by Veoneer's software stack and Qualcomm's SoC platform that's targeting customer production launches by 2024. The companies memorialized their agreement in January 2021, which formally established Veoneer's Arriver software brand.

That existing collaboration means that the deal wouldn't radically alter the pre-merger status quo, or the vertically linked products' development paths. Nonetheless, the merger would cement the partnership, and allow Qualcomm to more tightly and durably integrate Arriver into its Snapdragon Ride platform.

That could lead to a host of benefits, by incentivizing investment and creating a stronger, more efficient platform. But that integration could also leave the combined firm's rivals, or even downstream OEMs, increasingly locked out of Qualcomm's SoC platform or Arriver software

© 2021 The Capitol Forum. Direct or indirect reproduction or distribution of this article without prior written permission from The Capitol Forum is a violation of Federal Copyright Law.

stack. Those potential concerns could draw extra scrutiny in the FTC review, given Qualcomm's alleged history of using its market power to exclude smartphone chip rivals.

**Competitive landscape.** Qualcomm's ability and incentive to meaningfully foreclose competitors and harm competition rests largely on whether it has—or in the future is likely to have through the merger or otherwise—market power at either level of the SoC/software stack.

That certainly seems the goal: the companies said in a joint August 2020 investor presentation that their collaboration "establishes a main challenger for the next generation automobiles, *aiming for long-term market leadership*" [emphasis added].

At the moment, however, the companies' integrated solution is years away from actually entering the market. And in the interim, both firms face significant competition.

In perception and drive policy software, Arriver competes with Continental (CON: ETR), as well as suppliers with existing chip expertise like Bosch and Intel (INTC), which in 2017 acquired autonomous driving leader Mobileye. Nvidia is also set to introduce its own software, and in-house OEM development is another potential competitive constraint, Veoneer said in its most recent annual report.

For its part, Qualcomm's Snapdragon Ride competes with SoC platforms from Nvidia and Intel, as well as other automotive chipmakers like Xilinx (XLNX), NXP, and Renesas (6723:TYO).

Nonetheless, when it comes to the existing vision-based ADAS market, the combined Intel/Mobileye is dominant, and has been "criticized as a closed platform where its clients are supposed to take Mobileye's full suite of software without having an opportunity to write their own," said Danny Kim, a director and senior advisor at VSI Labs, an autonomous driving consultancy.

Against that backdrop, the companies may pitch the deal as increasing competition by creating a new, stronger—and crucially, more ope—rival to Intel. That could lead to some customer support for the deal, said Kim.

"Almost all OEMs are looking for alternatives to Mobileye to break the monopoly and to be less dependent on a single software-hardware vendor solution," he said.

In that same respect, the FTC under Khan isn't an easy audience for the argument that vertical mergers are necessary to more effectively take on a dominant rival—especially when that rival may be currently using its vertical integration to purchasers' detriment.

*© 2021 The Capitol Forum. Direct or indirect reproduction or distribution of this article without prior written permission from The Capitol Forum is a violation of Federal Copyright Law.*

And even if the merger does create a stronger competitor to Intel/Mobileye, it could in the worst-case lead to an entrenched duopoly in which the two vertically-integrated ecosystems leave competitors—or OEMs—increasingly locked out. That's a potentially unappetizing prospect for automakers who are more and more seeking to mix and match hardware and software providers, Kim said—a preference he described as the "aftermath of the dominant black box-solution provider Mobileye."

To be sure, that anticompetitive narrative isn't a slam dunk, especially because Arriver is already closely linked with Qualcomm through an existing collaboration agreement. From a market structure perspective, the companies' respective shares are also small enough that the foreclosure story is far from straightforward.

Nonetheless, Arriver could, but for the merger, evolve in a more open direction, and be more likely to partner with non-Qualcomm chipmakers. And acquiring ownership of the software stack may give Qualcomm an incentive and ability to close it off into its own vertically integrated offering, heightening rivals' barriers to entry, and otherwise creating a significant competitive moat.

Given the FTC's current approach to nascent tech questions, those potential concerns about the acquisition by Qualcomm—a firm the FTC in 2017 alleged had used exclusivity agreements to harm competitors and competition—could in turn lead to a close commission look at the deal.

*© 2021 The Capitol Forum. Direct or indirect reproduction or distribution of this article without prior written permission from The Capitol Forum is a violation of Federal Copyright Law.*