**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| DBW PARTNERS LLC : | |
| d/b/a THE CAPITOL FORUM, : | |
| : | Civil Action No. 22-1333 (BAH) |
| Plaintiff, : | |
| : | |
| v. : | |
| : | |
| : | JURY TRIAL DEMANDED |
| MARKET SECURITIES, LLC. : | |
| : | |
| And : | |
| : | |
| : | |
| BTG PACTUAL ASSET : | |
| MANAGEMENT US L.L.C. : | |
| : | |
| : | |
| : | |
| Defendants. : | |

---

**CAPITOL FORUM'S OPPOSITION TO BTG PACTUAL'S**
**MOTION TO DISMISS OR TO TRANSFER TO NEW YORK**

Plaintiff DBW Partners, LLC, doing business as The Capitol Forum, files this opposition to the motion of defendant BTG Pactual Asset Management U.S., LLC to dismiss or in the alternative, to transfer it to New York.

## I.    INTRODUCTION

The motion to dismiss or transfer should be denied.  Personal jurisdiction over BTG Pactual is proper under two separate provisions of the District of Columbia Long Arm statute. D.C. Code Section 423(a)(1) provides that a District of Columbia court may exercise personal

jurisdiction over a person who transacts business in the District of Columbia.  D.C. Code Section 13-423(a)(4) establishes jurisdiction over any person who causes tortious injury in the District of Columbia if he or she engages in any a persistent course of conduct in this jurisdiction.

Regarding the "transacting business" prong, District of Columbia law is clear: a defendant will be subject of personal jurisdiction if it enters a contract that has a "substantial connection" to the District of Columbia.  In this case the subscription agreement between the parties was subject to District of Columbia laws and was to be performed by Capitol Forum in the District of Columbia. The Capitol Forum articles that were infringed by BTG Pactual were created and edited in the District of Columbia.  The agreement also contained a provision which permitted Capitol Forum to electronically monitor BTG Pactual's compliance with the copyright restrictions. Moreover, pursuant to the subscription agreement BTG Pactual was entitled to, and did, participate in seminars held here in the District of Columbia.  BTG Pactual also received invoices from the District of Columbia and remitted payment to Capitol Forum's bank in the District of Columbia.  In sum, the subscription agreement at issue had a very substantial connection with the District of Columbia.

Regarding Section 13-423(a)(4), addressing tortious injury in the jurisdiction, the injury occurred here in the District of Columbia because this is where the copyright holder resides. While the D.C. Circuit has not yet addressed this specific issue, judges on our district court have expressed approval of the decisions of the Second and Ninth Circuits which hold that the situs of a copyright violation is the location of the copyright holder.  In addition, and for the reasons stated above, BTG Pactual has engaged in a persistent course of conduct in this district in connection with the performance of the parties under the subscription agreement.

Finally, because there is personal jurisdiction over BTG Pactual, there also exists proper venue under 28 U.S.C. Section 1400.  And because jurisdiction exists, any transfer of this claim under 28 U.S.C. 1631 would be inappropriate.

## II.   STATEMENT OF FACTS

In 2015, Capitol Forum entered into a subscription agreement with BTG Pactual Asset Management U.S. LLC. ("BTG Pactual").  [BTG Pactual's brief incorrectly states that the 2015 agreement was with BTG Pactual Global Asset Management Ltd (BTG LTD.)] That agreement permitted two individuals from BTG Pactual to obtain access to the Capitol Forum copyrighted articles, Cristina Suarez and Stefano Dardi, both having email address with the url address btgpactual.com.  The rate for the three-month subscription was $18,000.  That subscription was renewed for an additional month after which BTG Pactual decided not to renew.  Declaration of Trevor Baine (Baine Dec. at 2)

After that first agreement elapsed, Capitol Forum contacted Ms. Suarez on various occasions to propose that BTG Pactual enter into a new subscription agreement.  Capitol Forum addressed those messages to the same email address for Ms. Suarez.  At the time, the regular annual subscription rate was $70,000, but Mr. Alba and Ms. Suarez discussed the potential of obtaining a discount below the regular rate.  (Baine Dec. at 3.)  In 2020, Mr. Alba and Ms. Suarez negotiated a renewal of the subscription for a discounted rate of $40,000 per year.  The renewed agreement was sent to Ms. Suarez for signature.  Kory Zverin, controller for BTG Pactual, returned the agreement, designating the same two BTG Pactual portfolio managers, Mr. Dardi and Ms. Suarez, to receive access to the Capitol Forum publications at the same email addresses as before.  (Baine Dec. at 4.)  This 2020 agreement was signed by Kory Zverin of BTG

Pactual, but Mr. Zverin designated the "subscriber organization" as BTG Pactual Global Asset Management Ltd and provided the address of that organization as Conyers Pear and Dillman, a law firm in Bermuda. There is no evidence that Mr. Zverin was or is an employee of BTG Ltd. Mr. Zverin listed himself as the billing contact and provided his BTG Pactual email address. Capitol Forum sent its invoices to Mr. Zverin at BTG Pactual, and these invoices were paid by BTG Pactual.  (Baine Dec. at 6.)  [Defendant's brief erroneously states that the invoices were paid by BTG Ltd.].

The 2020 subscription was renewed three times, Prior to each renewal, there was a negotiation over the renewal rate with Mr. Zverin and/or Ms. Suarez.  Under the agreement, all notices were sent to Capitol Forum in the District of Columbia.  (Baine Dec. at 5.)

Pursuant to the subscription agreement, BTG Pactual received all of Capitol Forum's copyrighted content, 500-600 articles per year.  BTG Pactual was also permitted to download these articles, and during the contract, Ms. Suarez downloaded approximately 245 articles.  All these articles were edited in the District of Columbia and sent to BTG Pactual.  (Baine Dec. at 7.) The agreement also permits Capitol Forum to use electronic delivery software, which forwards technical data and newsletter usage information from any computer that opens the newsletter back to Capitol Forum.  The purpose of this provision is to monitor copyright compliance, and Capitol Forum used this software to monitor Ms. Suarez' activities.  The agreement further states that Capitol Forum was required to keep this monitoring information confidential, which Capitol Forum did.  (Baine Dec. at 8).

The subscription agreement also provides that the subscriber will have access to attendance at Capitol Forum "subscriber only" events.  These events are held in Washington,

4

D.C.  Ms. Suarez took advantage of this and attended (virtually) four of these events.  In addition, Capitol Forum subscribers may personally contact Capitol Forum journalists to discuss the articles they have written.  Ms. Suarez took advantage of this aspect of Capitol Forum's offerings as well, and personally contacted Capitol Forum journalists on at least eight separate occasions.  Ms. Suarez' activities in this regard are set forth in Exhibit E to the Baine Declaration.

In 2023, after Capitol Forum filed suit against BTG Pactual, the subscription agreement was cancelled by Kory Zverin of BTG Pactual.  (Baine Dec. at 10.)  When Mr. Zverin was asked why the subscription was being cancelled, he stated that it was because of the lawsuit, and further stated:  "We cannot continue as amicable subscriber/client relationship given its business practice of **suing its subscriber**."  (Exhibit C to the Baine Dec. page 1.)  Regarding BTG Pactual's assertion in the pending motion that the subscriber in this agreement is BTG Ltd and not BTG Pactual, Mr. Zverin's statement makes clear his understanding that the subscriber was BTG Pactual and not BTG, Ltd.

Prior to the agreement being signed, Capitol Forum had no dealings with BTG Ltd. Since the contract was executed, it has had no dealings with BTG Ltd.  All communications relating to this agreement have been with BTG Pactual.  Baine Dec. at 11

### III.   JURISDICTION LIES UNDER THE "TRANSACTING BUSINESS" PROVISION OF THE LONG ARM STATUTE

BTG Pactual makes two arguments why Section 13-423(a)(1) does not provide for personal jurisdiction, and both are based on a significant misunderstanding of the facts.  BTG

Pactual's principal argument is that the subscription agreement did not have a "substantial connection" to the District of Columbia, but this position overlooks the facts that the contract was negotiated between Capitol Forum and BTG Pactual; that the specific terms of the contract provided for a continuous course of dealing; that the parties engaged in such a continuous course of dealing; and that the agreement provided that District of Columbia law would apply.

BTG Pactual's other argument is that this agreement should not even be considered in this jurisdictional analysis because it was signed by a different BTG Pactual entity—BTG Pactual Global Asset Management, Ltd., a Bermuda company.  This argument is also based on a misunderstanding of the facts.  BTG Pactual is incorrect in asserting that Capitol Forum issued invoices to and received payment from the Bermuda company.  Invoices were issued to, and paid by, the BTG Pactual—the defendant in this case.  BTG Pactual is also incorrect that the initial contract was with the Bermuda company—it was with BTG Pactual.

Further, other the dealings between the parties, set forth above, demonstrates that the subscriber here was BTG Pactual.  Of note: when the agreement was recently cancelled, the reason given by BTG Pactual was that Capitol Forum had filed this lawsuit against "its subscriber."  This is a clear acknowledgement that BTG Pactual considers itself the subscriber under this agreement—and not BTG Ltd.

### A. The Subscription Agreement Has a Substantial Connection to the District of Columbia

As the D.C. Circuit stated in *Helmer v. Doletskaya,* 393 F.3d 201 (D.C. Cir. 2004), "the District of Columbia long-arm statute provides that a District of Columbia court can exercise personal jurisdiction over a defendant if the claim arises from the defendant's "transacting any

business in the District of Columbia."  This provision is "given an expansive interpretation" that

is "coextensive with the due process clause," and jurisdiction will lie if it is determined that the

defendant purposefully established "minimum contacts with [the District of Columbia] such that

the maintenance of the suit does not offend `traditional notions of fair play and substantial

justice,'" citing *Int'l Shoe Co. v. Washington*  326 U.S. 310, 316 (1945)

The *Helmer* court then ruled that a defendant would have the necessary minimum

contacts under the transacting business long arm statute if it entered into a contract that has a

"substantial connection" to the District of Columbia, citing *McGee v. Int'l Life Ins. Co.* 355 U.S.

220, 223 (1957).  However, because a contract is "ordinarily but an intermediate step serving to

tie up prior business negotiations with future consequences which themselves are the real object

of the business transaction," the *Helmer* court noted that a court must evaluate the "prior

negotiations and contemplated future consequences, along with the terms of the contract and the

parties' actual course of dealing" to determine whether the defendant "purposefully established

minimum contacts within the forum," citing *Burger King Corp. v. Rudzewicz,*  471 U.S. 462,

47 (1985)

Here, the prior negotiations between the parties, the "contemplated future consequences,"

the terms of the contract, and the "course of dealing" between the parties demonstrates that BTG

Pactual clearly and purposefully established the necessary minimum contacts with the District of

Columbia, such that it "should reasonably anticipate being haled into court" here in the District

of Columbia.

First, the contract in this case, the subscription agreement, was the result of a negotiation

between the parties, and was customized to reflect the individual employees of BTG Pactual who

would be entitled to obtain the copyrighted material.  Unlike the contract addressed in *National Resident Matching Program v. Elec. Residency LLC*, 720 F. Supp. 2d 92 (D.D.C. 2010), the subscription agreement was not a "contract of adhesion," one that is offered on a "take it or leave it" basis.  BTG Pactual did not "implicitly accept" this agreement simply by registering on a website.  Here the agreement was negotiated to reflect a discounted subscription rate, and further specified the specific individuals who would be permitted to obtain the copyrighted articles. Moreover, each of the three times it was renewed there was a renegotiation over the renewal rate.

Second, unlike the relationship between the parties in the *NRMP* case, where there were no 'future consequences of the contract," here the subscription agreement provided that BTG Pactual would receive all of Capitol Forum's published content, which amounted to approximately 40-50 publications per month.  Those publications were edited in the District of Columbia, and often addressed events occurring in the district.  The agreement contained a provision allowing Capitol Forum to conduct electronic monitoring of BTG Pactual's activity to ensure copyright compliance.  The agreement also provided that the BTG Pactual users would be entitled to attend seminars held in the District of Columbia—and Ms. Suarez took advantage of this contractual provision, attending four such seminars virtually.  Capitol Forum subscribers were further entitled to contact Capitol Forum journalists to obtain additional information regarding the articles that had been posted, which Ms. Suarez did on at least eight occasions. And throughout the term of the agreement, Ms. Suarez downloaded approximately 245 articles from the Capitol Forum servers.  The agreement also provided that the term of the agreement would automatically renew for an additional twelve-month period unless notice of non-renewal was provided.  Here, the contract continued for over three years.

Third, the course of dealing provides further evidence of the continuing connection to the District of Columbia.  Capitol Forum submitted invoices to BTG Pactual from this jurisdiction, and payment was made to Capitol Forum's bank in the District of Columbia.  These contacts "can in no sense be viewed as random, fortuitous, or attenuated." *Burger King Corp. v. Rudzewicz,* 471, U.S. 462, 480 (1985)

Fourth, the terms of the contract provide that District of Columbia law applies.  The Supreme Court also addressed this factor in *Burger King Corp.,* 471, U.S. at 479 (1985).  The Court stated that while a choice of law provision standing alone would be insufficient to confer jurisdiction, combined with the history of the dealings involving the defendant and the forum state, as here, such a provision "reinforces" the defendant's "deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there."  And the Court noted, with approval, the dissenting opinion below that the defendant had "purposefully availed himself of the benefits and protections of Florida's laws" by entering into contracts expressly providing that those laws would govern franchise disputes."

A choice of law provision was also considered in *Jung v. Association of American Medical Colleges,* 300 F. Supp. 2d 119 (D.D.C. 2004), in which this court stated that a provision in the contract that provided that Illinois law would apply "inform[s] the assessment of whether the defendants could have reasonably foreseen being involved in litigation in the District of Columbia, citing *Burger King,* 471 U.S. at 482.  Conversely, a choice of law provision specifying the applicability of D.C. law informs whether BTG Pactual could have "reasonably foreseen being involved in litigation in the District of Columbia."  The answer is yes.

Finally, this litigation results from alleged injuries that arise out of or relate to' BTG Pactual's contacts with the District of Columbia.  While this is not a breach of contract case, the contractual provisions in the subscription agreement specifically address the copyright claim that is the subject of this action.  The agreement states that the Capitol Forum articles are copyrighted and can only be accessed pursuant to the terms of the agreement.  In particular, the articles cannot be forwarded, which is the specific violation alleged in the Second Amended Complaint.

As the District of Columbia Court of Appeals stated in *Shoppers Food Warehouse v. Moreno,* 746 A.2d 320 (D.C. 2000)*,* the cause of action must be "related to," or "substantially connected to," or have a "discernible relationship" to the basis of the jurisdictional assertion. Here, that relationship and connection is self-evident: the copyright claim alleged in the Second Amended Complaint—without question—is related to and substantially connected to the subscription agreement, which provides access to the copyrighted material and prohibits the very conduct that is alleged in that complaint.

A review of the *Helmer* case, as well as the two opinions addressed in BTG Pactual's brief, *NRMP,* and *Aristotle Int'l, Inc. v. Acuant, Inc.*, No. 22-CV-741 (DLF), 2023 WL 1469038 (D.D.C. Feb. 2, 2023), further demonstrates that the exercise of jurisdiction is appropriate in this case.

In *Helmer,* the D.C. Circuit held that the contract had a substantial connection to the District of Columbia because: (1) the contract had been formed in the District of Columbia; (2) the contract involved credit cards issues to the plaintiff, a District of Columbia resident which were to be repaid by the defendant; and (3) the parties contemplated future repeated contacts in the District of Columbia.  All three factors exist in this case: the contract was made here and is

controlled by D.C. law; the contract involves copyrighted material owned by Capitol Forum and licensed to BTG Pactual; and the parties contemplated future and repeated contacts in the district by virtue of Ms. Suarez's ability to access seminars, to contact Capitol Forum journalists, and to download copyrighted materials from servers located in the district, as well as Capitol Forum's right to monitor BTG Pactual's compliance.  In addition, all payments and contractual notices were to be sent to the District of Columbia.

The *NRMP* case that BTG Pactual principally relies upon is inapposite.  In *NRMP,* the defendant had only become a party to the contract because he registered on the plaintiff's website.  There were no negotiation or customization, as here.  More important, as the court stated: (1) "the future consequences of that contract for the District of Columbia were *nonexistent***;**" (2) "NRMP had *no continuing obligations*…that were to be performed in the District of Columbia;" and (3) "the parties had *no "course of dealing*," in-or outside of the District." (Emphases added)

The jurisdictional facts of this case are far more analogous to the recent decision in *Aristotle v. Acuant* case.  In *Aristotle,* the plaintiff, a D.C. corporation, entered a contract whereby the defendant would resell its verification services.  The court found there to be a substantial relationship between the contract and the District of Columbia by virtue of the structured ongoing relationship between the parties, one in which they maintained consistent contact.  This is exactly what occurred here.  Ms. Suarez used the Capitol Forum services on an almost daily basis.  She downloaded the articles frequently.  She contacted the Capitol Forum journalists often, and she attended at Capitol Forum seminars in Washington, D.C.  The *Aristotle* court also commented on the fact that the contract permitted access to confidential information

and contained a corresponding requirement to keep that information confidential.  Similar

provisions are contained in the subscription agreement.  BTG Pactual acknowledged that the

Capitol Forum material was copyrighted and promised not to copy or forward the copyrighted

material.  The parties also acknowledged that Capitol Forum could electrically monitor the

activity of BTG Pactual in viewing and downloading the Capitol Forum material to ensure

copyright compliance and promised that the information gathered from this monitoring activity

would be kept confidential.  As such, Capitol Forum was entitled to, and did, monitor BTG's

compliance with the copyright restrictions of the agreement.

As these cases indicate, the determination as to whether a contract has a "substantial

connection" to the District of Columbia depends in large part on the parties' course of dealing

after the contract was negotiated.  If there was little or no contact once the contract was entered

into, as in the *NRMP* case, jurisdiction will not be found.  On the other hand, if the parties

engaged in a course of continued contact under the terms of the contract, as in the *Helmar* and

*Aristotle* cases, jurisdiction exists.  Here, the parties' activities under the agreement continued

well after the contract was formed, and they were substantial.

**B. The Subscription Agreement Applies in this Jurisdictional Analysis**

BTG Pactual says very little about BTG Ltd, other than to assert *incorrectly* that it has

always been the signatory to the agreements with Capitol Forum and that it was the entity that

paid the invoices.  To the contrary, the agreements were both signed by BTG Pactual and the

invoices were paid by BTG Pactual.  The defendant provides no basis for the Court to dismiss

this action, particularly on the inaccurate record it has brought forward.

BTG Pactual quotes Judge Friedman's comment in *Atlantigas Corp. v. Nisoure, Inc,* 290 F.Supp 2d 34, 48 (D.D.C. 2003) that: "Ordinarily, a defendant corporation's contacts with a forum may not be attributed to affiliated corporations."  But it does not address Judge Friedman's further statement: that there are exceptions to this rule when the party contesting jurisdiction is an alter ego or when there is an agency relationship, citing *El-Fadl v. Central Bank of Jordan* 75 F.3d 668, 676 (D.C. Cir 1996 ("if parent and subsidiary `are not really separate entities,' ... *or one acts as an agent of the other*, ... the local subsidiary's contacts can be imputed to the foreign parent") (emphasis supplied).  Further, under the Long Arm Statute, a court "may exercise personal jurisdiction over a person, who acts *directly or by an agent*… (emphasis added).

There are other exceptions as well, such as when the contract has been assigned, *District of Columbia v. Hamilton Nat. Bank,* 76 A. 2d 60 (D.C. 1950) (recognizing oral implied assignments); *see also Flack v. Laster*, 417 A. 2d 393 (D.C. 1980), or when supposedly responsible company is not the real party in interest.  *Sears Roebuck and Company v. Goudie,* 290 A.2d 826 (D.C. 1972).[1]

The facts presently before the Court demonstrate that BTG Pactual should be considered a party to the 2020 subscription agreement, whether as agent, assignee, or real party in interest. This agreement was signed by the controller of BTG Pactual.  Invoices were sent to the controller and were paid from BTG Pactual's bank account in New York.  BTG Pactual employees were the only individuals who were designated as authorized users under the

---

[1] [1] While these is a provision in the contract prohibiting assignment, anti-assignment clauses can be waived.  *Bewley v. Miller,* 341 A.2d 428(D.C. 1975)

agreement and were the only individuals who received services under the agreement.  The only

connection BTG Ltd has to this agreement is that Mr. Zervin wrote the name "BTG Pactual

Global Asset Management Ltd." in the subscriber organization block.  Moreover, as highlighted

above, in his notice of cancellation, Mr. Zverin stated that it was because Capitol Forum had

sued "its subscriber."  Mr. Zverin clearly understands that the subscriber in this case is BTG

Pactual.

The facts set forth above demonstrate that the relationship between BTG Pactual and

BTG Ltd is clearly sufficient for the Court to conclude there is personal jurisdiction over BTG

Pactual.  Should the Court be concerned that it does not have sufficient facts to reach that

conclusion, Capitol Forum requests that it be entitled to conduct jurisdictional discovery. *See,

eg., GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343 (D.C. Cir. 2000)[2]  Moreover,

were BTG Ltd considered to be the real party in interest, this action still should not be dismissed.

Under Rule 17(a)(3) of the Federal Rules of Civil Procedure, the action cannot be dismissed until

a reasonable time has been allowed for the real party to be substituted into the action.

## IV.  JURISDICTION LIES UNDER THE TORTIOUS INJURY PROVISION OF THE LONG ARM STATUTE

D.C. Code Section 13-423(a)(4) provides that that a District of Columbia court may

exercise personal jurisdiction over a person, who acts directly or by an agent, from the

person's "causing tortious injury in the District of Columbia by an act or omission outside the

---

[2] BTG Ltd makes filings with the U.S. Securities and Exchange Commission using the address of 601 Lexington Avenue, New York, New York, the same address of the BTG US headquarters. The same filings list Sharon Ingram as the compliance officer of BTG Ltd.  Ms. Ingram is also the compliance officer for BTG Pactual. https://www.sec.gov/Archives/edgar/data/1567992/000108514623003245/xslForm13F_X02/primary_doc.xml.  The organizational structure for the parent company, BTG Pactual, S.A., does not even list BTG Ltd. https://ri.btgpactual.com/en/about-the-bank/structure/ These facts would also support any request for jurisdictional discovery.

District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia."  The D.C. Circuit has found that copyright infringement cases sound in tort for purposes of the long-arm statute. See Costello Pub. Co. v. Rotelle, 670 F.2d 1035 (D.C. Cir. 1981) (holding that "it is well established that a suit for [copyright] infringement is analogous to other tort actions).  Here, Section 13-423(a)(4) provides this court with personal jurisdiction over BTG Pactual.  First, it caused tortious injury to Capitol Forum in the District of Columbia because the situs of the injury is the location of the copyright holder, which is the District of Columbia.  Second, as discussed below, Market Securities has engaged in a "persistent course of conduct" in this district.

While the District of Columbia Circuit has not yet ruled on where a tortious injury occurs in a copyright infringement case, judges in this court have recognized that this issue has been addressed elsewhere, both in the Ninth Circuit and in the Second Circuit.  In *Triple Up, Ltd. v. Youku Todou, Inc.,* 235 F.Supp 3d 15 (D.C.C. 2017*)*,  Judge Moss wrote that "the Ninth Circuit has taken the leading role in adapting the effects test to internet copyright infringement actions, holding that "personal jurisdiction can be based upon: (1) intentional actions (2) expressly aimed at the forum state (3) causing harm, the brunt of which is suffered—and which the defendant knows is likely to be suffered—in the forum state,." citing *Panavision Int'l L.P v. Toeppen,* 141 F.3d 1316 (9th Cir. 1998.  He further noted that the Ninth Circuit has held that willful copyright infringement is always "expressly aimed" at "the place where the copyright is held," citing *Washington Shoe Co. v. A-Z Sporting Goods, Inc.* 704 F.3d 668 (9th Cir. 2012*)*

In *Nu Image, Inc v. 1-23,322* 799,F. Supp 2d. 34 (D.D.C. 2011), Judge Wilkins addressed the decision of the Second Circuit in *Penguin Group (USA), Inc. v. Am. Buddha,* 640 F.3d 497, 500.  *American Buddha* construed the New York long arm statute which was "very similar to the District of Columbia long arm statute."  That decision also the situs of the injury in a copyright case is the location of the copyright holder.  Judge Wilkins went on to write that he found "the reasoning in American *Buddha* persuasive, particularly the explanation that "the unique bundle of rights granted to copyright owners" by the Copyright Act and the "overarching right to exclude others from using his property" tips the balance in favor of identifying the situs of the injury as the location of the copyright holder."

The reasoning expressed in *American Buddha* and *Nu Image* was subsequently addressed by Judge Contreas in *Shaheen v. Smith,* 994 F. Supp 2d 77 (D.C.C. 2013).   In *Shaheen,* the plaintiff was an attorney who worked in the District of Columbia but resided in Virginia.  The court did not decide the issue but stated that the *American. Buddha* and *Nu Image* test "would suggest that the tortious injury, then, occurred in Virginia, and not the District because Virginia is where the copyright holder resides."

BTG Pactual does not address the *Triple Up* case, or the *Shaheen* case, or the *Washington Shoe* case.  It does, however, attempt to distinguish the *American Buddha* decision, arguing that it should be limited to situations in which infringement could have occurred anywhere, which necessitated designating the location of the copyright holder as the proper forum.  First, the holding in *American Buddha* was not limited to a situation where the location of the harm is difficult to determine.  Second, the *Washington Shoe* and *Shaheen* cases, like here, involved a situation in which the site of the injury was identifiable.  And third, it would make no sense to

adopt two different jurisdictional rules, one for widespread infringement, and one for localized infringement.

As to the "plus factors," this case involves a situation in which the defendant has engaged in pervasive activity in the District of Columbia in connection with the services it has received under the subscription agreement. Pursuant to the terms of the agreement, Ms. Suarez has obtained over a thousand Capitol Forum articles over the three-year period and has downloaded hundreds of articles.  She attends Capitol Forum seminars held here pursuant to that contract; and regularly contacts Capitol Forum journalists.  In addition, BTG Pactual receives invoices generated in the district and pays these invoices to a District of Columbia bank.

BTG Pactual relies upon this Court's decision in *Burman v. Phoenix Worldwide Indus. Inc.,* 437 F. Supp 142, 153 (D.D.C. 2006), and contrasts the amount of activity that occurred in the District of Columbia in that case with the amount conducted here.  However, as the *Burman* court noted, the activity that took place in the District of Columbia was "completely distinct" from--and had no relationship to-- the cause of action in that case.  Here the situation is entirely different: the activities of Ms. Suarez in the District of Columbia related to the subscription agreement at issue here, as did the cause of action in this case. Indeed, the *Burman* court observed that there was "a notable lack of analogous case authority" on this distinction in the District of Columbia and turned to decisions from the courts of Maryland for guidance.  In so doing, the *Burman* court reviewed cases from the Maryland Court of Appeals, which drew a sharp distinction between the amount of local activity necessary to establish minimum contacts in cases in which that activity related to the cause of action, and the activity which did not relate to the claim: "[w]hen a claim does not arise out of or does not relate to the defendant's contacts

with the forum state, those contacts must be fairly extensive before personal jurisdiction will be imposed." *Poole Kent Co. v. Equilease Assoc,* 523 A.2d 1018, 1024 (Md. Ct. Spec. App. 1987). By the same token, because the claim in this case arises out of the subscription agreement, and the defendant's contacts also arise from that conduct, those contacts need not be as extensive.

## V.  VENUE IS PROPER

As BTG Pactual states, pursuant to 28 U.S.C. Section 1400(a), venue is proper in any district in which there is personal jurisdiction over the defendant.  Because BTG Pactual is subject to personal jurisdiction pursuant to both D.C. Code 423(a)(1) and (4), venue is also proper in this district.

## VI. THE CLAIM AGAINST BTG PACTUAL SHOULD NOT BE TRANSFERRED

BTG Pactual also asserts that if the court chooses not to dismiss this action for lack of jurisdiction, it should be transferred to New York pursuant to 28 U.S.C. Section 1631.  But this provision applies only if the court finds there is a "want of jurisdiction." It does not apply in situations in which personal jurisdiction is proper.

If personal jurisdiction exists, then 28 U.S.C. Section 1404(a) would apply to any transfer request. BTG Pactual has not addressed the factors that should be considered in evaluating these transfer motions, but they include: (1) the plaintiff's choice of forum, (2) the defendant's choice of forum, (3) where the claim arose, (4) the convenience of the parties, (5) the convenience of the witnesses, particularly if important witnesses may actually be unavailable to give live trial testimony in one of the districts, and (6) the ease of access to sources of proof." *Montgomery v. STG Int'l, Inc.,* 532 F.Supp 2d 29, 32-33 (D.C. 2008).

The plaintiff's choice of forum is "a paramount consideration that is entitled to great deference in the transfer inquiry." *FTC v. Cephalon, Inc.,* 551 F.Supp 2d 21, 26 (D.D.C 2008)  That choice is "entitled to deference, unless that forum has no meaningful relationship to the plaintiff[']s claims or to the parties." *United States ex rel. Westrick v. Second Chance Body Armor, Inc.* 771 F.Supp 2d 42, 47 (D.D.C. 2011) In this case, this forum has a significant relationship to Capitol Forum, and to Capitol Forum's claims.  In addition, as Capitol Forum is located here, this district would be more convenient for the parties, the witnesses, and access to proof would be easier.

As for the public interest factors, not only is there a local interest in deciding local controversies at home, but a transfer of the claim against BTG Pactual would be remarkably inefficient.  There are two defendants in this case, and jurisdiction has been properly established over Market Securities.  It would make no sense to try one defendant here, and one in New York.

## VII.  CONCLUSION

The motion to dismiss or transfer should be denied.

Dated:  Washington, D.C.
        October 27, 2023

                              Respectfully submitted,


                          By: */s/ John B. Williams*_____
                              John B. Williams (DC Bar #257667)
                              WILLIAMS LOPATTO PLLC
                              1629 K Street, N.W. Suite 300
                              Washington, D.C.  20006
                              Tel.: (202) 277-8435

jbwilliams@williamslopatto.com


*Counsel for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 27, 2023, a true and correct copy of Plaintiff's Opposition to BTG Pactual's Motion to Dismiss or Transfer to New York was served by electronic mail on Defendants' counsel:

Jason M. Dragnel
Kerry B. Brownlee
60 East 42nd St. Suite 1250
New York, New York 10165
jdrangel@ipcounselors.com
kbrownlee@ipcounselors.com
212-292-5390

AND

John D. Mason
7315 Wisconsin Avenue
Suite 400 West
Bethesda, Maryland 20814
jmason@copyrightcounselors.com
301-760-7032

*Counsel for Market Securities LLC*

Charles S. Baker
JP Morgan Chase Tower
600 Travis, Suite 2800
Houston, Texas 77002
cbaker@lockelord.com
713-226-1200

*Counsel for BTG Pactual Asset Management U.S. LLC*

/s/

_____

John B. Williams