## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DBW PARTNERS, LLC,

        Plaintiff,

        v.

MARKET SECURITIES, LLC, *et al.*.

        Defendants.

Civil Action No. 22-1333

Judge Beryl A. Howell

### <u>MEMORANDUM OPINION</u>

Plaintiff DBW Partners LLC, d/b/a The Capitol Forum, a District of Columbia-based investigative news and analysis company, brings this suit against defendants Market Securities, LLC ("MSL"), and BTG Pactual Asset Management U.S., LLC ("BTG"), (collectively, "defendants"), alleging direct copyright infringement and contributory copyright infringement. Second Am. Compl.  ("SAC") ¶¶ 1–2, 9–11, ECF No. 28; *see* 17 U.S.C. § 101 *et seq.*  In this second round of consideration of a dismissal motion in this case, *see DBW Partners, LLC v. Mkt. Sec., LLC* ("*DBW Partners I*"), Civil Action No. 22-1333 (BAH), 2023 WL 2610498 (D.D.C. Mar. 23, 2023) (granting in part and denying in part MSL's first motion to dismiss), each defendant has filed a separate motion to dismiss on different grounds.  Specifically, MSL moves to dismiss the two counts against it in plaintiff's second amended complaint for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6), *see* MSL Partial Mot. to Dismiss Second Am. Compl. for Failure to State a Claim Upon Which Relief Can Be Granted ("MSL's Mot."), at 1, ECF No. 31, and BTG moves to dismiss the single count against it for lack of personal jurisdiction and improper venue, pursuant to Federal Rule of

1

Civil Procedure 12(b)(2) and 12(b)(3), or alternatively, to transfer plaintiff's claim against it to the Southern District of New York, pursuant to 28 U.S.C. § 1631, *see* BTG's Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue, or in the Alternative, Motion to Transfer ("BTG's Mot.") at 1, ECF No. 40.  For the reasons below, MSL's motion to dismiss for failure to state a claim is denied, and BTG's motion to dismiss for lack of personal jurisdiction is granted.

## I.   BACKGROUND

The relevant factual and procedural background is summarized below.

### A.  Factual Background

Plaintiff is an investigative news and analysis company that "publishes a premium internet-based subscription service, releasing anywhere between 30 and 50 reports each month on matters relating to mergers and acquisitions, consumer protection, government contracts, corporate investigations, and antitrust enforcement."  SAC ¶ 2.  Plaintiff's reports are "often the product of months of work," and "release of its reports will often affect the price of publicly traded stocks . . . in a matter of minutes."  *Id.*  These reports provide value to plaintiff's subscribers through the high quality of investigative reporting and the timeliness with which the analysis reaches its subscribers.  *Id.* ¶ 15.

Plaintiff owns valid copyright registrations that apply to its reports, which are distributed only to paid subscribers and other authorized recipients.  *Id.* ¶¶ 19–20.[1]  Each report contains a copyright notice and disclosure stating that "[d]irect or indirect reproduction or distribution of this article without prior written permission from [plaintiff] is a violation of Federal Copyright Law."  *Id.* ¶ 18.  Additionally, all subscribers must execute the Capitol Forum Subscription

---

[1]    Plaintiff's relevant copyright registration numbers are: TX0008939090, TX0008941939, TX0008953721, TX0008993172, TX0008996171, TX0009025 943, TX0009070990, TX0009032436, TX0009032413, TX0009032843, TX0009031554, TX000 9033043, TX0009108744, TX0009094440, TX0009071495, and TX0009082488.

Agreement to subscribe.  *Id.* ¶ 20.  The subscription agreement "explicitly prohibits transmission and distribution of its copyrighted material."  *Id.* ¶ 3.

BTG is a financial services company involved in asset management, sales and trading, and investment banking.  *Id.* ¶ 22.  MSL is a financial services broker that "acquires timely market information from various sources and then publishes this information to its clients . . . one of which is BTG."  *Id.* ¶ 23.  Cristina Suarez, a portfolio manager at BTG, and Jennifer Donaker, MSL's Head of US Operations, "are personal acquaintances, having met during a prior employment."  *Id.* ¶ 24.  Importantly here, BTG subscribes to plaintiff's reporting platform, *id*. ¶ 4, while MSL does not, *see id*. ¶ 25.

Plaintiff describes that the subscription agreement was executed with BTG in 2015, and was in place for four months, after which BTG decided not to renew.  Pl.'s Opp'n to BTG's Mot. to Dismiss or Transfer to New York ("Pl.'s BTG Opp'n"), Ex. 1, Declaration of Trevor Baine ("Baine Decl."), Pl.'s Chief Financial Officer, ¶¶ 2–10, ECF No. 41-1; Pl.'s BTG Opp'n at 3. That agreement allowed two of BTG's employees, Suarez and Stefano Dardi, to access plaintiff's copyrighted materials.  Baine Decl. ¶ 3.  After the subscription lapsed, plaintiff contacted Suarez a handful of times to propose a new subscription agreement, which, in 2020, plaintiff and Suarez negotiated at a discounted rate from $70,000 to $40,000 per year.  *Id*. ¶¶ 3–4.  This renewed subscription again provided for Suarez and Dardi to receive access to plaintiff's publications.  *Id.* ¶ 4.  At the time of renewal in 2020, Kory Zverin, BTG's controller, signed and returned the agreement, though Zverin designated the "subscriber organization" on the agreement as "BTG Pactual Global Asset Management Ltd.," which is a slightly different name than that of the named defendant BTG and is the name for what appears to be an affiliated

organization operating in Bermuda.  *See* BTG's Mot., Ex. 4, Subscription Agreement at 2, ECF No. 40-4.

Plaintiff alleges that starting in 2020, BTG "has been systematically downloading [its] copyrighted reports and transmitting them to [MSL]."  SAC ¶ 4.  Such unauthorized transmission occurs within minutes of the release of plaintiff's reports and, according to plaintiff, MSL "will then republish a summary of that report to its clients, including verbatim excerpts from the Capitol Forum report."  *Id.*

As described in the second amended complaint, this scheme began shortly after BTG subscribed to plaintiff's reports, when BTG's employee, Suarez, "entered an arrangement with" MSL's employee Donaker, "by which Ms. Suarez would send the Capitol Forum reports to Ms. Donaker."  *Id.* ¶ 25.  In return, "Donaker agreed to provide Ms. Suarez with her views and advice on the Capitol Forum analyses" and assured Suarez that she would not share plaintiff's reports once they were received, nor "use or republish the copyrighted material in any fashion," *id*.  With these assurances, Donaker allegedly "induced, enticed, and promoted BTG[]'s direct infringement."  *Id.*

Plaintiff alleges that these two employees of defendants "knew their conduct was illegal and thus took affirmative steps to conceal their unlawful activity."  *Id.* ¶ 26.  These steps included: (1) transmitting the reports over the WhatsApp application on their personal cellular telephones, and (2) agreeing to delete all communications they had over the WhatsApp application.  *Id*.  They did this presumably knowing that the "use of such personal communications devices to send and receive messages that their firms cannot capture and monitor is prohibited by the regulations of the Financial Regulatory Authority (FINRA)" and

that FINRA also "require[s] all regulated persons and entities to preserve all records of client communications for at least three years." *Id.*

BTG's employee, Suarez, began to send reports to MSL in early 2020, and "[b]etween March 2020 and November 2021, [she] sent over 60 Capitol Forum copyrighted publications to Ms. Donaker." *Id.* ¶ 27.  This included reports from April 24, 2020, September 23, 2020, and November 13, 2020, that "escaped destruction." *Id.*  Plaintiff avers that it has "[a]t no time . . . provided its subscribers permission to transmit its material to [MSL]," nor has it "provided [MSL] with permission to obtain its copyrighted material or to copy and republish its protected works." *Id.*

Donaker, in her role at MSL, would "repackage, copy, and quote the most creative and original aspects of those publications in [MSL's] own format and would then distribute this repackaged information to its clients." *Id.* ¶ 28.  Over time, two other MSL content providers, Eddie Lee and Stephen Grahling, began to help with this endeavor to repackage plaintiff's reports and distribute them to MSL customers. *Id.*

Plaintiff claims that in distributing its reports, MSL would not "add any of its own analysis or contribute any meaningful reporting," and "would simply extract the key information from Plaintiff's reports and repackages [sic] that work in a shorter form for a quicker read." *Id.* ¶ 29.  Attached to the second amended complaint are Capitol Forum reports and MSL publications, comparison of which demonstrates the "substantial similarity between the protectable material in the Plaintiff's work and the infringing nature of the Defendant's work." *Id.* ¶ 30.  Indeed, the MSL publications attached to the second amended complaint begin by specifically drawing attention to the fact that plaintiff has reported on a certain topic. *See, e.g.*, SAC, Ex. B, October 18, 2021 Market Securities Publication, ECF No. 28; *id.*, Ex. B, October

25, 2021 Market Securities Publication, ECF No. 28.  Plaintiff further alleges that MSL "has illegally obtained and copied portions of the Capitol Forum publications for its own clients," and "has also illegally obtained and transmitted copies of the Capitol Forum publications within its organization," *id.* ¶ 37, since MSL is not itself a subscriber of plaintiff's reports.

After plaintiff filed this suit, BTG's subscription agreement was canceled by Zverin, who told plaintiff that "[w]e cannot continue as amicable subscriber/client relationship given its business practice of **suing its subscriber**."  Pl.'s BTG Opp'n at 5 (emphasis in original).

### B.  Procedural Background

Plaintiff initiated the instant suit against MSL in May 2022, bringing claims for direct copyright infringement, contributory copyright infringement and common law misappropriation of proprietary information, and requesting both injunctive and monetary relief.  *See* Compl. ¶¶ 35–56, "Prayer for Relief," ECF No. 1.  MSL's first motion to dismiss, *see* MSL's First Mot. Dismiss ("MSL 1st MTD"), ECF No. 15, was granted in part and denied in part, and this case was allowed to proceed "based only on plaintiff's direct copyright infringement claim," while plaintiff's claims for contributory copyright infringement and misappropriation of proprietary information were dismissed without prejudice.  *DBW Partners I,* 2023 WL 2610498, at *1.

Plaintiff and MSL proceeded to discovery in April 2023, and three months later, plaintiff moved to amend its complaint to add a claim for direct copyright infringement against new defendant BTG, as well as add a new contributory copyright infringement claim against MSL. Pl.'s Mot. Amend Compl. at 1, ECF No. 25.  MSL originally opposed plaintiff's motion to amend the complaint, but the parties later stipulated their agreement to consider the first amended complaint moot and to the filing of the second amended complaint.  Stipulation at 1, ECF No. 27.

Plaintiff's operative second amended complaint, filed in September 2023 with leave of Court, *see* Min. Order (Aug. 31, 2023)**,** asserts, in Counts I and II against MSL, claims for direct copyright infringement and contributory infringement violations, respectively, and, in Count III against BTG, a claim for direct copyright infringement violations.  *See generally* SAC.  Plaintiff requests declaratory and injunctive relief, along with compensatory damages, restitution, disgorgement, punitive damages, as well as statutory damages of $150,000 for each act of infringement.

In response to plaintiff's second amended complaint, MSL renewed its motion to dismiss the two claims against it for failure to state a claim, MSL's Mot. at 1, and BTG separately moved to dismiss the single claim against it for lack of personal jurisdiction or, alternatively, to transfer plaintiff's claim to the Southern District of New York, BTG's Mot. at 1.  With the filing of plaintiff's responses in opposition and defendants' replies, Pl.'s Mem. in Opp'n to MSL's Mot. to Partially Dismiss ("Pl.'s MSL Opp'n"), ECF No. 34; MSL's Reply Mem. of Law in Supp. of Partial Mot. to Dismiss Second Am. Compl. ("MSL's Reply"), ECF No. 35; Pl.'s BTG Opp'n; BTG's Reply in Supp. of Mot. to Dismiss or in the Alternative, Mot. to Transfer ("BTG's Reply"), ECF No. 43, these motions are ripe for resolution.

## II.   LEGAL STANDARD

### A.  Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "[a] plaintiff need not make 'detailed factual allegations,'" but the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *VoteVets Action Fund v. United States Dep't of Veterans Affairs*, 992 F.3d 1097, 1104 (D.C. Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A facially plausible claim pleads facts

that are not "'merely consistent with' a defendant's liability" but that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007)); *see also Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012). Consequently, "[a] complaint survives a motion to dismiss even '[i]f there are two alternative explanations, one advanced by [the] defendant and the other advanced by [the] plaintiff, both of which are plausible.'" *VoteVets Action Fund*, 992 F.3d at 1104 (quoting *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015)) (alteration in the original).

In deciding a motion under Rule 12(b)(6), the court must consider the whole complaint, accepting all factual allegations as true, "even if doubtful in fact." *Twombly*, 550 U.S. at 555; *see also Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 210 (D.C. Cir. 2022). Courts do not, however, "assume the truth of legal conclusions, nor do [they] 'accept inferences that are unsupported by the facts set out in the complaint.'" *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (alteration in original) (citation omitted) (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)).

### B.  Personal Jurisdiction

The federal courts "are courts of limited jurisdiction" and cannot hear cases without, among other things, personal jurisdiction over the parties. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1086 (D.C. Cir. 2007) ("Personal jurisdiction is 'an essential element of the jurisdiction of a district . . . court,' without which the court is 'powerless to proceed to an adjudication.'" (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999)). To survive a motion to dismiss for lack of personal jurisdiction, under Federal Rule of Civil Procedure 12(b)(2), the plaintiff must "make a *prima facie*

showing of the pertinent jurisdictional facts." *Livnat v. Palestinian Auth.*, 851 F.3d 45, 56–57 (D.C. Cir. 2017) (quoting *First Chi. Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378 (D.C. Cir. 1988)).  The *prima facie* showing requires specific factual allegations connecting each defendant to the forum.  *First Chi. Int'l*, 836 F.2d at 1378.  While the complaint's factual allegations must be accepted as true, and all reasonable inferences must be drawn in plaintiff's favor, *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 861 (D.C. Cir. 2022), mere conclusory statements and bare allegations are insufficient, *Livnat*, 851 F.3d at 57.

In contrast to a motion to dismiss pursuant to Rule 12(b)(6), the court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)).  Indeed, jurisdictional arguments may be premised on the "pleadings, bolstered by such affidavits and other written materials as [the parties] can otherwise obtain."  *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005).  "When deciding personal jurisdiction without an evidentiary hearing—as here—the 'court must resolve factual disputes in favor of the plaintiff.'"  *Livnat*, 851 F.3d at 57 (quoting *Helmer v. Doletskaya*, 393 F.3d 201, 209 (D.C. Cir. 2004)).  The court, however, "'need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts.'"  *Id.* (quoting *Helmer*, 393 F.3d at 209).

## III.   DISCUSSION

Defendants' separate motions to dismiss will be addressed in turn.

### A.  MSL's Motion to Dismiss For Failure To State a Claim

Plaintiff's two claims against MSL are assessed, *seriatim,* under the Rule 12(b)(6) standard.  Accepting as true the factual allegations in the second amended complaint, plaintiff

plausibly states claims for relief on both its direct and contributory copyright infringement claims.

### 1. *Plaintiff States a Claim for Direct Copyright Infringement.*

"To prevail on a copyright claim, a plaintiff must prove both [1] ownership of a valid copyright and [2] that the defendant copied original or 'protectible' aspects of the copyrighted work.'" *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1295 (D.C. Cir. 2002) (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348, 361 (1991)).  While registration with the Copyright Office is not a prerequisite for the ownership of a valid copyright, *see* 17 U.S.C. § 408, timely registration does serve as "*prima facie* evidence of the validity of the copyright," *see Stenograph L.L.C. v. Bossard Assocs., Inc.*, 144 F.3d 96, 99 (D.C. Cir. 1998); 17 U.S.C. § 410(c).  The second element may be established either with direct evidence that a defendant "copied" the protected work or by establishing: "(1) that defendants had access to the copyrighted work, and (2) the substantial similarity between the protectible material in plaintiff's and defendants' works." *Prunte v. Universal Music Grp.*, 484 F. Supp. 2d 32, 40–41 (D.D.C. 2007).  Protectible material includes only those aspects of an author's work "that display the stamp of the author's originality," and does not include the underlying facts, ideas, or other elements that are "standard[] in the treatment of a given topic." *Sturdza*, 281 F.3d at 1295–96.

As this Court previously concluded in resolving MSL's first motion to dismiss, plaintiff's operative second amended complaint adequately establishes both required elements as to its claim of direct copyright infringement.  First, plaintiff alleges that it registered for and owns valid copyrights in each of its reports, including those published during the period in which MSL is alleged to have been copying those reports. *See* SAC ¶ 19; Pl.'s MSL Opp'n at 6.  Second, plaintiff successfully alleges that MSL copied the protectible aspects of its reports by alleging (1)

that MSL had access to the copyrighted work, which MSL obtained from a BTG, a Capitol

Forum subscriber, *see id.* ¶ 25, and (2) that several of MSL's reports contained identical wording

and structure to the Capitol Forum originals, *see id.* ¶¶ 28–30; *see also id.* ¶¶ 31–33 (providing,

as representative examples, a comparison of MSL and Capitol Forum reports).

Once again, however, MSL contends that plaintiff fails to make out a *prima facie* case

for two reasons, both of which were previously rejected when asserted as support for MSL's first

motion to dismiss.  MSL first argues that plaintiff's second amended complaint is still unclear

regarding the works at issue and fails exhaustively to catalogue every copyrighted report that

MSL may have copied.  MSL's Mem. Supp. Mot. Dismiss Second Am. Compl. ("MSL's

Mem.") at 5–7, ECF No. 31-1.  In advancing this argument, MSL itself acknowledges that this is

the *same argument* unsuccessfully asserted in support of its first motion to dismiss.  *Id.* at 5

("Here, like Plaintiff's Original Complaint, the SAC cites to sixteen (16) purportedly 'relevant'

copyright registrations, which all cover serials of varying dates from October 2020 through

January 2022 (the 'Asserted Registrations')).

In denying MSL's first motion to dismiss, plaintiff's identification of at least two specific

examples of allegedly infringing works was determined to be sufficient to move its claims

beyond the pleading stage. *DBW Partners I,* 2023 WL 2610498, at *3.  Now, MSL

acknowledges that plaintiff has identified over forty such examples of such alleged

infringements.  MSL's Mem. at 6 ("While Plaintiff once again attaches Plaintiff's publications

dated October 25, 2021 and October 18, 2021 as Exhibit A (presumably covered by TX 9-108-

744, which covers newsletter issues published from October 1, 2021 through October 29, 2021),

Plaintiff now also attaches a document as Exhibit C that identifies forty-four (44) additional

alleged infringements, and seven (7) 'instances of [alleged] illegal distribution of copyrighted

material' (the 'Additional Alleged Infringements')" (alteration in original)).  Given these

identified 46 instances of alleged infringement in its second amended complaint, MSL has an

*even weaker* basis from which to argue that the second amended complaint should be dismissed

for failure to identify the works allegedly infringed upon.  In other words, this argument is no

more successful the second time around than the first.

      Next, MSL asserts, again for the second time, that plaintiff fails adequately to allege

substantial similarity between protectible elements of plaintiff's copyrighted materials and

MSL's commentaries.  MSL's Mem. at 7.  In MSL's view, "the comparisons set forth on Exhibit

C to the SAC clearly demonstrate that many of Plaintiff's claims fail as a matter of law" because

"the only similarity between the works" is "Defendants' purported use of components of

Plaintiff's titles or short words or phrases that are commonplace in the financial industry," and

thus "are unprotectible, and not original to Plaintiff."  *Id.* at 8.  This almost identical argument

was unsuccessfully asserted in MSL's first motion to dismiss plaintiff's complaint, *see* MSL 1st

MTD at 9–11 (arguing that the copyrighted materials and MSL's materials had only "similarities

in the underlying facts[] and common verbiage within the financial industry"), and rejected as a

gross mischaracterization of the level of copying demonstrated by comparisons with plaintiff's

works, *DBW Partners I,* 2023 WL 2610498, at *4.  Once again, this argument strains credulity

when examining the line-by-line comparison of several of the reports at issue provided in Exhibit

C to the second amended complaint.  SAC, Ex. C, List of 44 Additional Infringements Not

Included in Complaint ("Comparison Chart"), ECF No. 28.  MSL uses many of the same turns of

phrase, analytical frameworks, and subjective conclusions as plaintiff's works—often using the

same word choices, precise sentence structure, and summary observations reflected in plaintiff's

works.  *See* Comparison Chart.  These allegations, once again, are sufficient at this stage

plausibly to allege substantial similarity to the creative expression protected by plaintiff's copyright.  *See Prunte*, 484 F. Supp. 2d at 41 (noting that "[s]ubstantial similarity is a question that should be decided either by a factfinder at trial or, in some cases, in the context of a motion for summary judgment" rather than litigated in a Rule 12(b)(6) motion to dismiss).

Notably, the reports attached as exhibits to the second amended complaint plausibly show that MSL not only copies language in titles and text from plaintiff's reports, but further specifically announces that plaintiff has reported on certain topics.  *See, e.g.*, October 18, 2021 Market Securities Publication; October 25, 2021 Market Securities Publication.  Alerting MSL customers that they could obtain from MSL synopses of plaintiff's expensive subscription-only reports, which contain the expertise of plaintiff's news gathering and analysis, would certainly add value to MSL's customers by obviating the need for MSL customers to subscribe to plaintiff's subscription platform.  "[I]t is as clear, that if [an infringer] cites the most important parts of the work, with a view, not to criticise [sic] but to supersede the use of the original work, and substitute the review for it, such a use will be deemed in law a piracy."  *Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 550–52 (1985) (internal citation omitted).  While plaintiff acknowledges that Donaker "may not have forwarded the entirety of the Capitol Forum articles to her clients," plaintiff alleges that, with Donaker as the conduit for unauthorized receipt of plaintiff's reports, MSL was able to republish substantial portions of plaintiff's copyrighted materials.  Pl.'s MSL Opp'n at 15.

Plaintiff's allegations, accepted as true, adequately establish the elements of a *prima facie* copyright infringement claim, and MSL's motion to dismiss Count I is, again, denied.[2]

---

[2]     MSL states that it is "[m]omentarily putting the issue of [MSL's] obvious fair use of Plaintiff's materials aside" for the purposes of its motion, because although MSL "maintains that its conduct is in fact a fair use" it will not "belabor the point herein, given that this Court previously found that [MSL's]

### 2. *Plaintiff States a Claim For Contributory Copyright Infringement*

"In order to establish a claim of contributory copyright infringement, the plaintiff must allege (1) direct infringement by a third party; (2) knowledge by the defendant that third parties were directly infringing; and (3) substantial participation by the defendant in the infringing activities." *Newborn v. Yahoo!, Inc.*, 391 F. Supp. 2d 181, 186 (D.D.C. 2005) (internal quotation omitted); *see also Bus. Casual Holdings, Ltd. Liab. Co. v. YouTube, Ltd. Liab. Co.*, No. 22-3007-cv, 2023 U.S. App. LEXIS 27511, at *4 (2d Cir. Oct. 17, 2023) (articulating standard for showing of contributory copyright infringement that plaintiff must show defendant "with knowledge of the infringing activity, induce[d], cause[d] or materially contribute[d] to the infringing conduct of another." (quoting *EMI Christian Music Grp. Inc. v. MP3 Tunes LLC*, 844 F.3d 79, 99-100 (2d Cir. 2016)). While MSL's first motion to dismiss plaintiff's claim of contributory copyright infringement was granted, plaintiff's second amended complaint remedies the deficiencies in the original complaint.

Unlike the original complaint, the second amended complaint identifies BTG as a third-party entity that committed direct infringement of plaintiff's copyrighted materials, activity that MSL allegedly "encouraged, induced, promoted, and aided and abetted . . . ." SAC ¶ 52. This claim of contributory copyright infringement is no longer supported only by mere conclusory assertions. Instead, plaintiff offers detailed accounts of how MSL allegedly obtained timely copies of plaintiff's reports from a BTG employee, and how an employee at MSL allegedly induced and encouraged direct infringement by this BTG employee. *Id.* ¶¶ 25–26. These allegations are sufficient to support a claim of direct infringement by a third party, BTG, *id.*

---

arguments related to the same were premature on a motion to dismiss, and as such, [MSL] will reserve all such arguments for its motion for summary judgment." MSL's Mem. at 1 & n.2 (internal citation omitted).

¶¶ 24–25, knowledge by MSL that BTG was directly infringing, *id.* ¶ 26, and substantial participation by MSL in the infringing activities, *id.* ¶¶ 25–29.

MSL nevertheless argues that plaintiff's claims for contributory copyright infringement should be dismissed because plaintiff fails: (1) to establish direct infringement on the part of BTG or any other third party; (2) to allege facts sufficient to demonstrate knowledge by MSL; and (3) to allege facts supporting substantial participation on the part of MSL in BTG's direct infringement. MSL's Mem. at 9–16. Each of these arguments falls flat.

The second amended complaint sufficiently alleges facts establishing the first factor for a contributory infringement claim, namely, BTG's direct infringement. As discussed *supra* in Part III.A.1, "[t]o prevail on a copyright claim, a plaintiff must prove both [1] ownership of a valid copyright and [2] that the defendant copied original or 'protectible' aspects of the copyrighted work.'" *Sturdza*, 281 F.3d at 1295. After establishing its ownership of valid copyrights covering the infringed work, SAC ¶ 19, plaintiff alleges that BTG, through its employee Cristina Suarez, infringed Capitol Forum's exclusive right to distribute the copyrighted material to the public by illegally transmitting at least 60 of plaintiff's copyrighted articles to an MSL employee, Jennifer Donaker, *id.* ¶ 27. MSL contests that these allegations show any clear violation of any copyright protection because the complaint alleges only that BTG sent the reports to MSL over "private" WhatsApp messages, and thus the transmission was not "public" in MSL's view. MSL's Mot. at 10–11. This semantic distinction falls short of providing a basis to dismiss plaintiff's claims here, especially where the copyright notice in plaintiff's publications clearly prohibits any unauthorized distribution of plaintiff's publications, no matter how broad the audience. SAC ¶ 18 (quoting from copyright notice on plaintiff's reports that "Direct or indirect reproduction or

distribution of this article without prior written permission from the Capitol Forum is a violation of Federal Copyright Law.")

MSL's second argument fares no better.  Here, MSL reasons that BTG was merely "'transmitting' Plaintiff's publications to Defendant [MSL] for the purpose of Defendant [MSL] providing investment advice," MSL's Mem. at 12, and that such allegations fail to establish knowledge of BTG's direct copyright infringement, *id.*  These cherry-picked factual allegations ignore the fuller context described in the second amended complaint that bely such a characterization of both BTG's actions and MSL's knowledge and participation.  Specifically, plaintiff's reports contain a copyright notice and disclosure notice prohibiting unauthorized distribution.  SAC ¶ 3.  Contrary to this clear copyright notice and distribution prohibition, BTG and MSL employees allegedly "agreed that the Capitol Forum reports would be transmitted over their WhatsApp applications on their personal cellular telephone devices, a method by which they could escape detection from their internal compliance departments and the regulators." SAC ¶ 26.  Further, such actions allegedly were taken "despite their awareness that the use of such personal communications devices to send and receive messages that their firms cannot capture and monitor is prohibited by the regulations of the Financial Regulatory Authority (FINRA), regulations which they are required to obey."  *Id.*  Lastly, demonstrating consciousness of guilt on the part of defendants, defendants' two employees allegedly "agreed to delete all communications between themselves over the WhatsApp system—although FINRA regulations require all regulated persons and entities to preserve all records of client communications for at least three years."  *Id.*  Indeed, plaintiff indicates that "Capitol Forum does not yet know the accurate number of direct infringements by BTG [] [] because Ms. Donaker deleted and destroyed the articles she received from Ms. Suarez through her WhatsApp application, an issue

16

previously brought to the Court's attention."  Pl.'s MSL Opp'n at 9.  These allegations, if

accepted as true, could support a plausible inference that Donaker demonstrated consciousness of

guilt, and therefore are sufficient for plaintiff's claim of contributory copyright infringement to

survive at the motion to dismiss stage.  *See VoteVets Action Fund*, 992 F.3d at 1104.

      Finally, MSL's argument that the second amended complaint fails to allege MSL's

substantial participation in BTG's direct infringement simply ignores the thrust of the factual

allegations.  BTG's employee and MSL's employee allegedly "entered an arrangement by which

[BTG's] Ms. Suarez would send the Capitol Forum reports to [MSL's] Ms. Donaker," and

"Donaker's actions and expressions in this regard induced, enticed, and promoted BTG []'s

direct infringement."  Compl. ¶ 25.  By entering into this arrangement and encouraging BTG to

participate in the direct infringement of sharing plaintiff's publications with MSL through

WhatsApp message, MSL substantially participated in and facilitated a scheme to promote direct

infringement of plaintiff's copyrighted materials.  Plaintiff's second amended complaint meets

each element required to allege contributory copyright infringement and thus this claim survives

MSL's motion to dismiss.

### B.  Personal Jurisdiction Over BTG Is Lacking

      BTG argues that the claim against it must be dismissed because no provision of the

District of Columbia's long-arm statute supports the exercise of personal jurisdiction as to BTG

in this case.  BTG's Mot. at 8.  Alternatively, BTG argues that venue is improper and the claim

against this defendant should be transferred to the Southern District of New York, where BTG

maintains its principal place of business.  *Id.* at 23–24.  As noted, *supra* in Part II.B., when

evaluating jurisdiction over a claim, "the district court may consider materials outside the

pleadings," *Jerome Stevens Pharms.*, 402 F.3d at 1253, and the Court has considered the two

declarations submitted by BTG in support of its motion and plaintiff's single declaration

submitted in opposition.  For the following reasons, BTG's motion to dismiss for lack of

personal jurisdiction will be granted.

### 1.  *Applicable Legal Principles*

The law is well-settled that "a defendant outside a forum's borders may be subject to

suit" only if the defendant has "'certain minimum contacts with [the forum] such that the

maintenance of the suit does not offend traditional notions of fair play and substantial justice."

*Livnat*, 851 F.3d at 48 (quotation marks omitted) (quoting *Int'l Shoe Co. v. Wa.*, 326 U.S. 310,

316 (1945)).  The D.C. Circuit has "explained that the Fifth Amendment's Due Process Clause

protects defendants from being subject to the binding judgments of a forum with which they

have established no meaningful contacts, ties, or relations, and requires fair warning that a

particular activity may subject them to the jurisdiction of a foreign sovereign."  *Id.* (cleaned up).

"The Supreme Court has developed two distinct analyses of the circumstances in which a

forum state may, consistent with due process, authorize its courts to exercise contact-based

personal jurisdiction over a defendant[:]" general jurisdiction and specific jurisdiction.  *Erwin-*

*Simpson v. AirAsia Berhad*, 985 F.3d 883, 888 (D.C. Cir. 2021).  General jurisdiction, which

"'permits a court to assert jurisdiction over a defendant based on a forum connection unrelated to

the underlying suit[,]'" *Livnat*, 851 F.3d at 56 (quoting *Walden*, 571 U.S. at 283 n.6), is only

established when a plaintiff has shown that the defendant's "affiliations with the State are so

continuous and systematic as to render them essentially at home in the forum State[,]"  *Goodyear*

*Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quotation marks omitted);

*see Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 592 U.S. 351, 358–59 (2021) (noting

"breadth [of general jurisdiction] imposes a correlative limit: Only a select 'set of affiliations

with a forum' will expose a defendant to such sweeping jurisdiction," such that "an individual is subject to general  jurisdiction in her place of domicile" and "the 'equivalent' forums for a corporation are its place of incorporation and principal place of business.").  Plaintiff does not argue that general jurisdiction may be exercised over BTG, *see* Pl.'s BTG Opp'n at 1–3, leaving as the sole issue whether the requirements for specific jurisdiction are satisfied.

The Supreme Court has instructed that "[s]pecific jurisdiction is different: It covers defendants less intimately connected with a State, but only as to a narrower class of claims." *Ford Motor Co.,* 592 U.S. at 359.  A defendant subject to specific jurisdiction must have contacts with the forum consisting of "some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State," and those "contacts must be the defendant's own choice and not random, isolated, or fortuitous," showing "that the defendant deliberately reached out beyond its home—by, for example, exploi[ting] a market in the forum State or entering a contractual relationship centered there."  *Id.* (internal quotations and citations omitted; alteration in original).  "Yet even then—because the defendant is not 'at home'—the forum State may exercise jurisdiction in only certain cases" when "[t]he plaintiff 's claims, we have often stated, must arise out of or relate to the defendant's contacts with the forum."  *Id.* (internal quotations omitted).  Thus, the "'essential foundation of specific jurisdiction' is the 'relationship among the defendant, the forum, and the litigation.'"  *Atchley*, 22 F.4th at 234 (quoting *Ford*, 592 U.S. at 352).

To show that the exercise of specific jurisdiction over a defendant satisfies due process, a plaintiff must establish the following: "(1) minimum contacts demonstrating that the defendant[s] purposefully availed [themselves] of the forum; (2) relatedness between the contacts and the claim; and (3) compliance with 'fair play and substantial justice.'"  *Id.*  "These

rules derive from and reflect two sets of values—treating defendants fairly and protecting interstate federalism." *Ford Motor Co.*, 592 U.S. at 360 (quotation marks omitted).

### 2. *No Personal Jurisdiction Over BTG Under D.C. Long-Arm Statute*

The Federal Rules of Civil Procedure authorize federal district courts to assert personal jurisdiction over a defendant to the same extent that a state court in the state where the federal district court is located, *see* FED. R. CIV. P. 4(e)(1), (k)(1)(A), and thus, even when, as here, subject matter jurisdiction is predicated upon a federal question, courts "must rely on D.C. law to sue nonresident defendants, since no federal long-arm statute applies." *Edmond v. United States Postal Serv. Gen. Counsel*, 949 F.2d 415, 424 (D.C. Cir. 1991) (citing *Omni Capital Int'l v. Rudolf Wolff & Co.,* 484 U.S. 97 (1987); *First Chicago Int'l v. United Exch. Co.,* 836 F.2d 1375, 137–79 (D.C. Cir. 1988) (using D.C. long-arm statute in federal question case)). "The traditional personal jurisdiction analysis asks first whether an applicable long-arm statute authorizes the court to hear the case, and second whether doing so comports with due process." *Atchley*, 22 F.4th at 231.

Plaintiff's claim of specific jurisdiction is predicated on two provisions of the D.C. long-arm statute, D.C. Code § 13-423(a)(1) and (a)(4), each of which is discussed separately next.

### (a) *D.C. Code § 13-423(a)(1): Claim Arising From Transacting Business in the District.*

Subsection (a)(1) of the District of Columbia's long-arm statute confers personal jurisdiction over any person "as to a claim for relief arising from the person's . . . transacting any business in the District of Columbia." D.C. Code § 13-423(a)(1); *see also Forras v. Rauf*, 812 F.3d 1102, 1106 (D.C. Cir. 2016) (noting that § 13-423(a)(1) "has been held 'to be coextensive (for cases that fit within its description) with the Constitution's due process limit'" (quoting *Crane v. Carr*, 814 F.2d 758, 762 (D.C. Cir. 1987))). To invoke this provision of the District's long-arm statute, a plaintiff must meet two prerequisites: (1) the defendant must have conducted business in

the District, and (2) plaintiff's claim against the defendant must arise from that business. *See Forras*, 812 F.3d at 1106.

Plaintiff's argument in favor of exercising specific jurisdiction over BTG under D.C. Code § 13-423(a)(1) fails on the first prong of this inquiry. BTG has submitted a declaration from its Head of Finance attesting that the company has no offices or employees in Washington, D.C., is not registered to conduct business in the District, and receives no revenue or income from sources in the District. *See* BTG's Mot., Att. 6, Declaration of A. Maron ("Maron Decl.") ¶¶ 7–8, 10, ECF No. 40-6. Although plaintiff describes a brief history of communications, via emails and telephone calls, in which BTG employees located in New York and Texas communicated with plaintiff's employees in the District to negotiate and execute the subscription agreement, *see* Baine Decl. ¶¶ 7–9, such communications are not enough, on their own, to establish that BTG has been conducting business in the District. *See Thompson Hine, LLP v. Taieb*, 734 F.3d 1187, 1192 (D.C. Cir. 2013) (finding that "at least ten emails" sent by a non-resident defendant to a law firm in the District of Columbia retained by the defendant did not establish a basis for personal jurisdiction in this forum); *Health Comm's, Inc. v. Mariner Corp.*, 860 F.2d 460, 462 (D.C. Cir. 1998) (holding that eight months of telephone conversations and correspondence negotiating a contract with a District-based firm, along with attendance at workshops planned, and acceptance of materials distributed, by this firm, were insufficient to establish personal jurisdiction over Texas-based defendant); *see also Allen v. Addi*, Civil Action No. 20-cv-01650 (TSC), 2021 U.S. Dist. LEXIS 180476, at *17-18 (D.D.C. Sep. 22, 2021) (finding personal jurisdiction insufficient because "email and telephone communications sent into the District of Columbia are not sufficient to constitute business transactions in themselves"); *Associated Producers, LTD v. Vanderbilt Univ.*, 76 F. Supp. 3d 154, 165 (D.D.C.

2014) ("[E]mail and telephone communications sent into the District of Columbia are not sufficient to constitute business transactions in themselves, even if they are made pursuant to an underlying contract between a resident business and a nonresident Defendant."); *Nat'l Resident Matching Program v. Elec. Residency LLC* ("*NRMP*"), 720 F. Supp. 2d 92, 99–100 (D.D.C. 2010) (nonresident defendant subscribing to platform and sending communications to resident plaintiff does not by itself establish personal jurisdiction); *Gibbons & Co., Inc. v. Roskamp Inst.*, No. 06–CV–720, 2006 WL 2506646, at *3 (D.D.C. Aug. 28, 2006) (fifty to seventy-five emails and seventy-five phone calls related to an underlying contract between the parties did "not constitute a deliberate and voluntary association with the District that rises to the level of transacting business within the District"); *Mizlou Television Network, Inc. v. Nat'l Broadcasting Co.*, 603 F. Supp. 677, 681 (D.D.C. 1984) ("[A] few communications from [a] District lawyer" with a non-resident defendant, "will not draw the nonresident defendants within the sphere of this Court's jurisdiction." (citing *Mitchell Energy Corp. v. Mary Helen Coal Co.*, 524 F. Supp. 558, 563 (D.D.C. 1981) and *Cockrell v. Cumberland Corp.*, 458 A.2d 716, 717–18 (D.C. 1983) (even calls and letters placed rather than received by out-of-state defendant do not satisfy long-arm statute's "transacting business" test))).

In the face of this long-settled law, and to bolster the argument that personal jurisdiction may properly be exercised over BTG, plaintiff relies on the subscription agreement entered into in 2015 and then renewed in 2020, 2021, 2022, and 2023 with "BTG Pactual Global Asset Management Ltd."  Pl.'s BTG Opp'n at 5–14.  As a threshold matter, the parties dispute whether the subscription agreement can be attributed to this case's named defendant, which is "BTG Pactual Asset Management U.S. LLC."  SAC ¶ 11.  Plaintiff avers that it first entered into the subscription agreement with the named defendant "BTG Pactual Asset Management U.S. LLC"

in 2015, Baine Decl. ¶ 2, and authorized access to plaintiff's copyrighted materials by two of BTG's employees, Suarez and Dardi, both of whom used email addresses with the url "btgpactual.com," *id.*  After that subscription lapsed, plaintiff then contacted Suarez on various occasions to offer a new subscription agreement, *id.* ¶ 3, resulting, in 2020, in a renewed subscription at a discounted rate of $40,000 per year that again provided for Suarez and Dardi, two BTG portfolio managers, to receive access to plaintiff's publications, *id.* ¶ 4.

At the time of renewal in 2020, Kory Zverin, the controller for BTG, signed and returned the agreement, designating the "subscriber organization" on the agreement as "BTG Pactual Global Asset Management Ltd."[3]  *See* Subscription Agreement.  Due to the different names, BTG contends that plaintiff "cannot rely on the Subscription Agreement as a basis of personal jurisdiction over BTG because BTG is not the subscriber, instead it is non-party BTG Pactual Global Asset Management Ltd."  BTG's Mot. at 12.  Plaintiff counters that BTG should be considered a real party to the subscription agreement, because the controller of this BTG entity signed the subscription agreement, received the invoices, which were paid by this entity's "bank account in New York," and this entity's "employees were the only individuals who were designated as authorized users under the agreement."  Pl.'s BTG Opp'n at 13–14.  Plaintiff further argues that BTG and "BTG Pactual Global Asset Management Ltd." are alter egos and the actions of both should be considered in assessing whether personal jurisdiction may be properly exercised over the named BTG defendant.  Pl.'s BTG Opp'n at 12–14.  While "[o]rdinarily, a defendant corporation's contacts with a forum may not be attributed to affiliated corporations," *Johnson Tanner v. First Cash Fin. Servs., Inc.*, 239 F. Supp. 2d 34, 38 (D.D.C. 2003), the parties' dispute over whether the two like-named corporate entities should be treated

---

[3]     The precise corporate relationship between the two similarly named BTG entities is nowhere explained on the record before the Court. *See generally* BTG's Mot.

as alter egos need not be resolved, since even assuming that the contacts by "BTG Pactual Global Asset Management Ltd." with the District are attributed to the named defendant BTG, those contacts—which consist primarily of the negotiation with plaintiff and signing of the subscription agreement—would not be sufficient to establish personal jurisdiction over BTG in the District.

The subscription agreement is not sufficient alone to provide a basis to exercise specific jurisdiction here. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985) ("If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot") (emphasis in original). For a contractual relationship to serve as the basis for exercise of personal jurisdiction, the contract must have a "substantial connection" to the jurisdiction. *Helmer v. Doletskaya*, 393 F.3d 201, 205–207 (D.C. Cir. 2004) (citing *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)); *see also Burger King*, 471 U.S. at 478–79. Four factors are considered in evaluating a potential substantial connection with the forum: (a) prior negotiations, (b) contemplated future consequences, (c) the parties' actual course of dealing, and (d) the terms of the contract. *Burger King*, 471 U.S. at 479. While BTG and plaintiff engaged in some limited negotiations, these did not involve any substantial connection between BTG and this forum, and none of the other factors support a finding of a substantial connection between this transaction and the District.

As to the first factor, the parties' negotiations were limited to the single issue of the subscription rate. Otherwise, the subscription agreement was "the standard agreement all subscribers agree to," and "[o]ther than discussing the price and start date of the subscription," BTG had no meaningful input on the content of the agreement. BTG's Mot., Att. 5, Declaration

24

of Cristina Suarez ("Suarez Decl.") ¶¶ 6–8, ECF No. 40-5.  Each time the agreement was renewed, "there was a negotiation over the renewal rate," Pl.'s BTG Opp'n at 4, and BTG was able to obtain a significant discount on a material term of the contract.  All of these negotiations occurred over email and phone calls while Suarez was located outside the District, and the subscription agreement was shared over email with Suarez, and executed over email.  In these circumstances, merely subscribing to plaintiff's reports does not amount to a subscriber like BTG expressing an intent to "avail" itself of the laws and protections of D.C.  *See NRMP*, 720 F. Supp. 2d at 100 (holding that merely subscribing to information published by a District-based organization was insufficient to warrant the exercise of specific jurisdiction).  As BTG correctly observes, BTG's Mot. at 13–14, BTG's negotiations with plaintiff were a far cry from the type of extensive and customized agreement over multiple terms at issue in *Burger King*, where the Supreme Court concluded that personal jurisdiction could properly be exercised in Florida over Michigan-based defendants, who participated in "extended" discussions with the Florida-based company over fees, building design, rent, and liability for a franchise located in Michigan. *Burger King*, 471 U.S. at 467–68.

Next, the future consequences of the subscription agreement also fail to establish any meaningful connection to the District.  A contract that requires ongoing contacts with the District for its performance is more likely to have a substantial connection with this forum.  *See Helmer*, 393 F.3d at 206 (holding that "because the contract [at issue] was formed in the District of Columbia, the corpus of the contract involved credit cards issued to a District of Columbia resident and registered with a District of Columbia address, and the parties contemplated future repeated contacts with the District of Columbia as a condition of performance, we hold that the contract had a substantial connection with the District of Columbia.").  Here, by contrast to

*Helmer*, the nature of this essentially standard subscription agreement for access to plaintiff's published reports delivered electronically to a nonresident of the forum created no future consequences that would require BTG's presence in the District.  The only potential future consequences contemplated at all consisted of the subscription term, which was automatically renewed unless notice of non-renewal was provided, receipt outside the District of the articles distributed over the internet by plaintiff, the option to reach out to plaintiff's journalists and attend plaintiff's subscriber-only events, and BTG's agreed upon use of electronic delivery software to monitor its copyright compliance.  *See* Pl.'s BTG Opp. at 8.   None of these contacts necessitated any meaningful connection to the District as a forum, but rather consisted merely of contacts with plaintiff as a service provider.  BTG's Reply at 5.

Plaintiff relies on two cases in urging that the subscription agreement provides future consequences connections between BTG and the District, Pl.'s BTG Opp'n at 10–11 (citing *Aristotle Int'l, Inc. v. Acuant, Inc.*, No. 22-CV-741 (DLF), 2023 WL 1469038 (D.D.C. Feb. 2, 2023 and *Helmer*, 393 F.3d at 205), but neither are helpful here.  In *Aristotle*, a breach of contract and trade secret theft case brought by a District-based company, the nonresident defendant "reached out beyond" its home state and "negotiated with a [D.C.] corporation," to resell the plaintiff's verification services, pursuant to "a structured, ongoing relationship between the two companies which necessarily required [the defendant] to maintain consistent contacts with [] a D.C.-based corporation," and provided the defendant with "access to [plaintiff's] product and confidential information," with confidentiality obligations, as well as "access to [plaintiff's] software services, which it resold to third parties under certain conditions prescribed by the agreement."  *Aristotle*, 2023 WL 1469038, at *4.  As the Court found, "[g]iven [defendant]'s voluntary acceptance of this long-term and structured relationship with [plaintiff]

in D.C., the quality and nature of its relationship to the company in D.C. can in no sense be viewed as random, fortuitous, or attenuated," particularly in light of the contract provision instructing that the contract "shall be performed entirely within . . . the District of Columbia." *Id.* at 4–5 (cleaned up with internal quotations and citations omitted). Similarly, in *Helmer*, the D.C. Circuit agreed that the exercise of personal jurisdiction was appropriate in a breach of contract claim where a contract was negotiated in, and involved continuing contacts with, the District where the defendant, a citizen and resident of Russia, would use the credit cards of her District resident romantic partner "on the condition that the monthly billing statements would be sent to Helmer's home address in the District of Columbia." 393 F.3d at 204.

In contrast to the facts in *Aristotle* and *Helmer,* the essentially form subscription agreement between plaintiff and BTG is far less involved than the agreement at issue with the District plaintiff in *Aristotle*, and was not "contingent" on BTG maintaining close or continuous contacts with the District in any way. Plaintiff itself admits that BTG's representative, Suarez, participated in subscriber-only events *virtually*, without traveling to D.C. or maintaining any significant connection with the district. Pl.'s BTG Opp'n at 4–5. As BTG notes, these contacts were substantially less significant than those of nonresident businesses over which courts have previously refrained from exercising personal jurisdiction. BTG's Mot. at 21–22 (citing *Burman v. Phoenix Worldwide Indus., Inc*., 437 F. Supp. 2d 142, 153–55 (D.D.C. 2006) (finding that although the nonresident defendant accounting firm provides services for some D.C. residents, the 0.15% of total income received by defendant from those services along with phone calls to D.C. and attendance at workshops, was not a sufficient relationship to warrant exercising specific jurisdiction in the District)). In this case, the future consequences of the subscription agreement,

including the subscriber-only events and contacts with journalists were perks, not requirements

of execution, and this factor thus also fails to support exercising personal jurisdiction over BTG.

The next factor, considering the parties' course of dealings, also fails to establish any

substantial connection to the District.  A connection based on the course of dealings should

indicate that the relationship was deliberate rather than "random, fortuitous, or attenuated."

*Burger King*, 471 U.S. at 480.  Emails and phone calls merely incidental to the contract are not

considered a substantial connection where they do not "arise out of any desire . . . to do

business" in the District.  *Burman*, 437 F. Supp. 2d at 151–52 (finding communications occurred

only "because the plaintiffs requested that these communications be directed to the District of

Columbia" (quoting *COMSAT Corp. v. Finshipyards S.A.M.*, 900 F. Supp. 515, 523 (D.D.C.

1995)) (alteration in original)); *see also Gibbons & Co. Inc. v. Roskamp Inst.*, No. 06-cv-720

(EGS), 2006 WL 2506646 (D.D.C. Aug. 28, 2006) at *3.  For example, in *Burger King*, the

Supreme Court held that a nonresident defendant was subject to suit in Florida because the

defendant "deliberately reached out beyond Michigan and negotiated with a Florida corporation

for the purchase of a long-term franchise," thereby "enter[ing] into a carefully structured 20-year

relationship that envisioned continuing and wide-reaching contacts" with the plaintiff in Florida,

involving "a continuous course of direct communications by mail and by telephone."  471 U.S. at

479–81 (quotation marks and alterations omitted).   In these circumstances, the Court found that

the Michigan-based franchisees could reasonably have expected to be haled into court in Florida.

*Id.*

Here, the parties' course of dealings do not establish any meaningful connection to the

District.  BTG's contacts with the District amount to paying a yearly subscription fee to

plaintiff's bank in the District and receiving access outside the District to plaintiff's newsletters

(approximately 500–600 per year) electronically via plaintiff's servers, Baine Decl. ¶ 7.  In addition, Suarez reached out to speak to plaintiff's journalists eight times, and virtually attended four subscriber-only events held in the District.  *Id.* ¶¶ 7–9.  None of these contacts sufficed as deliberate steps to solicit or do business in the District, and instead amounted to merely transactional acts by a customer of plaintiff's services.

Lastly, the contract terms do not indicate any significant connection to the District.  As to this factor, plaintiff points out that the parties had a choice-of-law provision in the Subscription Agreement stating that the laws of the District govern the contract.  Subscription Agreement at 2, ("This Agreement should be governed by and construed under the laws of the District of Columbia.").  A choice-of-law provision in a contract does not by itself confer personal jurisdiction, however, and while informative, such a provision is not determinative.  *See NRMP*, 720 F. Supp. at 100 (finding that a choice-of-law provision in an "unnegotiated form agreement that did not create continuing consequences in the District of Columbia" and was "insignificant" in the overall analysis).

In sum, plaintiff makes no meaningful showing that BTG transacted business in D.C. in a manner that shows purposeful conduct by BTG to avail itself of the laws and protections of the District.  Personal jurisdiction thus cannot be exercised under the provision of the D.C. long-arm statute at D.C. Code § 13-423(a)(1).

### (b) D.C. Code § 13-423(a)(4): Tortious Injury in the District

Plaintiff also contends that personal jurisdiction may properly be exercised over BTG under § 13-423 (a)(4), which provides that a nonresident defendant is subject to personal jurisdiction if the claim against such defendant arises from "causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or

solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia."  D.C. Code § 13-423 (a)(4).  This subsection requires a plaintiff to show, first, that the nonresident defendant "caus[ed] tortious injury *in* the District of Columbia by an act or omission *outside* the District," D.C. Code § 13-423(a)(4) (emphasis added), and is thus sometimes referred to as the "act out/impact in" subsection, *Crane*, 814 F.2d at 762.

"[R]ecognizing that allowing for personal jurisdiction any time an act outside of the District caused an injury within the District might open the courthouse doors too wide, Congress insisted that plaintiffs show 'something more' before haling a defendant into this Court."  *Groop Internet Platform Inc. v. Psychotherapy Action Network*, Civil Action No. 19-1854 (BAH), 2020 WL 353861, at *4 (D.D.C. Jan. 21, 2020) (quoting *Crane*, 813 F.2d at 761).  Consequently, as a second requirement for the exercise of personal jurisdiction under subsection (a)(4), plaintiff must also demonstrate that the defendant (1) "regularly does or solicits business" in the District, (2) "engages in any other persistent course of conduct" here, or (3) "derives substantial revenue from goods used or consumed, or services rendered" in this forum.  D.C. Code § 13-423(a)(4). These so-called "plus factors" ensure that personal jurisdiction is not exercised over a defendant when the in-District injury "is an isolated event and the defendant otherwise has no, or scant, affiliations with the forum."  *Steinberg v. Int'l Crim. Police Org.*, 672 F.2d 927, 931 (D.C. Cir. 1981).

As to the first factor—whether defendant "caus[ed] tortious injury *in* the District of Columbia by an act or omission *outside* the District"—the law is clear that copyright infringement cases sound in tort for purposes of the long-arm statute.  *See Costello Pub. Co. v. Rotelle*, 670 F.2d 1035 (D.C. Cir. 1981) (holding that "it is well established that a suit for

[copyright] infringement is analogous to other tort actions").  Yet, the law is less clear in this Circuit whether the situs of a copyright injury is the location of the tortious act, *i.e.,* where the infringement occurred—which here would likely be New York—or the location of the injured copyright holder—which here would be the District, where plaintiff is domiciled.  The Second and Ninth Circuits have held that the site of a copyright injury is the location of the copyright holder, reasoning in part that such a conclusion is practical because the location of infringement that takes place over the internet can be difficult to identify, *see Penguin Group (USA) Inc. v. American Buddha*, 640 F.3d 497, 500–01 (2d Cir. 2011); *Panavision Int'l v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998); Pl.'s BTG Opp'n at 14–16, and this reasoning has been followed by other judges of this Court, *see Triple Up, Ltd. v. Youku Todou, Inc.*, 235 F. Supp 3d. 15, 31–32 (D.D.C. 2017) (Moss, J.); *Nu Image, Inc v. 1-23,322*, 799 F. Supp 2d. 34, 42 (D.D.C. 2011) (Wilkins, J.).  Whether this reasoning applies on the record in this case need not be resolved, however, since regardless of the situs of the copyright injury, plaintiff fails to meet any of the subsection (a)(4) "plus factors" necessary to exercise personal jurisdiction.

Beyond the site of injury, courts require "something more than the in-forum impact at issue in the litigation" to exclude defendants who have "no, or scant, affiliations with the forum." *Steinberg*, 672 F.2d at 931.  Essentially conceding that BTG does not "regularly" engage in or solicit business in the District nor "derive[] substantial revenue from goods used or consumed, or services rendered, in the District," D.C. Code § 13-423(a)(4), plaintiff focuses only on the remaining subsection (a)(4) plus factor, asserting that BTG has "engage[d] in any other persistent course of conduct . . . in the District," *id.*; Pl.'s BTG Opp'n at 15; *see Steinberg*, 672 F.2d at 931. As evidence of such a persistent course of conduct, plaintiff points to BTG's employee, Suarez, "obtain[ing] over a thousand Capitol Forum articles over the three-year period and []

download[ing] hundreds of articles"; "attend[ing] Capitol Forum seminars held here pursuant to" the subscription agreement; "regularly contact[ing] Capitol Forum journalists"; and "receiv[ing] invoices generated in the district and pay[ing] these invoices to a District of Columbia bank." Pl.'s BTG Opp'n at 17.

Plaintiff fails, however, to wrestle with the fact that this BTG employee conducted all of these cited activities either from BTG's office in New York or from her home in Texas.  Suarez Decl. ¶¶ 4 8.  None of this supposed "persistent course of conduct" required any contact with the District.  Merely communicating with individuals in Washington, D.C. does not establish a persistent course of conduct.  *See Tavoulareas v. Comnas,* 720 F.2d 192, 194 (D.C. Cir. 1983); *see also Burman,* 437 F. Supp. 2d at 154 (holding that approximately 1,326 telephone calls into the District does not constitute "persistent course of conduct"); *Lewy v. S. Poverty L. Ctr.*, 723 F. Supp. 2d 116, 124 (D.D.C. 2010) (similar).

Suarez's virtual attendance at plaintiff's subscriber-only events is also inadequate to satisfy the persistent-course-of-conduct requirement of subsection (a)(4).  *See, e.g.*, *Groop Internet Platform Inc.*, 2020 WL 353861, at *8 ("[F]our trips [to Washington, D.C.] over twenty years falls far short of coming within the long-arm statute's ambit."); *Lewy*, 723 F. Supp. 2d at 124 ("Occasional travel to the District is also insufficient [under subsection (a)(4)]."); *Urban Inst. v. FINCON Servs.,* 681 F. Supp. 2d 41, 47–48 (D.D.C. 2010) (finding that three business trips to Washington, D.C. did not qualify as persistent course of conduct); *Burman,* 437 F. Supp. 2d at 153–54 (finding that attendance by defendants' employees at seminars and conferences in Washington, D.C. was not persistent course of conduct when "there [was] no evidence that these excursions to the District of Columbia are regular in nature"); *see also Parsons v. Mains*, 580 A.2d 1329, 1330 (D.C. 1990) (reasoning that subsection (a)(4) is "more concerned with a

continuing contact than with the impact or substance of a single contact").  Attending programs, seminars, and conferences in Washington, D.C., even if in-person rather than virtually, as here, is insufficient when "no evidence that these trips involve[] doing or soliciting business" in this forum, and this activity by defendant is not "regular in nature."  *Burman*, 437 F. Supp. 2d at 153–55.

Plaintiff does not contest that BTG is not registered to do business in District, has no office or employees in the District, pays no corporate income taxes in the District and derives no revenue from goods or services in the District.  BTG's Mot. at 21; *see generally* Pl's BTG Opp'n.  These are further indicia that BTG simply does not engage in any persistent course of conduct in the District, and therefore is not subject to the Court's personal jurisdiction pursuant to subsection (a)(4).[4]

\* \* \*

In sum, personal jurisdiction may not be exercised over BTG under either provision of the long-arm statute invoked by plaintiff to assert the claim for direct copyright infringement in Count III, requiring dismissal of this claim against BTG in the second amended complaint.[5]

---

[4]       Plaintiff asks that "[s]hould the Court be concerned that it does not have sufficient facts to" exercise personal jurisdiction over BTG under the provision at D.C. Code § 13-423(a)(1), "it be entitled to conduct jurisdictional discovery."  Pl.'s BTG Opp'n at 14 (citing *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343 (D.C. Cir. 2000)).  To be granted jurisdictional discovery, plaintiff must show "at least a good faith belief that such [jurisdictional] discovery will enable it to show that the court has personal jurisdiction over the defendant." *Williams v. Romarm, SA*, 756 F.3d 777, 786 (D.C. Cir. 2014).  While this standard is not onerous, plaintiff has already engaged in discovery since April 2023, after MSL's first motion to dismiss was denied, and plaintiff identifies no specific areas to explore with further discovery that, based on a fairly clear record before the Court, including the sworn declarations of persons with knowledge from BTG, would change the outcome or reveal contacts between BTG and the District to warrant the exercise of personal jurisdiction in this case.

[5]       Along with its motion to dismiss for lack of personal jurisdiction, BTG requests, in the alternative, that the claim against it be transferred to the Southern District of New York.  BTG's Mot. at 1.  Transferring the claim against BTG would divide the claims to be pursued in two different federal district courts.  Given the obvious resource and logistical challenges that would present to plaintiff to pursue these claims before two separate courts, plaintiff does not consent to transfer.  *See* Pl.'s BTG Opp'n at 18–19.  Moreover, as plaintiff notes, "[i]f personal jurisdiction exists, then 28 U.S.C. § 1404(a) would apply to any transfer request," but BTG has not addressed the factors to be considered for such transfer.  *Id.*  Dismissal, rather than transfer, of the claim against BTG is thus appropriate.

## IV.     CONCLUSION

For the foregoing reasons, plaintiff's allegations sufficiently support claims for relief in Counts I and II against MSL for direct and contributory copyright infringement and MSL's dismissal motion is therefore denied.  Plaintiff has failed to demonstrate, however, that personal jurisdiction may be exercised over BTG, under District of Columbia's long-arm statute, D.C. Code § 13-423(a)(1) and (a)(4), and, accordingly, BTG's motion to dismiss the single claim against it in Count III is granted.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  August 10, 2024


_____

**BERYL A. HOWELL**
United States District Judge