**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DBW PARTNERS, LLC d/b/a THE CAPITOL FORUM, <br><br> *Plaintiff* <br><br> v. <br><br> MARKET SECURITIES, LLC, <br><br> *Defendant* | **CIVIL ACTION NO.: 22-1333 (BAH)** <br><br> **MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SANCTIONS** |

**<u>MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR
SANCTIONS</u>**

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 1

II.  ABBREVIATED PROCEDURAL HISTORY ...................................................... 3

III.  ABBREVIATED RELEVANT FACTS ................................................................ 5

  A.  BRIEF RELEVANT BACKGROUND .................................................................. 5
  B.  MS. DONAKER'S PERSONAL CELLPHONE ...................................................... 6
  C.  ABBREVIATED RECITATION OF FACTS RELATING TO DISCOVERY IN THIS LITIGATION ........ 7

IV.  ARGUMENT ...................................................................................................... 12

  A.  LEGAL STANDARD FOR IMPOSITION OF SANCTIONS PURSUANT TO COURT'S INHERENT POWERS ..................................................................................................... 12
  B.  PLAINTIFF'S IRRELEVANT "FACTS" SHOULD BE DISREGARDED ......................... 14
  C.  PLAINTIFF HAS FAILED TO MAKE A SHOWING OF BAD FAITH MISCONDUCT .................... 15
    1)  Plaintiff Cannot Demonstrate That Any Omissions, All of Which Have Been Cured, Were Done Deliberately ................................................................. 15
    2)  Plaintiff Has Failed to Establish Any Fed. R. Civ. P. 26(g) Violation ........................... 19
      a.  Plaintiff Has Failed to Establish Any Violation By Market Securities' Counsel ...... 20
      b.  Plaintiff Has Failed to Establish Any Violation By Market Securities' CCO ........... 23
    3)  Plaintiff Has Failed to Establish Any Violation of Market Securities' Duty to Preserve Evidence ................................................................................. 26
  D.  THE DRASTIC SANCTIONS PLAINTIFF SEEKS ARE NOT JUSTIFIED OR COMMENSURATE WITH ANY VIOLATION ALLEGED ......................................................................... 28
    1)  Preclusion from Offering Objection or Rebuttal to Number of Capitol Forum Articles Received Is Unwarranted ............................................................. 28
    2)  Preclusion From Offering Fair Use Defense Is Harsh and Amounts to A Deprivation of Market Securities' Critical Rights ......................................................... 31
    3)  The Presentation of Evidence Relating to Market Securities' Alleged Discovery Abuse Is Unwarranted and Unduly Prejudicial ..................................................... 33
    4)  Attorneys' Fees, Especially Plaintiff's Exorbitant Fees Incurred, Are Likewise Unjustified ................................................................................. 35

V.  CONCLUSION ................................................................................................... 38

**TABLE OF AUTHORITIES**

**Cases**

*Atkins v. Fischer*, 232 F.R.D. 116 (D.D.C. 2005) .......................................................................... 17

*Ball v. George Wash. Univ.*, 798 Fed. Appx. 654 (D.C. Cir. 2020) ............................................ 27

*Ball v. George Wash. Univ.*, No. 17-cv-0507 (DLF), 2018 U.S. Dist. LEXIS 165983 (D.D.C. Sept. 27, 2018) ........................................................................................................................... 27

*Beck v. Test Masters Educ. Servs.*, No. 04-1391 (JDB), 2012 U.S. Dist. LEXIS 190127 (D.D.C. Sep. 25, 2012) ............................................................................................................................ 32

*Bonds v. District of Columbia*, 320 U.S. App. D.C. 138, 93 F.3d 801 (1996) ............................ 32

*Borum v. Brentwood Vill, LLC*, No. 16-1723 (RC), 2020 U.S. Dist. LEXIS 162664 (D.D.C. Sep. 4, 2020) ................................................................................................................................ 21

*Borum v. Brentwood Vill., LLC*, 332 F.R.D. 38 (D.D.C. 2019) .................................................... 13

*Compton v. Alpha Kappa Alpha Sorority, Inc.*, 938 F. Supp. 2d 103 (D.D.C. 2013) .................. 13

*Davenport v. Djourabchi*, No. 16-02445 (ABJ/RMM), 2020 U.S. Dist. LEXIS 225322 (D.D.C. Nov. 30, 2020) ............................................................................................................................ 21

*Goolsby v. Cty. of San Diego*, No. 3:17-cv-564-WQH-NLS, 2019 U.S. Dist. LEXIS 140326 (S.D. Cal. Aug. 19, 2019) ............................................................................................................ 26

*In re Frontier Commc'ns Corp.*, 658 B.R. 277 (Bankr. SDNY 2024) ........................................ 29

*Jenkins v. Wash. Metro. Area Transit Auth.*, 279 F.R.D. 18 (D.D.C. 2011) ............................... 13

*Johnson v. BAE Sys.*, 4 F. Supp. 3d 62, 307 F.R.D. 220 (D.D.C. 2013) ............................... 22, 34

*M & T Mortg.Corp. v. Miller*, No. 2002-5410, 2007 U.S. Dist. LEXIS 60610, 2007 WL 2403565 (E.D.N.Y. Aug. 17, 2007) ........................................................................................................... 31

*Mahaffey v. Marriott Int'l, Inc.*, 898 F. Supp. 2d 54 (D.D.C. 2012) ..................................... 27, 35

*Mazloum v. District of Columbia Metro. Police Dep't*, 530 F.Supp.2d 282 (D.D.C. 2008) ........ 34

*Mica Saint-Jean v. District of Columbia*, No. 08-cv-1769 (RWR-AK), 2014 U.S. Dist. LEXIS 204533 (D.D.C. Sep. 8, 2014) ................................................................................................... 24

*Moore v. Napolitano*, 926 F. Supp. 2d 8 (D.D.C. 2013) ............................................................. 16

*Newborn v. Yahoo!, Inc.*, 391 F. Supp. 2d 181 (D.D.C. 2005) ................................................... 16

*Paavola v. Hope Vill.*, No. 19-1608 (JDB), 2021 U.S. Dist. LEXIS 168241 (D.D.C. Sep. 4, 2021) ........................................................................................................................................ 15, 34

*Priority One Servs. v. W&T Travel Servs., LLC*, 987 F. Supp. 2d 1 (D.D.C. 2013) ................... 36

*Putscher v. Smith's Food & Drug Ctrs., Inc.*, No. 2:13-cv-1509, 2014 U.S. Dist. LEXIS 85024, 2014 WL 2835315 (D. Nev. June 20, 2014) ............................................................................. 28

*Richardson v. Union Oil Co. of Calif.*, 167 F.R.D. 1 (D.D.C. 1996) ......................... 18, 19, 30, 36

*Richardson v. Union Oil Co.*, 170 F.R.D. 333 (D.D.C. 1996) ..................................................... 33

*Scimed Life Sys. v. Medtronic Ave., Inc.*, 297 F. Supp. 2d 4 (D.D.C. 2003) ............................. 17

*Shepherd v. Am. Broad. Cos., Inc.*, 62 F.3d 1469 (D.C. Cir. 1995) ................................... passim

*Sturdza v. United Arab Emirates*, 281 F.3d 1287 (D.C. Cir. 2002) ........................................... 16

*United States v. Kellogg Brown & Root Servs.*, 284 F.R.D. 22 (D.D.C. 2012) ........................... 25

*Vasser v. Shulkin*, No. 14-0185, 2017 U.S. Dist. LEXIS 193174, 2017 WL 5634860, (D.D.C. Nov. 22, 2017) ............................................................................................................................ 27

*Young v. Off. of U.S. Senate Sergeant at Arms*, 217 F.R.D. 61 (D.D.C. 2003) ...................... 13, 14

*Zayn Al Abidin Muhammad Husayn v. Austin*, No. 08-1360 (EGS), 2024 U.S. Dist. LEXIS 183377 (D.D.C. Oct. 8, 2024) ............................................................................................. 30, 31

*Zhi Chen v. District of Columbia*, 839 F.Supp.2d 7 (D.D.C. 2011) ...................................... 35, 36

**Statutes**

17 U.S.C. § 107 ................................................................................................................ 32

17 U.S.C. § 504 ................................................................................................................ 31

17 U.S.C. § 505 ................................................................................................................ 38

**Rules**

Fed. R. Civ. P. 26(e) ................................................................................................... 21, 22

Fed. R. Civ. P. 26(g) ............................................................................................. 19, 20, 21

Fed. R. Civ. P. 33(b)(1)(B) .............................................................................................. 24

Fed. R. Civ. P. 33(d) ........................................................................................................ 24

Fed. R. Civ. P. 37(c)(1) .................................................................................................... 16

**Treatises**

3 Nimmer on Copyright 12.04 .......................................................................................... 29

Defendant Market Securities, LLC ("Defendant" or "Market Securities") hereby submits its opposition to Plaintiff DBW Partners, LLC d/b/a The Capitol Forum's motion for sanctions (*Dkt. No. 56*) ("Plaintiff" or "CapForum" and "Motion", respectively), which was filed under seal, and states as follows:

## I.    INTRODUCTION

Since the onset of this litigation, it has been abundantly clear that Plaintiff, which lacks an understanding of Market Securities' business as a broker-dealer, with clear obligations to its clients to communicate material information relating to stock movement, is on an abusive witch hunt against Market Securities, with the intent of bleeding Market Securities dry with legal expenses, and instilling fear in other third parties [1] so that the information set forth in Plaintiff's publications—despite creating market movement—remains available only to insiders. Plaintiff's Motion, which is rife with inflammatory and misleading allegations or misstatements, is yet another vexatious litigation tactic whereby Plaintiff attempts to vilify Market Securities and its counsel in a clear attempt to alleviate itself of the burden of making out its case. More specifically, Plaintiff inappropriately asks this Court to improperly weigh its one-sided statements regarding the evidence and infer nefarious intent, in order to provide a foundation for issuing the following unwarranted sanctions: 1) preclusion of Market Securities from offering opposing evidence regarding central factual allegations, 2) preclusion of Market Securities from offering its pivotal fair use defense that could dispose of certain of Plaintiff's claims, 3) allowing Plaintiff to introduce unduly prejudicial evidence of Market Securities' supposed misconduct, and 4) an award of

---

[1] By way of example, BTG Pactual Asset Management US LLC ("BTG"), Market Securities' client, and a subscriber to Plaintiff's publications, was added as a party to this litigation, and dismissed due to a lack of personal jurisdiction. Plaintiff has now instituted its own copyright infringement litigation against BTG in the Southern District of New York, *DBW Partners, LLC d/b/a/ The Capitol Forum v. BTG Pactual Asset Mg't, US, LLC*, Case No. 24-cv-9836-LGS.

Plaintiff's exorbitant attorneys' fees arising from this Motion and the investigation of Market Securities' supposed misconduct,.

In its Motion, which is disorganized, and at times incoherent regarding precisely what Plaintiff is asking for, Plaintiff improperly claims that the sanctions it seeks are warranted by: 1) certain omissions in Market Securities' original production, all of which have unequivocally been cured, on Market Securities' own accord, without any involvement by this Court; 2) alleged Fed. R. Civ. P. 26(g) violations that do not exist; and 3) the loss of the *personal* cellphone of Jennifer Donaker, one of Market Securities' employees, which was already searched for discoverable information, in a sheer accident. While Market Securities acknowledges that its initial production was imperfect, such imperfection was caused by the unique complexities associated with pulling the data that Plaintiff seeks. In an attempt to streamline this case and avoid needless costs, Market Securities employees spent countless hours creating documents for this litigation, and Plaintiff and its counsel were made aware of this process. When the margin of human error was discovered, and in an effort to demonstrate that it has nothing to hide, Market Securities supplied Plaintiff with all of the underlying data requested, such that Market Securities has over inclusively produced over approximately 2.3 million pages of documents to date. Despite this, Plaintiff somehow claims that "[w]hen Market Securities got caught red-handed doctoring documents, it doubled down on its discovery misconduct--instead of adhering to the rules" (Motion, p. 4); however, any such claim is patently false, and belied by the fact that Market Securities promptly cured its discovery deficiencies once they became known.

After learning of the issues set forth in the Motion several months ago, Plaintiff has spent an inordinate amount of time, and attorneys' fees on pursuing unjustified sanctions rather than focusing on the merits of this case. It has become apparent, through this Motion, and otherwise,

that Plaintiff's counsel's personal interest in this case has clouded the manner in which this case has been litigated.[2] Zealous advocacy is not synonymous with overly aggressive gamesmanship,[3] the latter of which should not be rewarded. Consequently, Market Securities implores this Court to not condone Plaintiff's efforts, which are, once again, as this Court noted in its Minute Order of June 23, 2023, "a needlessly burdensome distraction".

## II.    ABBREVIATED PROCEDURAL HISTORY

On May 13, 2022, Plaintiff filed its original Complaint (*Dkt. No.1*) (the "Original Complaint") against Market Securities, wherein it alleged claims of direct copyright infringement, contributory copyright infringement, and misappropriation of proprietary information. On July 15, 2022, Market Securities filed a motion to dismiss the Original Complaint (*Dkt. No. 15*). Thereafter, on March 23, 2023, this Court issued a Memorandum Opinion and Order (the "3/23 Order") in which it dismissed Plaintiff's claims of contributory copyright infringement and misappropriation of proprietary information, but allowed Plaintiff's claim for direct infringement to survive.

In June 23, 2023, Plaintiff raised a discovery dispute wherein it sought (1) "leave to file a discovery motion to compel the appointment of an independent expert in computer forensics who would then develop a protocol to recover" deleted data from the *personal* cellphones of certain Market Securities employees, and (2) the appointment of a special master to oversee discovery matters in this case, which was opposed by Market Securities. *Dkt. No. 26*. That same day, the Court denied Plaintiff's request in a Minute Order (the "6/23 Order"), finding as follows, in relevant part:

---

[2] Plaintiff's counsel, John Williams, is the father of Jake Williams, Senior Editor and Chief Operating Officer of Plaintiff. Upon information and belief, Mr. Williams is believed to have a second son, Michael Williams, who also works at Plaintiff as a Senior Correspondent.

[3] On more than one occasion, Plaintiff's counsel has had to be reminded of his duty of civility. *See, e.g.*, Transcript of Deposition of Erin Baskett, *Dkt. No. 55-8*, 86: 1-14. Similarly, on several occasions, Plaintiff's counsel has made threats of court intervention prior to even attempting to engage in good faith communications with Market Securities' counsel.

First, plaintiff proposes a significant impingement of defendant's employees' privacy to obtain 'mirror images' of three employees' personal cellphones, all for the purpose of obtaining information that is of only infinitesimal relevance. This is a copyright infringement action that can be proven, as this Court has already stated, through discovery of 'all of Market Securities' reports to determine how many are potentially infringing.' 20 Mem. Op. & Order at 7. Discovery of plaintiff's own reports in defendant's possession, by contrast, proves little, if anything; after all, the mere possession of plaintiff's reports--which defendant and its employees would have been free to obtain through subscriptions--does not prove copyright infringement. Discovery in this case should be an entirely straightforward exercise in which defendant produces its own reports, and in particular, those referencing plaintiff or bearing a resemblance to plaintiff's reports, and this discovery appears to be underway. Consequently, plaintiff's request is not 'proportional to the needs of the case,' Fed. R. Civ. P. 26(b)(1), as the requested discovery would illuminate little, while coming at the cost of defendant's employees' privacy and the significant expense of hiring an expert to attempt to recover long-since deleted messages. This requested discovery--and the request itself--is a needlessly burdensome distraction. . .Second, plaintiff's request for the appointment of a special master is, as defendant urges, an unnecessary proposal that does little more than 'drive up litigation costs.'

After some discovery took place, on September 11, 2023, Plaintiff filed the Second Amended Complaint (*Dkt. No. 28*) (the "SAC")[4] wherein it alleged claims of direct and contributory copyright infringement against Market Securities, as well as a direct copyright infringement claim against BTG. In September and October 2023, Market Securities and BTG each separately moved, in part and in whole, respectively, to dismiss the SAC. *Dkt. Nos. 31, 40*. While the motions were pending, the parties sought two extensions of the discovery period, given that "discovery cannot proceed with respect to some claims, and cannot proceed at all with respect to others, until the motions [were] resolved." *Dkt. Nos. 45, 46*. Thereafter, on August 10, 2024, the Court issued a Memorandum Opinion and Order (the "8/10 Order") in which it denied Market Securities' motion to dismiss, thereby, among other things, allowing Plaintiff's newly added claim

---

[4] On June 16, 2023, Plaintiff filed a motion to amend its Original Complaint that sought to lodge a first amended complaint, which was then denied as moot in light of a stipulation between the parties. *Dkt. Nos. 25, 27-28*.

of contributory infringement to proceed, and dismissed the claims against BTG for a lack of personal jurisdiction. *Dkt. No. 48.*

After certain discovery issues came to light, which will be addressed further *infra*, on November 26, 2024, Plaintiff sought a four (4) month extension of the discovery period (from December 30, 2024 up to April 30, 2025), and an extension of the time to designate additional expert testimony (which had passed, until March 31, 2025), which was granted by the Court. *Dkt. Nos. 51-54.* On February 18, 2025, Plaintiff submitted a motion for leave to file the Motion under seal, and after its sealing application was granted, Plaintiff filed its Motion on February 19, 2025.

### III.    ABBREVIATED RELEVANT FACTS[5]

#### A.   Brief Relevant Background

Market Securities is a U.S. FINRA-registered broker dealer that covers an investment strategy known as "risk arbitrage", which assesses the risks associated with mergers and acquisitions in the public markets. *Declaration of Jennifer Donaker In Support of Defendants' Opposition to Plaintiff's Motion*, submitted herewith ("*Donaker Dec.'*"), ¶ 4. One component of Market Securities' business is assessing the financial health of both the seller and buyer, along with the regulatory risks associated with closing the transaction. This requires a constant review of financial records of public companies filed with the Securities and Exchange Commission in quarterly, annual and current event reports, along with press releases, news and other relevant events that impact, or have the potential to impact, the value and therefore, stock price of said companies. *Id.* at ¶ 5. Plaintiff, which issues 30-50 reports each month (i.e., 360-600 annually), is

---

[5] As detailed further *infra* in Section IV(B), Plaintiff introduces a number of "facts" in its lengthy Statement of Facts, and throughout its Motion, that are not proven "facts", but are instead, contested. Nonetheless, given that Market Securities is of the position that the Court should not be called on to weigh the evidence at this juncture, and that many such so-called facts and inflammatory statements are irrelevant to the Court's disposition of this Motion, Market Securities will not waste the Court's time addressing the same herein, but instead, presents an abbreviated statement of facts most relevant to the issues at hand, which is further supplemented by the declarations submitted herewith.

one of many news sources that at times has the potential to cause the price of a stock to change, which can be material to investors. Motion, p. 5; *Donaker Dec.*, ¶ 6.

Market Securities' employees predominantly communicate with clients, which are large institutional investors, such as mutual funds, pension funds, banks and hedge funds, among others, by telephone and through the Bloomberg terminal—the most widely used computer system for investment professionals, which enables financial professionals to access and monitor real-time stock market data, analytical tools, provides news of its own along with other news outlets small and large, trading execution platform and algorithmic trading tools, and allows users to communicate with one another—using Instant Bloomberg chats ("IB Chat(s)"). *Id.* at ¶¶ 8-9.

### B.  Ms. Donaker's Personal Cellphone

Ms. Jennifer Donaker, Head of U.S. Event Driven at Market Securities, has a cellular telephone that is primarily for personal use, and is not issued or paid for by Market Securities. *Donaker Dec.*, ¶ 28. Beginning in or about 2014, after Ms. Donaker's first child was born, she began using an application called WhatsApp, primarily as a method to send and receive photographs and communications from her daughter's school program, and due to storage restrictions, maintained certain, standard auto deletion settings (either 24 hours or 7 days). *Id.* at ¶ 33. When Market Securities received a cease and desist letter from Plaintiff on or about October 27, 2021, the aforementioned automatic delete settings on WhatsApp were already in effect, and Ms. Donaker only ever manually chose to back up select personal data received via WhatsApp, such as photographs. *Id.* at ¶ 34. At her deposition, Ms. Donaker testified that she searched her backups for any relevant material, including any WhatsApp data, and there was nothing. *Id.* at ¶ 35. Thereafter, after doing such searches, in July 2022 (after the institution of this litigation, prior

to the issuance of any requests for documents), Ms. Donaker's cellphone accidentally fell into a pond while she was paddle boarding in Vermont with her family. *Id.* at ¶ 36.

**C. Abbreviated Recitation of Facts Relating to Discovery In This Litigation**

On March 28, 2023—three (3) days after the Court issued the 3/23 Order in which it dismissed Plaintiff's claims of contributory copyright infringement and misappropriation of proprietary information, but allowed Plaintiff's claim for direct infringement to survive—Plaintiff, via an email from its attorney, John B. Williams, served Plaintiff's First Request for Production of Documents on Defendant (the "First RFPs"). *Declaration of Kerry B. Brownlee In Support of Defendants' Opposition to Plaintiff's Motion*, submitted herewith ("*Brownlee Dec.*'"), ¶ 4, Ex. A. Shortly thereafter, the parties, through their counsel, agreed upon search terms for responsive documents and custodians; specifically, the following: CapForum, Capitol Forum, Capital Forum, Cap Forum, and Cappy as search terms (the "Search Terms"), and Jennifer Donaker, Eddie Lee, and Stephen Grahling as custodians. *Id.* at ¶¶ 5-6.

On April 27, 2023, Market Securities served its responses and objections to the First RFPs on Plaintiff, which were signed by Market Securities' counsel, Kerry B. Brownlee, and Market Securities simultaneously produced certain documents MARKETSECURITIES00000001-MARKETSECURITIES00000442 (the "4/27 Responses & Documents"), while specifically indicating that further documents would be forthcoming. *Id.* at ¶ 11. Of the 4/27 Responses & Documents, MARKETSECURITIES00000410 to MARKETSECURITIES00000439 consisted of thirty (30) pages of chat blasts sent by Market Securities to its clients that were copied and pasted from the Bloomberg terminal by Market Securities employees into a Word document that was then reviewed and converted into a PDF by Market Securities' counsel. *Id.* at ¶ 11. At that same time,

7

Market Securities' counsel asked for a call with Plaintiff's counsel to discuss certain discovery-related issues. *Id.* at ¶ 12.

On May 4, 2023, Plaintiff's and Market Securities' counsel had a telephone call regarding discovery related issues (the "5/4 Call"), including, but not limited to Market Securities' difficulty in searching for and producing chats that occurred via the Bloomberg terminal. *Id.* at ¶ 13-14. More specifically, Market Securities' counsel raised the issue that Market Securities was able to pull only approximately one years' worth of data residing on its Bloomberg terminals, and it was most efficiently able to do so by copying and pasting the data therefrom (in lieu of the alternative of producing screenshots), which was the method used to produce MARKETSECURITIES00000410 to MARKETSECURITIES00000439. *Id.* at ¶ 14. Thereafter, on May 8, 2023, Market Securities supplemented its production with MARKETSECURITIES00000443 to MARKETSECURITIES00000563 (the "5/8 Production"). The 5/8 Production included, among other things, IB Chats yielded by the Search Terms that were, as discussed with Plaintiff's counsel on the 5/4 Call, copied and pasted from the Bloomberg terminal by Market Securities employees into a Word document that was then reviewed by Market Securities' counsel, converted into a PDF, and bate-stamped, along with three (3) of Plaintiff's articles with Cristina Suarez' watermark thereon. *Id.* at ¶ 18.

Since Market Securities only had access to one years' trailing worth of IB Chats at any given time locally on its systems, Market Securities had to pay its third-party vendor, Bloomberg Vault, $6,000 (inclusive of VAT) to search for and extract IB Chat data reaching further back, from October 30, 2019 to April 11, 2022. *Donaker Dec.*, ¶¶ 12, 16-18. In or about June 2023, Market Securities received the first extraction from Bloomberg Vault (the "June 2023 Bloomberg Vault Data"), which contained approximately 3.3 GB of data (i.e., over approximately two million

pages), produced by Bloomberg Vault in three (3) folders of data associated with three (3) different Bloomberg user accounts: UUID 17914760 (Jennifer Donaker), UUID 17914700 (Stephen Grahling), and UUID 25113852 (Eddie Lee). *Id.* at ¶¶ 18-19. Consistent with the process previously used by Market Securities in producing MARKETSECURITIES00000410 to MARKETSECURITIES00000439 and MARKETSECURITIES00000443-MARKETSECURITIES00000508, due to the unmanageable size of the data and enormous amount of irrelevant results, Jennifer Donaker, Stephen Grahling and Eddie Lee split up the June 2023 Bloomberg Vault Data files, searched their designated portions with the agreed upon Search Terms and copied and pasted the results yielded into a Word document, and sent the same to Market Securities' counsel for review. *Id.* at ¶¶ 21-23. Given the IB Chats were pulled via user (i.e., Jennifer Donaker, Eddie Lee, and Stephen Grahling), and that these users often appear in the same chats with a high volume of clients, the IB Chats garnered a substantial amount of duplications across the files, as well as within the files themselves. Going through the June 2023 Bloomberg Vault Data was an extremely laborious process – particularly because of the unwieldy size of the data, and the high level of duplications, which took upwards of approximately eighty (80) hours collectively for Market Securities' employees (specifically, Jennifer Donaker, Eddie Lee, and Stephen Grahling) to complete. *Id.* at ¶ 24. After Market Securities' employees searched the June 2023 Bloomberg Vault Data, and copied and pasted the same into a singular Word document, Market Securities' counsel substantively reviewed the Word document, and later, converted it into PDF, and bate-stamped it for production as MARKETSECURITIES00000566 to MARKETSECURITIES00000656, which was served on Plaintiff on June 23, 2023 (MARKETSECURITIES00000410 to MARKETSECURITIES00000439, MARKETSECURITIES00000443-MARKETSECURITIES00000508, and

MARKETSECURITIES00000566 to MARKETSECURITIES00000656 are the IB Chat documents created by Market Securities' employees in 2023, which are collectively, hereinafter, referred to as the "2023 Chat Production"). *Brownlee Dec.*, ¶¶ 26, 28.

Thereafter, Plaintiff's attorney, Mr. Williams, took the depositions of Eddie Lee and Stephen Grahling. *Id.* at ¶¶ 30-31. Given Plaintiff's filing of the SAC, and Market Securities' and BTG's motions to dismiss, from September 2023 through August 10, 2024 (i.e., for nearly one year), discovery in this case was in a holding pattern. *Id.* at ¶ 39.

After the Court issued the 8/10 Order in August 2024, discovery resumed. On or about September 20, 2024, Plaintiff issued subpoenas to Cristina Suarez, commanding her to produce certain documents, and appear for a deposition. *Id.* at ¶ 42. On or about October 28, 2024, Market Securities' counsel had a conversation with BTG's counsel, after which Market Securities' counsel first became aware of the potential incomplete nature of Market Securities' 2023 Chat Production, and promptly took steps to investigate the same. *Id.* at ¶ 45. On October 30, 2024, Market Securities' counsel, Kerry Brownlee, emailed Mr. Williams to advise him that Market Securities recently became aware of the incomplete nature of its 2023 Chat Production, and was taking steps to rectify the same, including by having Market Securities' counsel undergo the time-consuming and expensive task of searching the June 2023 Bloomberg Vault Data for the search term "Suarez" since it had come to light that, at the very least, IB Chats involving Ms. Suarez were missing or incomplete. *Id.* at ¶¶ 46, 49. On November 5, 2024, Market Securities supplemented its production and produced MARKETSECURITIES00000657-MARKETSECURITIES00000800 (the "11/5 Supplemental Production"), which was prepared by its counsel. *Id.* at ¶ 51.

On the following day, Plaintiff's counsel took the deposition of Jeremy Civre, a trader at Market Securities, pursuant to Fed. R. Civ. P. 30(b)(1). *Id.* at ¶ 52. After said deposition, Plaintiff's

and Market Securities' counsel had a conversation about the incomplete nature of Market Securities' production. *Id.* at ¶¶ 54-55. At that time, Market Securities' counsel offered to have Epstein Drangel LLP employees search all of the June 2023 Bloomberg Vault Data for all agreed upon Search Terms (i.e., "Cap Forum", "Capitol Forum", "Capital Forum", "Cap Forum", "Cappy") to ensure completeness, and further supplement Market Securities' production. *Id.* In response, Mr. Williams indicated that Plaintiff wanted the raw June 2023 Bloomberg Vault Data or he would go to the Court. *Id.* at ¶ 55.

On November 14, 2024, Market Securities produced the raw June 2023 Bloomberg Vault Data to Plaintiff as fifteen native text files, marked MARKETSECURITIES00000801 to MARKETSECURITIES00000815. *Id.* at ¶ 61. Since only approximately one years' worth of data is stored on Market Securities' Bloomberg terminals at a given time, due to the passage of time, Market Securities then had to engage Bloomberg Vault to retrieve the data that it was able to pull from its own systems in 2023 when it compiled the 2023 Chat Production. *Id.* at ¶ 62; *Donaker Dec.*, ¶ 55. After paying another $6,000 to Bloomberg Vault, in or about December 2024, Market Securities received an additional data set from Bloomberg Vault yielded by the Search Terms, which was approximately 0.25 GB in size, for two (2) years rolling back from April 30, 2023 (the "2024 Bloomberg Vault Data"). *Donaker Dec.*, ¶¶ 26-27. On December 20, 2024, Market Securities served Plaintiff with Market Securities' further supplemental production, including the 2024 Bloomberg Vault Data, marked MARKETSECURITIES00000816-MARKETSECURITIES00098325. *Brownlee Dec.*, ¶ 66.

# IV.    ARGUMENT

In its Motion, which is disordered, and rife with extraneous so-called facts,[6] Plaintiff asks the Court to impose four (4) drastic sanctions: 1) that the Court "rule on summary judgment or instruct the jury at trial that Market Securities is precluded from offering objection or rebuttal to Capitol Forum's evidence regarding the number of Capitol Forum articles it received" (Motion, p. 34); 2) that the Court "rule on summary judgment or instruct the jury at trial that Market Securities is precluded from offering a 'fair use' defense with respect to [certain allegedly] truncated articles" (Motion, p. 35); 3) that the Court "permit Capitol Form to present evidence of Market Securities' discovery abuse on summary judgment or at trial" (Motion, p. 35); and 4) that the Court "award Capitol Forum the attorneys' fees, expert fees, and costs it incurred due to Market Securities' [alleged] discovery misconduct", including the fees associated with Plaintiff making its Motion (Motion, p. 35). Plaintiff appears to argue that the four (4) foregoing categories of sanctions are apparently justified by the following: 1) certain omissions in Market Securities' initial document production, which have been cured; 2) purported violations of Fed. R. Civ. P. 26(g) by both Market Securities' counsel and Market Securities' Chief Compliance Officer; and 3) Market Securities' supposed violation of its duty to preserve evidence when the *personal* cellphone of one of its employee accidentally fell into a pond in July 2022. Not only are the sanctions that Plaintiff seeks draconian measures, but Plaintiff's request for any such sanctions woefully lacks sufficient factual and legal support, as further addressed herein.

## A.  Legal Standard for Imposition of Sanctions Pursuant to Court's Inherent Powers

"'[C]ourts have the inherent power to impose sanctions for abusive litigation practices' when the Federal Rules of Civil Procedure alone do not provide them with 'sufficient authority to protect

---

[6] Notably, the Statement of [Alleged] Facts section of the Plaintiff's memorandum is pages 5 through 24, whereas Plaintiff's argument is only on pages 24 through 35.

the integrity of the judicial system.'"[7] *Borum v. Brentwood Vill., LLC*, 332 F.R.D. 38, 44 (D.D.C. 2019), citing *Young v. Off. of U.S. Senate Sergeant at Arms*, 217 F.R.D. 61, 65 (D.D.C. 2003). When considering the propriety of sanctions under a court's inherent authority, "the court must consider, *inter alia*, the prejudice to the opposing party." *Jenkins v. Wash. Metro. Area Transit Auth.*, 279 F.R.D. 18, 22 (D.D.C. 2011). "As the Supreme Court has explained, 'because inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion.' . . .The Court has also cautioned restraint in the use of inherent powers 'because of their very potency.'" *Shepherd v. Am. Broad. Cos., Inc.*, 62 F.3d 1469, 1475 (D.C. Cir. 1995) (internal citations omitted). The Court must "properly 'calibrate the scales' to ensure that the gravity of an inherent power sanction corresponds to the misconduct." *Shepherd*, 62 F.3d at 1479.

"The evidentiary standard governing use of a court's inherent power varies with the nature of the sanction [sought to be] imposed." *Compton v. Alpha Kappa Alpha Sorority, Inc.*, 938 F. Supp. 2d 103, 106 (D.D.C. 2013). More specifically, "[s]o called 'issue-related sanctions'—those that are 'fundamentally remedial rather than punitive and do not preclude a trial on the merits'— require proof by a preponderance of the evidence." *Id.* at 106 (internal citation omitted). On the other hand, "[a]ny 'fundamentally penal' sanctions— 'dismissals and default judgments, as well as contempt orders, awards of attorneys' fees, and the imposition of fines'—require proof by clear and convincing evidence." *Id.* (internal citation omitted). Such penal sanctions can only be imposed upon a finding "first, that there is clear and convincing evidence that the fraudulent or bad faith misconduct occurred, and second, that a lesser sanction would not sufficiently punish

---

[7] While Plaintiff contends that a violation of Fed. R. Civ. P. 26(g) allegedly occurred, in its Motion, Plaintiff addresses this Court's capacity to issue sanctions pursuant to its inherent authority, not under Fed. R. Civ. P. 26(g)(3), and as such, Market Securities only addresses this Court's inherent authority powers herein. Moreover, there is not, nor can there be, any allegation that Market Securities has violated a specific discovery order that would invoke the sanctions provided by Rule 37(b)(2) of the Federal Rules of Civil Procedure.

and deter the abusive conduct while allowing a full and fair trial on the merits . . . provid[ing] a specific reasoned explanation for rejecting lesser sanctions." *Young*, 217 F.R.D. at 66 (internal quotation omitted). As noted above, here, Plaintiff seeks both issue-related and penal sanctions in the form of the preclusion of evidence, the preclusion of making out Market Securities' fair use defense (which goes to the heart of this case), introducing evidence of Market Securities' supposed misconduct at summary judgment or trial, and attorneys' fees.

### B. Plaintiff's Irrelevant "Facts" Should Be Disregarded

As an initial matter, throughout Plaintiff's Motion, Plaintiff introduces a number of "facts", which are utterly irrelevant or vehemently contested, along with statements that are disguised as facts, but in actuality, are legal assessments, all of which should be disregarded by the Court. For example, Plaintiff introduces a number of "facts" regarding conversations that occurred between Plaintiff's counsel and Market Securities' counsel Jason M. Drangel (*see, e.g.,* Motion, pp. 6-7), prior to the institution of this litigation, and were part of settlement discussions pursuant to Fed. R. Evidence 408; therefore, these "facts" should not be considered by this Court under Fed. R. Evidence 408(a)(2), and regardless, are wholly irrelevant to any alleged sanctionable conduct occurring during the course of this litigation. As another example, Plaintiff references a number of chats entirely out of context (*see, e.g.*, Motion, p. 2), and improperly asks this Court to weigh the skewed evidence presented in Plaintiff's favor. Market Securities will not waste this Court's precious time and resources by responding to each and every one of Plaintiff's "facts" or incendiary allegations, but in refraining from doing so, does not concede the accuracy thereof. Instead, Plaintiff reserves the right to respond to such "facts" or allegations at the appropriate time (e.g., on summary judgment, at trial, etc.).

**C.  Plaintiff Has Failed to Make A Showing of Bad Faith Misconduct**

**1)  *Plaintiff Cannot Demonstrate That Any Omissions, All of Which Have Been Cured, Were Done Deliberately***

The first alleged misconduct that Plaintiff asserts took place is that: "Market Securities' employees [allegedly] doctored the Word document it produced in June 2023 by stripping material from it that would have shown Market Securities [allegedly] received from Suarez copyrighted Capitol Forum publications on a regular and immediate basis. Market Securities also [allegedly] concealed from its 2024 Supplemental Production [8] extensive evidence of [alleged] direct infringement, including the [alleged] truncation of 19 Capitol Forum articles, and contributory infringement by encouraging Suarez to supply it with Capitol Forum articles." Motion, p. 31. More specifically, Plaintiff claims that "Market Securities [allegedly] stripped every reference from the 2023 transcripts that stated or implied that Suarez was sending, or had sent, or would send, Capitol Forum reports to Market Securities; it [allegedly] stripped every reference to the Capitol Forum watermark; it [allegedly] stripped every reference that stated or implied that Market Securities employees contacted Suarez for information from Capitol Forum articles; and it [allegedly] deleted specific lines within certain chats to remove evidence of copyright infringement." Motion, p. 15.[9] In apparent support of the supposed intentionality of the omissions, Plaintiff offers the Affidavit

---

[8] To be clear, the 11/5 Supplemental Production (what Plaintiff refers to as the "2024 Supplemental Production") was further supplemented by Market Securities' production of the entirety of its raw, overinclusive Bloomberg Vault data. *Brownlee Dec.*, ¶¶ 55, 61. It was not, by itself, represented by Market Securities' counsel as complete. *Id.*

[9] Plaintiff also claims that "900 previously withheld communications have been produced and are being examined" (Motion, p. 2); however, the relevancy of any such communications, and whether they even relate to Plaintiff, is unclear. It also begs the question of the prematurity of this Motion. *See Paavola v. Hope Vill.*, No. 19-1608 (JDB), 2021 U.S. Dist. LEXIS 168241 (D.D.C. Sep. 4, 2021). Although Plaintiff has had months to draft and file this Motion since becoming aware of the supposed misconduct in or about November 2024, it claims that it is continuing to analyze Market Securities' supposed malfeasance. *See* Motion, pp. 21-22.

of Robert N. Fineli, PhD—a previously undisclosed expert[10]—whose methodology is egregiously flawed, as further addressed below.

At the outset, it bears mentioning that on September 11, 2023, the SAC was filed (*Dkt. No. 28*), such that this case now involves both claims of direct and contributory copyright infringement against Market Securities. In April-June 2023, when Market Securities first responded to Plaintiff's First RFPs, only claims of direct infringement were alleged against Market Securities (with Plaintiff's original claim of contributory infringement having been dismissed by virtue of the 3/23 Order). Nonetheless, to make out Plaintiff's claims for direct copyright infringement, Plaintiff needs to establish: 1) ownership of a valid copyright or copyrights; and 2) that Market Securities copied Plaintiff's original aspects of its articles, by demonstrating access and substantial similarity of protectible expression. *See Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1295 (D.C. Cir. 2002). As for its claims of contributory infringement, Plaintiff must demonstrate: "'(1) direct infringement by a third party; (2) knowledge by [Market Securities] that third parties were directly infringing; and (3) substantial participation by [Market Securities] in the infringing activities.'" *Newborn v. Yahoo!, Inc.*, 391 F. Supp. 2d 181 (D.D.C. 2005). While Plaintiff professes that the material omitted from Market Securities' 2023 Chat Production purportedly evidences direct and contributory infringement, and Market Securities' apparent attempt to minimize its exposure, Plaintiff's attestations are self-serving, conclusory, and call on this Court to make assessments about the merits of this case that are premature. *See Scimed Life Sys. v. Medtronic*

---

[10] Mr. Finelli was not disclosed to Market Securities or its counsel until Plaintiff filed its Motion. "The D.C. Circuit has not announced whether initial disclosures under Rule 26(a)(1) require a party to disclose expert witnesses who will not testify at trial, and courts in other districts are split." *Moore v. Napolitano,* 926 F. Supp. 2d 8, Note 12 (D.D.C. 2013). To the extent that Plaintiff was required to disclose Mr. Finelli pursuant to Rule 26(a)(1), Fed. R. Civ. P. 37(c)(1) could be triggered (providing that "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."). Defendant has unfairly not had the opportunity to depose Mr. Finelli prior to filing the instant opposition. If Mr. Finelli's affidavit is considered, it should be assigned minimal weight.

*Ave., Inc.*, 297 F. Supp. 2d 4, 11 (D.D.C. 2003) (holding a motion for sanctions, albeit pursuant to Fed. R. Civ. P. 11, was premature where it would necessarily require a finding as to the merits of the underlying dispute). Moreover, while Plaintiff claims that the omitted portions are damaging, Plaintiff fails to demonstrate that Market Securities employees involved in the discovery process considered such portions—to the extent they were actually considered and not merely overlooked—to be anything other than irrelevant.

In fact, the breadth of evidence produced by Market Securities in 2023 rebuts the suggestion that Market Securities is guilty of intentionally suppressing or "falsifying" any evidence. For example, it was through Market Securities' 2023 production that Plaintiff learned of Ms. Suarez when Market Securities produced articles in its possession with Ms. Suarez' watermark. *See Brownlee Dec.*, ¶ 18. By way of further example, Plaintiff highlights Market Securities' inadvertent omission of a mere reference in an IB Chat to a transcription by Stephen Grahling of one of Plaintiff's articles on May 12, 2020, which had already been produced in full by Plaintiff. *Id.* at ¶ 11. It seems "highly unlikely that a guilty party -- intent on suppressing evidence. . . would produce so much material". *Atkins v. Fischer*, 232 F.R.D. 116 (D.D.C. 2005). Additionally, Market Securities has now unequivocally rectified any defects in its 2023 Chat Production. *See Brownlee Dec.*, ¶¶ 61, 66.

Plaintiff's argument also fails to account for the enormity of the June 2023 Bloomberg Vault Data, and the data culled from the Bloomberg terminals in 2023, and the high likelihood of inadvertent, human error. While Mr. Finelli—a previously undisclosed alleged expert—claims that any omissions were "not the result of honest or inadvertent mistakes", he does so by comparing

the 2023 Chat Production[11] to the 11/5 Supplemental Production, without any reference to, or consideration of, the underlying June 2023 Bloomberg Vault Data.[12] As Ms. Donaker testified, the June 2023 Bloomberg Vault Data was approximately 3.3 GB of data (consisting of approximately 3.3 billion characters, and millions of pages, many of which are duplicative chats), which took her team over eighty (80) hours to get through.[13] *Donaker Dec.*, ¶¶ 18, 24. The propensity for human error is also supported by Plaintiff's own Motion wherein Plaintiff incorrectly claims that one chat was truncated, but instead, it seems that particular chat blasted by Mr. Civre was simply missed, and another very similar one authored by Ms. Donaker was produced in full. *Brownlee Dec.,* ¶¶ 73-78.

Throughout the Motion, Plaintiff erroneously attempts to liken the facts of this case to *Richardson v. Union Oil Co. of Calif.,* 167 F.R.D. 1 (D.D.C. 1996), which will be addressed in further detail *infra*, stating that "[l]ike this Court in *Richardson*, the Court should 'not believe for one moment' that these omissions were 'innocent mistakes.'" (Motion, p. 31). Plaintiff fails to adequately consider, however, that the facts of *Richardson* are entirely distinct. *Richardson*, which was vacated in part, did not involve "omissions" from certain chats within high volumes of data by lay persons without familiarity with copyright cases, like here, but instead, involved deletions of references to test results that unequivocally went to the heart of the case and the removal of document headers that "would have alerted any knowledgeable reader that the document had been redacted", by a legal assistant with over seven years of experience, with intimate familiarity with

---

[11] Mr. Finelli also defines the "2023 production" as Bates 443-508 and Bates 566-656; however, MARKETSECURITIES00000410-439 also contain IB Chats, albeit those that were blasted out to clients, not one to one side chats. *See Brownlee Dec.*, ¶ 11.

[12] It is worth mentioning that during the course of Ms. Donaker's deposition, Plaintiff's attorney, Mr. Williams, acknowledged that he had not looked at the Bloomberg Vault data set. Donaker Tr., 280: 4-16.

[13] Plaintiff misconstrues Ms. Donaker's testimony, and claims that "2023 Word document supposedly containing all client communications drawn from the Bloomberg portal was drawn from three folders of data created by her, Lee, and Grahling"; however, the folders of data were not "created by" Market Securities' employees, but instead, provided by Bloomberg Vault.

benzene cases. *Id.* at 167 F.R.D. at 2. Moreover, when the high margin of human error was realized, Market Securities' counsel, on its own, reached out to Plaintiff's counsel, and Market Securities took steps to rectify the same, without any involvement by this Court. *Contra* 167 F.R.D. at 4 ("it is significant that the only reason that these matters were fully exposed to public view was because of the Court's intervention").

Since the entirety of the Bloomberg Vault data has been produced, Plaintiff can hardly, in good faith, claim any prejudice, particularly when the discovery period remains open, and Plaintiff itself has recently produced documents (*Brownlee Dec.*, ¶ 72). Plaintiff fails to adduce any real evidence of prejudice, other than its hollow claim that Mr. Williams and Plaintiff's employees spent "approximately 200 hours building a largely circumstantial case for direct and contributory copyright infringement against Market Securities. Given the recent disclosures, this was all wasted work." Motion, p. 13. That Plaintiff and/or its attorneys spent an inordinate amount of time "building a largely circumstantial case", while discovery remained ongoing, is not cognizable prejudice caused by any alleged misconduct by Market Securities.

### 2) *Plaintiff Has Failed to Establish Any Fed. R. Civ. P. 26(g) Violation*

The second category of misconduct that Plaintiff alleges are two (2) violations of Fed. R. Civ. P. 26(g): one by its counsel, Kerry Brownlee, and the second by Market Securities' Chief Compliance Officer, Erin Baskett. Although Plaintiff alleges violations by Market Securities' counsel, it does not specify if it seeks sanctions against Market Securities' counsel, in addition to Market Securities. Nonetheless, Plaintiff has not demonstrated any violation by either Market Securities or its counsel.

19

### a.   *Plaintiff Has Failed to Establish Any Violation By Market Securities' Counsel*

Fed. R. Civ. P. 26(g)(1) provides, in relevant part, that: "[b]y signing [a discovery response], an attorney or party certifies *that to the best of the person's knowledge*, information, and belief *formed after a reasonable inquiry*: (A) with respect to a disclosure, it is complete and correct as of the time it is made" (emphasis added). In its Motion, Plaintiff brazenly claims that Ms. Brownlee purportedly violated the foregoing provision because:

> By signing Market Securities' 2023 production, Brownlee certified that, after making a reasonable inquiry, she determined that documents produced were complete and accurate. However, Brownlee admits, and Donaker testified, that neither Brownlee nor any other lawyer representing Market Securities even looked at the documents produced in 2023, much less did they conduct a reasonable inquiry into their completeness and accuracy.

Motion, p. 32.

Plaintiff's argument suffers from a number of flaws, including that: 1) despite what Plaintiff groundlessly insinuates, the fact that Ms. Brownlee did not substantively review the raw June 2023 Bloomberg Vault Data in 2023 does not signify that Ms. Brownlee did not conduct a reasonable inquiry into the completeness or accuracy of the 2023 Chat Production; 2) Plaintiff conveniently overlooks that when Ms. Brownlee signed Market Securities' responses to the First RFPs on April 27, 2023, the entirety of the 2023 Chat Production had not yet been produced, and Ms. Brownlee specifically indicated that documents would be produced on a rolling basis (i.e., that the production was incomplete). While Ms. Brownlee did not review all of the raw June 2023 Bloomberg Vault Data, and she was not involved in the actual creation of the Word document that became the 2023 Chat Production, she conferred with Market Securities before, during, and after the process, reviewed the Word document prepared by Market Securities' employees, and bate-stamped the same. *Brownlee Dec.*, ¶¶ 8-9, 25-26. In other words, she made a reasonable inquiry,

and based on said inquiry, to the best of her knowledge, the certification she made was proper at the time it was made. *See* Fed. R. Civ. P. 26(g). Contrary to what Plaintiff suggests, Ms. Donaker did not testify to the conversations she had with Ms. Brownlee, which are privileged, but instead, she simply stated that her attorneys were not involved in the actual copying and pasting process, and did not cross reference the same with the extremely voluminous raw June 2023 Bloomberg Vault Data. *See* Transcript of Deposition of Jennifer Donaker, Thursday, November 21, 2024, *Dkt. No. 56-7* ("Donaker Tr."), 45:7-46:3; *see e.g., Davenport v. Djourabchi*, No. 16-02445 (ABJ/RMM), 2020 U.S. Dist. LEXIS 225322, at *13-14 (D.D.C. Nov. 30, 2020) (finding confidential discussions regarding how representation should be carried out are subject to attorney-client privilege). Accordingly, Plaintiff has no basis for claiming that Ms. Brownlee did not conduct any reasonable inquiry. *See, e.g., Borum v. Brentwood Vill, LLC*, No. 16-1723 (RC), 2020 U.S. Dist. LEXIS 162664 (D.D.C. Sep. 4, 2020) (finding that failure to disclose does not indicate that a reasonable inquiry was not made).[14]

After gaining knowledge that Market Securities' 2023 Chat Production was seemingly incomplete in or about October 28, 2024, Ms. Brownlee promptly took steps to investigate the same, and brought the issue to Market Securities' attention. *Brownlee Dec.*, ¶¶ 44-46. In fact, Ms. Brownlee, on her own accord, notified Plaintiff's counsel of the issue on October 30, 2024. *Id.* at ¶ 46. Thereafter, Epstein Drangel LLP reviewed the June 2023 Bloomberg Vault Data, and attempted to fill in any known gaps in Market Securities' 2023 production. *Id.* at ¶ 49. On November 5, 2024, pursuant to Fed. R. Civ. P. 26(e), Ms. Brownlee served Plaintiff with Market

---

[14] It is worth noting that if Market Securities' counsel's conduct is deemed sanctionable, it calls into question Plaintiff's own conduct in certifying Plaintiff's discovery responses. In particular, by way of example, Market Securities was told in or about May 10, 2023, in Plaintiff's responses to Market Securities' document requests, which were certified by Mr. Williams, that certain documents responsive to Market Securities' requests did not exist, but it came to light during the deposition of Mr. Trevor Baine, well over one year later, that this assertion was not accurate. *Brownlee Dec.*, ¶¶ 21-22. While each party, and its counsel, has an independent obligation to comply with the Federal Rules, Plaintiff comes to this Court with unclean hands.

Securities' 11/5 Supplemental Production (i.e., a little over one week of learning of the issue), which took Ms. Brownlee's office a significant time to compile. *Id.* at ¶ 51. On the next day, Ms. Brownlee offered to have Epstein Drangel LLP re-search the June 2023 Bloomberg Vault Data. *Id.* at ¶ 55. Plaintiff declined Ms. Brownlee's offer, and less than one (1) week later, on November 12, 2024, Market Securities produced the raw June 2023 Bloomberg Vault Data to Plaintiff. *Id.* at ¶¶ 55, 61.

Plaintiff misleadingly alleges that "***16 months*** passed before Market Securities served its Supplemental Production in 2024" (Motion, p. 32), but conveniently overlooks that under Fed. R. Civ. P. 26(e), the duty to supplement or correct a response "in a timely manner" is triggered "if the party learns that in some material respect the disclosure or response is incomplete or incorrect". Fed. R. Civ. P. 26(e)(1)(A). Within days of learning of the issue, Market Securities' counsel notified Plaintiff's counsel, and a little over one week later, began supplementing Market Securities' production. *Brownlee Dec.*, ¶¶ 46, 51. Further, Plaintiff also conveniently fails to mention that this case, including discovery, was virtually at a standstill for nearly one (1) year, and as such, the 16 month time period is grossly overstated. *Id.* at ¶ 39.

While Plaintiff suggests that Market Securities' counsel's conduct in certifying the responses to the First RFPs is like *Johnson v. BAE Sys.*, 4 F. Supp. 3d 62, 307 F.R.D. 220 (D.D.C. 2013), a precursory review of J*ohnson* reveals that Plaintiff's reliance thereon is inapposite. Specifically, in *Johnson*—a suit involving claims of gender discrimination, sexual harassment, and retaliation—the Court found that the plaintiff's attorney "should be sanctioned for failing to certify the plaintiff's disclosure of her treatment records with Dr. Hayden and for failing to correct the plaintiff's disclosure of the falsified treatment records". *Id.* at 70. In that case, the plaintiff's attorney mailed the documents, without any cover letter or bates stamps, *and without ever*

*reviewing such documents*, and later sent new material without any identification as to what that material was and why it was being sent. Here, Market Securities' counsel unequivocally reviewed the documents that were produced, bate-stamped the same, and promptly supplemented such documents. Given the sheer size of the June 2023 Bloomberg Vault Data,[15] Market Securities' counsel was substantially justified in relying on the statements made by Market Securities before, during, and after the copying and pasting process.

### b.  *Plaintiff Has Failed to Establish Any Violation By Market Securities' CCO*

Likewise, Plaintiff has failed to establish any violation of Fed. R. Civ. P. 26(g) by Market Securities by having Ms. Baskett, an authorized signatory of the company, sign Market Securities' interrogatory responses. *Donaker Dec.*, ¶ 37. Based on Ms. Baskett's deposition testimony, Plaintiff claims that Ms. Baskett's certification was improper because she "did not even know what an interrogatory was, she had nothing to do with the responses to the interrogatories, and she had no idea if they were complete and accurate." Motion, p. 32. Plaintiff baselessly claims, without any citation to proper legal authority,[16] that "Market Securities' designation of Baskett to sign and verify those responses, instead of Donaker or some other knowledgeable employee, shows the contemptuous attitude Market Securities had regarding its discovery obligations to Capitol Forum." Motion, p. 33. This is simply not so.

During the course of Ms. Baskett's deposition, she testified that: 1) she, as a non-lawyer, did not know what an interrogatory answer is (Transcript of Deposition of Erin Baskett, Tuesday, February 4, 2025, *Dkt. No. 56-6* ("Baskett Tr."), 41:12-42:10); 2) she understood that the responses were supposed to be accurate, but did not know specifically "if it's accurate. I don't know how I

---

[15] It took Market Securities employees over eighty (80) hours to compile the 2023 Chat Production. *Donaker Dec.*, ¶ 24. If this task was conducted by Market Securities' counsel, this would be upwards of $50,000.

[16] Plaintiff cites to *Johnson*; however, *Johnson* did not involve the issue of a corporate signatory at all, but instead, solely the issue of the plaintiff's counsel's violation of Fed. R. Civ. P. 26(g).

would know if it's accurate" (Baskett Tr., 50:2-51:4). Plaintiff hinges on the foregoing testimony, and uses it as a basis for jumping to the conclusion that by designating Ms. Baskett to sign the interrogatories, *which, notably, Plaintiff does not contest the accuracy of*, Market Securities allegedly committed misconduct. Importantly, however, during Ms. Baskett's testimony, Mr. Williams did not question Ms. Baskett on the process of how the interrogatory answers were created, who was involved, and why Ms. Baskett was designated to sign the same. As noted in *Shepherd,* 62 F.3d at 1475, of which Plaintiff is presumably aware since it cites thereto in its Motion for a different proposition (*see, e.g.*, Motion, p. 24):

> Federal Rule of Civil Procedure 33 expressly permits a representative of a corporate party to verify the corporation's answers without personal knowledge of every response by 'furnishing such information as is available to the party.' Fed. R. Civ. P. 33(a) (emphasis added). . .[citing cases]. . . Of course, the representative must have a basis for signing the responses and for thereby stating on behalf of the corporation that the responses are accurate. . . The representative may accomplish this through whatever internal process the corporation has chosen, including discussions with counsel. . . If the party propounding the interrogatories wants to know the names of the individuals with personal knowledge of each response, it can always ask for them as part of the interrogatories.

*Id.* at 1482; *see also* Fed. R. Civ. P. 33(b)(1)(B) (noting that interrogatories for companies must be answered by "any officer or agent, who must furnish the information available to a party."); *see also Mica Saint-Jean v. District of Columbia*, No. 08-cv-1769 (RWR-AK), 2014 U.S. Dist. LEXIS 204533 (D.D.C. Sep. 8, 2014) (noting that an agent, who answers on behalf of a corporation need not have personal knowledge). Ms. Baskett is such an officer or agent. *Donaker Dec.*, ¶ 37.

Regardless, in a number of Market Securities' interrogatory responses, Market Securities referred Plaintiff to documents produced in this litigation, and did not include a substantive response. *See* Declaration of John B. Williams, submitted with Plaintiff's Motion (*Dkt. No. 56*-2) "Williams Dec.", Ex D. Pursuant to Fed. R. Civ. P. 33(d), "[i]f the answer to an interrogatory may be determined by examining . . . a party's business records (including electronically stored

information), *and if the burden of deriving or ascertaining the answer will be substantially the same for either party*, the responding party may answer by: (1) specifying the records that must be reviewed" (emphasis added). "As the Advisory Committee noted, Rule 33(d) relates 'especially to interrogatories which require a party to engage in burdensome or expensive research into his own business records in order to give an answer. The subdivision gives the party an option to make the records available and place the burden of research on the party who seeks the information." *United States v. Kellogg Brown & Root Servs.*, 284 F.R.D. 22, 29 (D.D.C. 2012). Despite Market Securities' reference to its business records being well-founded, Plaintiff suggests, once again without any proper legal support, that this is also sanctionable, stating:

> in response to Capitol Forum's interrogatories asking for the identification of Capitol Forum articles that had been deleted or destroyed, Market Securities stated—under oath—that this information is not presently known or reasonably available to it but could be ascertained by Capitol Forum through a search of the Market Securities records. Capitol Forum, at considerable expense, is undertaking that effort, painstakingly analyzing the "blasts" and the "chats" to determine the number of articles Market Securities received. *Market Securities could have done this and should have done this to answer the interrogatories—but did not.*

Motion, pp. 34-35 (emphasis added). While Market Securities undertook the substantial time, effort and expense of compiling the 2023 Chat Production for the sake of efficiency, and to reduce the costs to both sides, given the issues that came to light with the 2023 Chat Production, in order to ensure completeness, it produced the raw Bloomberg Vault data. Now that Plaintiff is in possession of said raw data, the burden of ascertaining the answer(s) that Plaintiff seeks is substantially the same for Plaintiff as it would be for Market Securities. While Plaintiff complains that this is a "considerable expense", Plaintiff is the party that instituted this litigation, and as such, the onus is on Plaintiff—not Market Securities—to make out its claims. This very Motion highlights Plaintiff's attempt to take short cuts to relieve it of the time and effort of making out its

case; the cost of doing so, particularly when Plaintiff has driven up litigation costs recklessly, is of Plaintiff's own making.

**3)** ***Plaintiff Has Failed to Establish Any Violation of Market Securities' Duty to Preserve Evidence***

The third, final, and equally meritless category of asserted misconduct that Plaintiff alleges is that Market Securities purportedly violated its duty to preserve evidence when Ms. Donaker's *personal* cellphone accidentally fell into a pond in July 2022 (i.e., two months after this litigation was filed).[17] Once again, Plaintiff's contention is unsupported.

As an initial matter, Ms. Donaker's cellphone is not issued by Market Securities, and is her own personal electronic device. *Donaker Dec.*, ¶ 28. The onus is on Plaintiff to demonstrate that Ms. Donaker's personal device is subject to Market Securities' control, which it has not done. *See, e.g., Goolsby v. Cty. of San Diego*, No. 3:17-cv-564-WQH-NLS, 2019 U.S. Dist. LEXIS 140326 (S.D. Cal. Aug. 19, 2019) (finding a party seeking production of an employee's personal device must first show that the device was subject to the employer's possession, custody, and control, generally by establishing that the device was used for business purposes).

Regardless, putting the above issue aside, "[a] party has a duty 'to preserve potentially relevant evidence . . . 'once [that party] anticipates litigation'", and if any such party fails to do so, it "'runs the risk of being justly accused of spoliation' — defined as 'the destruction or material alteration of evidence or the failure to preserve property for another's use as evidence in pending

---

[17] In a further shameless attempt to inappropriately mar Market Securities' counsel's reputation, Plaintiff suggests that since Ms. Brownlee advised the Court in June 2023 that Ms. Donaker's cellphone "died" in July 2022 (Plaintiff erroneously says 2027 on Motion, p. 33, which is incorrect) and "would no longer turn on", and did not divulge what precisely caused the cellphone to die and not turn on (which was unknown to Ms. Brownlee at the time) (i.e., because it had accidentally fallen into a pond) that she somehow "concealed the issue as to whether the destruction of the phone violated Market Securities' duty to preserve evidence." To be clear, Ms. Brownlee did not conceal anything from the Court and Plaintiff's suggestion otherwise is another uncalled for distraction. Plaintiff has known about Ms. Donaker's loss of her phone since in or before June 2023 and Plaintiff unduly delayed until March 2025 to bring any sanctions motion, albeit an uncalled for one, relating to the phone.

or reasonably foreseeable litigation'". *Mahaffey v. Marriott Int'l, Inc.*, 898 F. Supp. 2d 54, 58 (D.D.C. 2012). Accordingly, at least as early as on or about October 27, 2021, after receiving a letter from Plaintiff's counsel (Williams Dec., Ex. A), Market Securities had a duty to preserve relevant evidence. What Plaintiff fails to mention is at that time, Ms. Donaker did not back-up the WhatsApp data on her *personal* cellphone, and all such data was subject to certain, standard automatic deletion settings (either 24 hours or 7 days). *Donaker Dec.*, ¶¶ 32-34. Consequently, when Ms. Donaker's *personal* cellphone *accidentally* fell into a pond and would no longer turn on, any potentially relevant WhatsApp data, to the extent it were to exist, was long gone (including unequivocally anything prior to October 27, 2021 or anything from October 2019 through March 2022, which Plaintiff claims in its Motion are the "the dates of potential infringement" (p. 22)). Consequently, even putting aside the issue of Ms. Donaker's cellphone being for *personal* use (and not the property of Market Securities), Plaintiff has failed to establish that Ms. Donaker's cellphone contained any arguably, potentially relevant WhatsApp data in October 27, 2021 or when her cellphone died in July 2022. *See, e.g., Vasser v. Shulkin*, No. 14-0185, 2017 U.S. Dist. LEXIS 193174, 2017 WL 5634860, at *3 (D.D.C. Nov. 22, 2017) ("A movant seeking sanctions for spoliation must demonstrate that the subject documents actually existed."); *Ball v. George Wash. Univ.*, No. 17-cv-0507 (DLF), 2018 U.S. Dist. LEXIS 165983 (D.D.C. Sept. 27, 2018) (denying sanctions when plaintiff had not proven that the footage, which was automatically deleted in the ordinary course of defendant's business, was in existence at the time any duty to preserve attached), affirmed by *Ball v. George Wash. Univ.*, 798 Fed. Appx. 654 (D.C. Cir. 2020) (unpublished), citing *Mahaffey*, 898 F. Supp. 2d 54, 59 (D.D.C. 2012) (concluding defendants had no duty to preserve video when "the record [was] muddled concerning whether the requested video images were still in existence at the time that the duty to preserve attached") and *Putscher v.*

*Smith's Food & Drug Ctrs., Inc.*, No. 2:13-cv-1509, 2014 U.S. Dist. LEXIS 85024, 2014 WL 2835315 (D. Nev. June 20, 2014) (denying sanctions when there was no evidence that the footage existed, other than a witness's speculative comments); *see also Shepherd*, 62 F.3d at 1481 (suggesting that deletion of copies prior to when lawsuit was commenced was not sanctionable conduct). Therefore, Plaintiff has failed to show that Market Securities had a duty to require Ms. Donaker to preserve her personal cellular device when her cellphone accidentally fell into a pond in July 2022 that could give rise to any sanctions.

**D.  The Drastic Sanctions Plaintiff Seeks Are Not Justified or Commensurate With Any Violation Alleged**

Although Market Securities respectfully submits that Plaintiff has failed to establish any sanctionable misconduct, to the extent that the Court finds otherwise, the oppressive nature of the sanctions sought by Plaintiff is unwarranted, as further set forth below.

**1)  *Preclusion from Offering Objection or Rebuttal to Number of Capitol Forum Articles Received Is Unwarranted***

First, Plaintiff asks this Court to "rule on summary judgment or instruct the jury at trial that Market Securities is precluded from offering objection or rebuttal to Capitol Forum's evidence regarding the number of Capitol Forum articles it received." Motion, p. 34. Plaintiff claims this "punishment fits the crime" (Motion, p. 35) because: 1) Market Securities supposedly concealed and minimized "the number of copyrighted Capitol Forum articles it solicited and received from Suarez" (Motion, p. 34) through its use of WhatsApp and Gmail, and the unintentional loss of Ms. Donaker's personal phone; and 2) Market Securities was unable to provide the precise number of Capitol Forum articles it received in its interrogatory responses. Motion, pp. 34-35. Oddly, much of Plaintiff's rationale for preclusion rests on actions outside the four (4) categories of misconduct alleged. For example, is Plaintiff suggesting that Market Securities' use of WhatsApp and Gmail,

which predates this litigation, is itself sanctionable? Similarly, as already addressed in Section IV(C)(2)(b), Plaintiff does not cite an iota of authority supporting that Market Securities' interrogatory responses are somehow sanctionable.

As this Court has already stated in the 6/23 Order "[d]iscovery of plaintiff's own reports in defendant's possession, by contrast, proves little, if anything; after all, the mere possession of plaintiff's reports--which defendant and its employees would have been free to obtain through subscriptions--does not prove copyright infringement." While a claim for contributory infringement was added after the 6/23 Order (after the first claim was dismissed), the receipt of any Capitol Forum publications by Market Securities, without more, does not constitute infringement. *See, e.g.*, 3 Nimmer on Copyright 12.04 ("in order to be deemed a contributory infringer, the authorization or assistance must bear some direct relationship to the infringing acts, and the person rendering such assistance or giving such authorization must be acting in concert with the infringer") ; *see also In re Frontier Commc'ns Corp.*, 658 B.R. 277 (Bankr. SDNY 2024) (noting that for inducement to be shown there must be a high standard of affirmative conduct). Nonetheless, Plaintiff, since the outset of this litigation, has harped on the number of articles received by Market Securities, suggesting that it is of the position that this is a central element of its case. Unable to prove this element with certainty, Plaintiff now unjustifiably, and conveniently asks the Court to preclude Market Securities from introducing evidence regarding the number of Capitol Forum articles Market Securities received, thereby essentially asking this Court to categorically adopt, or ask a jury to adopt, whatever factual finding that Capitol Forum espouses at summary judgment or trial on this issue.

In apparent support of its request that the Court preclude Market Securities from introducing evidence on the above-referenced issue, Plaintiff relies on two (2) cases: *Richardson*,

29

167 F.R.D. 1 and *Zayn Al Abidin Muhammad Husayn v. Austin*, No. 08-1360 (EGS), 2024 U.S. Dist. LEXIS 183377 (D.D.C. Oct. 8, 2024), which[18] are entirely distinguishable. As noted above in Section IV(C)(1), *Richardson* involved a paralegal's doctoring of existing documents relating to the level of benzene—an issue that the parties agreed went to the heart of the case. Under those circumstances, the Court precluded the defendant from presenting any evidence or argument that there "was insufficient benzene in the lactol spirits or xylene produced", finding that the "[i]mposition of the particular sanctions chosen is directly related to both the particular issue which was the subject of altered documents and misrepresentations and to the manner in which the misconduct occurred." *Richardson*, 167 F.R.D. at 5-6. In its argument on this point (Motion, p. 34), as noted *supra*, Plaintiff does not appear to directly rely on the omissions in Market Securities' 2023 Chat Production. Nonetheless, the inadvertent omissions in Market Securities' 2023 Chat Production (all of which now have unquestionably been cured by the full production of the Bloomberg Vault data), Market Securities' use of WhatsApp and Gmail (use that predates this litigation), and its interrogatory responses—to the extent any constitute sanctionable misconduct (which, as noted above, Market Securities submits has not been established by Plaintiff)—do not directly and solely relate to the number of Capitol Forum articles it received. While Plaintiff claims that the aforementioned conduct establishes Market Securities' attempt to minimize the number of articles it received, that is not a proven fact, but instead, a hotly contested issue.

As for *Zayn Al Abidin Muhammad Husayn*, No. 08-1360 (EGS), 2024 U.S. Dist. LEXIS 183377 (D.D.C. Oct. 8, 2024), a habeas corpus action, which involved the intentional spoliation

---

[18] Plaintiff claims that "[c]onsistent with *Richardson*, *Johnson*, *Husayn*, *and Zhi Chen* [] the Court should impose issue-related sanctions on Market Securities and award Capitol Forum attorneys' fees." (Motion, p. 34); however, not all four (4) of these cases cited involved all four (4) categories of sanctions that Plaintiff seeks. For example, only *Richardson* and *Husayn* involved the preclusion of evidence. Given this, Market Securities will address the applicable cases in the relevant sections herein.

of video evidence relating to an allegedly unjustified retention at Guantanamo Bay, the Court rejected adverse inference sanctions, and found that prelusion from offering rebuttal evidence on the narrow issue of the content of the interrogations that would have been depicted on the dates of the destroyed videotapes was an appropriate remedy. In fashioning this remedy, the Court noted that "it is one thing to accept Petitioner's sworn declaration as unrebutted evidence and quite another to accept the factual and legal conclusions presented in Petitioner's proposed inferences that effectively seek to dispose of the central issues in this case." *Id.* at *77 (citing *M & T Mortg.Corp. v. Miller*, No. 2002-5410, 2007 U.S. Dist. LEXIS 60610, 2007 WL 2403565, at *12 (E.D.N.Y. Aug. 17, 2007) wherein the District Court for the Eastern District of New York rejected sanctions as "too severe" when they would preclude the defendants from opposing central factual allegations). While the number of Capitol Forum articles received, without more, does not amount to direct or contributory copyright infringement, in order to establish each of its claims of contributory infringement, Plaintiff needs to first establish each instance of direct infringement by a third party. It is apparent that Plaintiff intends to do this by demonstrating that a third party unlawfully distributed Capitol Forum's publications to Market Securities. It would be highly prejudicial to preclude Market Securities from offering objection or rebuttal to Capitol Forum's evidence regarding a central, disputed factual allegation—the number of articles it was sent, which Plaintiff will use to attempt to show the number of purported contributory violations, thereby impacting the damages that Plaintiff is entitled to seek. *See* 17 U.S.C. § 504 (specifying that awards of statutory damages are per work).

**2)** ***Preclusion From Offering Fair Use Defense Is Harsh and Amounts to A Deprivation of Market Securities' Critical Rights***

Second, Plaintiff asks this Court, without any appropriate, relevant legal authority, to award it the extremely drastic remedy of ruling on summary judgment or instructing a jury at trial "that

Market Securities is precluded from offering a 'fair use' defense" with respect to nineteen (19) articles that Plaintiff alleges were truncated by Market Securities in the 2023 Chat Production. As addressed above (*see* Section IV(C)(1)), not all nineteen (19) articles that Plaintiff points to were in fact truncated. *Brownlee Dec.*, ¶¶ 73-78. Regardless, as this Court stated in *Shepherd*, 62 F.3d at 1476, "[o]ur judicial system has a cherished tradition of using a heightened standard of proof to guard against the erroneous imposition of criminal punishments and analogous deprivations of liberty, property, or reputation" (internal citation omitted). The preclusion of Market Securities from offering a pivotal defense—one that has the potential to absolve it of any liability—amounts to such a deprivation. *See* 17 U.S.C. § 107 (providing that fair use of a work does not amount to infringement).

None of the legal authorities cited by Plaintiff involve the deprivation of any defense, let alone the fair use defense. In fact, such an extreme, prejudicial sanction—particularly here, where any supposed truncation has been remedied—is contrary to case precedent. *See, e.g., Bonds v. District of Columbia*, 320 U.S. App. D.C. 138, 93 F.3d 801, 805-806, 809 (1996) (finding that the broad preclusion order sought approached a default judgment in its severity since it left the party with "little ability to contest the plaintiff's claims", and that "a discovery sanction that results in a one-sided trial. . .is a severe one."); *see also Beck v. Test Masters Educ. Servs.*, No. 04-1391 (JDB), 2012 U.S. Dist. LEXIS 190127, at *27-28 (D.D.C. Sep. 25, 2012) (noting that the D.C. Circuit has cautioned against issuing sanctions that are the practical equivalent of a default judgment, and that there is a high burden on a party to show the justification for any such sanction, which was not met because it was "not a situation where plaintiffs have no way to prove their case"). Plaintiff has unquestionably failed to meet its burden of demonstrating that such a sanction is warranted by virtue of Market Securities' inadvertent omissions, all of which have undeniably been cured.

Instead, the mere fact that Plaintiff asks this Court to award it such an extraordinary remedy once again demonstrates that Plaintiff is unreasonably attempting to deprive Market Securities of a fair trial on the merits.

### 3) *The Presentation of Evidence Relating to Market Securities' Alleged Discovery Abuse Is Unwarranted and Unduly Prejudicial*

Third, Plaintiff asks this Court to "permit Capitol Form *[sic]* to present evidence of Market Securities' [alleged] discovery abuse on summary judgment or at trial" because it claims that there is apparently "clear and convincing evidence that Market Securities did this to minimize its liability." Motion, p. 35[19]. Not only is there no evidence of any bad faith intent on the part of Market Securities, but also, the presentation of any such evidence, particularly to a jury, is unduly prejudicial and likely to confuse the issues.

In fact, while Plaintiff implores this Court to "as in *Richardson*. . . permit Capitol Form to present evidence of Market Securities' discovery abuse on summary judgment or at trial" (Motion, p. 35), Plaintiff egregiously fails to mention to this Court that this aspect of *Richardson*, 167 F.R.D. 1 was vacated on reconsideration. In *Richardson v. Union Oil Co.*, 170 F.R.D. 333 (D.D.C. 1996), the Court reconsidered the portion of its prior order that allowed the plaintiff to present evidence at trial regarding discovery misconduct because it "concluded that not only would it serve no remedial purpose but that it ha[d] the potential for creating a distracting and confusing side-issue which would only divert the jury from its main task." *Id.* at 334. While, as noted herein, *Richardson* is factually distinguishable, the rationale for this Court's vacatur applies in equal force here: the introduction of such evidence is distracting and has the potential to confuse the issues. Moreover,

---

[19] The precise relief that Plaintiff seeks is internally inconsistent: on p. 5 of the Motion, Plaintiff claims to be seeking to inform the jury of "the [alleged] document falsification and then on p. 35, Plaintiff refers to the alleged "discovery misconduct" generally.

the introduction of any such evidence has the capacity to be unduly prejudicial to Market Securities, which is wholly inequitable since Plaintiff has suffered no prejudice here.

Additionally, while Plaintiff asks this Court to introduce evidence of Market Securities' purported misconduct, it cites a litany of authority on adverse inferences (Motion, pp. 25, 28, 30); however, befuddlingly, Plaintiff does not explicitly ask that this Court or a jury be permitted to draw any adverse inferences nor does it propose any instructions. Plaintiff's failure to do so should operate as a waiver. Nonetheless, even if it does not, to the extent that the Motion can be read as asking this Court to permit any adverse inferences, any such request should be denied. As Plaintiff acknowledges (Motion, p. 25), a party requesting an adverse inference instruction due to the alteration or destruction of evidence considers the *Mazloum* factors: that a party had control of the evidence and a duty to preserve it, the destruction or loss was with a "culpable state of mind", and the evidence was relevant to the claims or defenses of the party seeking such evidence. *Mazloum v. District of Columbia Metro. Police Dep't*, 530 F.Supp.2d 282, 291 (D.D.C. 2008). This being said, "an adverse inference instruction may not be appropriate every time the Mazloum test is satisfied. Rather, when evaluating the propriety of such an instruction, a court considers 'the importance of the evidence involved, the importance of the evidence lost to the issues at hand, and the availability of other proof enabling the party deprived of the evidence to make the same point.'" *Paavola*, 2021 U.S. Dist. LEXIS 168241, at *23 (internal citation omitted).

Plaintiff once again cites to *Johnson*, 307 F.R.D. 220 where the Court allowed an adverse instruction that provided that the jury could, but was not required to, find that absent the plaintiff's failure to make a complete disclosure, the defendant could have found more evidence unfavorable to the plaintiff. For the reasons stated in Section IV (c)(2)(a), among others, *Johnson* is factually distinguishable. Plaintiff also cites to *Zhi Chen v. District of Columbia*, 839 F.Supp.2d 7 (D.D.C.

2011), a case involving allegations of illegal detention and search of the plaintiff by a hotel's security guard, wherein the Court ordered a jury instruction permitting, but not requiring, the jury to infer that the destroyed video footage would have been unfavorable to the defendant. In *Zi Chen*, unlike here, the defendant did not contest that the footage was in existence at the relevant time and there was a duty to preserve it, the spoliation was grossly negligent, and the footage was likely the only objective evidence of what actually happened.

Instead, this case is more akin to *Mahaffey*, 898 F. Supp. 2d 54. In *Mahaffey*, the Court found "[s]o, in the end, although it is regrettable that important, relevant evidence may have been destroyed in the flood, there is no indication that this was anything other than an unfortunate accident and, as such, Marriott did not act with the requisite culpable state of mind to merit sanctions." *Id.* at 62. Like in *Mahaffey*, here, not only has Plaintiff failed to show that any relevant data was on Ms. Donaker's personal cellphone when it accidentally was damaged in July 2022, there is also no evidence whatsoever that Ms. Donaker had any culpable state of mind when her personal cellphone fell into the pond while paddleboarding. *See Donaker Dec.*, ¶¶ 33-36. Consequently, to the extent that Plaintiff's Motion can be read as asking for any unidentified adverse inferences to be drawn, Market Securities respectfully submits that there is absolutely no basis for this Court to award the same.

### 4) *Attorneys' Fees, Especially Plaintiff's Exorbitant Fees Incurred, Are Likewise Unjustified*

Finally, relying on *Johnson*, *Richardson*, and *Zhi Chen,* Plaintiff also asks this Court to "award Capitol Forum the attorneys' fees, expert fees, and costs it incurred due to Market Securities' discovery misconduct and in making this [M]otion." Motion, p. 35. Not only, once again, is Plaintiff's reliance on the aforementioned cases misguided, but also, in order to justify the imposition of the attorneys' fees, which is a penal sanction, Plaintiff needs to demonstrate, by

clear and convincing evidence, that Market Securities acted in bad faith, which it has not done. *Shepherd*, 62 F.3d at 1476; *see also Priority One Servs. v. W&T Travel Servs., LLC*, 987 F. Supp. 2d 1, 4-5 (D.D.C. 2013) (wherein Your Honor noted that it is well settled that a finding of bad faith is required for sanctions under the court's inherent powers; that an award of attorneys' fees is a "narrow exception" to the American Rule that generally requires parties to each pay their own fees; and that bad faith requires "finding an intent unreasonably to delay the proceedings", and "a finding of intentional conduct, not conduct that is merely negligent").

As already addressed herein, in *Johnson*—wherein the Court awarded attorneys' fees for the time spent investigating the fraudulent documents and ten percent (10%) of defendants' attorneys' fees—the plaintiff, *which initiated the case*, failed to promptly investigate and correct fabricated documents, unlike here, where any deficiencies were promptly investigated and corrected. Likewise, as also further set forth above, *Richardson*—wherein the Court awarded "fees and costs incurred in connection with this Motion and all discovery matters related the discovery abuses discussed herein"—is distinguishable for a number of reasons, including, but not limited to that Court intervention was required on several occasions, whereas here, Market Securities corrected any discovery issues on its own accord, obviating the need for the filing of any motions to compel or the like. *Richardson*, 167 F.R.D. at 6. In *Zhi Chen*—wherein the Court awarded only fees associated with preparing and filing the motion for sanctions—unlike here, gross negligence relating to the failure "to preserve vital evidence" was not in dispute. *Zhi Chen*, 839 F. Supp. 2d at 16.

Dissimilar to the cases on which Plaintiff relies, in this action, Plaintiff has not established bad faith misconduct. First, due to the complexities of associated with pulling data from the Bloomberg terminal, in an effort to streamline this litigation, and reduce costs on both sides, *and*

*at a substantial cost to Market Securities*, Market Securities consolidated the relevant data by copying and pasting said data into one or more Word documents. *See, e.g., Donaker Dec.*, ¶¶ 23-24. Ms. Donaker testified that any omissions from the June 2023 data were innocent misses. *See, e.g.,* Donaker Tr., 108:17-19. Upon first learning of the issues with Market Securities' production, *and once again, at a substantial cost to Market Securities*, Market Securities' promptly investigated the same, and in order to resolve any issues with completeness moving forward, it, in good faith, produced all raw data received from Bloomberg Vault. *Brownlee Dec.*, ¶¶ 44-46, 51, 61, 64, 66. Second, Plaintiff has failed to establish any Fed. R. Civ. P. 26(g) violation, let alone a deliberate one. Third, Plaintiff has not established, nor can it, that Ms. Donaker's loss of her own *personal* cellphone was anything other than an unfortunate accident. Consequently, Plaintiff has failed to demonstrate any bad faith, improper motive that would justify the imposition of attorneys' fees.

Additionally, even if attorneys' fees were justified, which Market Securities respectfully submits they are not, the award that Plaintiff seeks is wholly unreasonable. Specifically, Plaintiff seeks not only its attorneys' fees associated with drafting the Motion, but also "its expert fees, and [unidentified categories of] costs it incurred due to Market Securities' discovery misconduct". Motion, p. 35. The vexatious manner that Plaintiff has litigated this case has driven up legal costs exorbitantly.[20] Plaintiff's choice to waste an enormous amount of time and resources in pursuing unjustified sanctions, rather than focusing on the merits of this case, along with pursuing unnecessary alleged expert testimony relating to the same, is of its own making. It is wholly inequitable for Market Securities to be required to pay such fees, particularly when liability has

---

[20] Due to Mr. Williams personal relationship to this case, there is also a question of whether or not any and all of the attorneys' fees billed have in fact actually been paid by Plaintiff.

not been established, and under 17 U.S.C. § 505, the prevailing party can seek its attorneys' fees and costs.

## V.    CONCLUSION

For the foregoing reasons, Market Securities respectfully requests that the Court deny Plaintiff's Motion in its entirety.

Dated: March 4, 2025                                    Respectfully submitted,

                                                        **EPSTEIN DRANGEL LLP**

                                                        BY:    S/ *Kerry B. Brownlee*
                                                               Kerry B. Brownlee
                                                               NY Bar No. 5309075
                                                               kbrownlee@ipcounselors.com
                                                               Jason M. Drangel (JD 7204)
                                                               NY Bar No. 2538981
                                                               jdrangel@ipcounselors.com
                                                               60 East 42nd Street, Suite 1250
                                                               New York, NY 10165
                                                               Telephone: (212) 292-5390
                                                               Facsimile: (212) 292-5391
                                                               *Attorneys for Defendant*
                                                               *Market Securities, LLC*
                                                               *PRO HAC VICE*