## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

| | | |
|---|---|---|
| DBW PARTNERS, LLC | : | |
| d/b/a THE CAPITOL FORUM, | : | |
| 1629 K Street, N.W. | : | |
| Suite 300 | : | |
| Washington, DC 20006 | : | Civil Action 1:22-cv-01333-BAH |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| | : | JURY TRIAL DEMANDED |
| MARKET SECURITIES, L.L.C. | : | |
| 85 Broad Street, 17th Floor | : | |
| New York, New York, 10004 | : | |
| | : | |
| | ; | |
| | ; | |
| | ; | |
| | : | |
| and | : | |
| | : | |
| | : | |
| : | | |
| | : | |
| MARKET SECURITIES LLP | : | |
| 55 Baker Street | : | |
| London, United Kingdom WIU 8EW | : | |
| | : | |
| | : | |
| | : | |
| and | : | |
| | : | |
| | : | |
| | : | |
| MARKET SECURITIES HOLDINGS, INC. | : | |
| 85 Broad Street 17th Floor | : | |
| New York, New York 10004 | : | |
| | : | |
| Defendants. | : | |

---

## THIRD AMENDED COMPLAINT

Plaintiff, DBW Partners LLC, d/b/a The Capitol Forum ("Plaintiff" or "Capitol Forum"), for its complaint against Market Securities, L.L.C. ("Market Securities"), Market Securities, LLP, and Market Securities Holding, Inc., alleges as follows:

## INTRODUCTION

1.      This is an action for direct copyright infringement and contributory copyright infringement arising from (1) Market Securities' copying of Capitol Forum's copyrighted material; (2) Market Securities' substantial participation in the illegal transmission of this material to it from BTG Pactual Asset Management US, LLC (BTG Pactual); and (3) Market Securities' illegal transmission of altered Capitol Forum' copyrighted material..

2.      The Capitol Forum is an investigative news and analysis company, in the business of providing time-sensitive and in-depth reports to its subscribers, including investors, industry stakeholders, law firms and policymakers. It publishes a premium internet-based subscription service, releasing anywhere between 30 and 50 reports each month on matters relating to mergers and acquisitions, consumer protection, government contracts, corporate investigations, and antitrust enforcement. The Capitol Forum's reports are extensively researched and carefully written, often the product of months of work, and its subscribers rely on these reports to make investment and business decisions. Given the respected nature of Capitol Forum and its journalists, the release of its reports will often affect the price of publicly traded stocks—and will do so in a matter of minutes.

3.      Capitol Forum's reports constitute a fundamental and competitively significant component of its business. These reports are provided only to its subscribers and to other authorized recipients, and each report contains a copyright notice and disclosure that its contents may not be distributed or reproduced without Capitol Forum's permission. Each subscription

agreement between Capitol Forum and its subscribers explicitly prohibits transmission and distribution of its copyrighted material.

4.      BTG Pactual is a Capitol Forum subscriber.  Since it became a subscriber, BTG Pactual has been systematically downloading Capitol Forum's copyrighted reports and transmitting them to Market Securities.  Within minutes of the release of many of Capitol Forum's reports, Market Securities will illegally obtain the report from BTG Pactual, and will then republish a summary of that report to its clients, including verbatim excerpts from the Capitol Forum report, thus obviating the need for potential subscribers to purchase a Capitol Forum subscription.

5.      It is a direct copyright violation for BTG Pactual to send the copyrighted publications to Market Securities.  It is a contributory copyright violation for Market Securities to induce the subscriber's direct violation.  It is a direct copyright violation for Market Securities to repackage and summarize the Capitol Forum analyses.

6.      When the initial complaint in this action was filed, Capitol Forum was unaware of the extent of Market Securities copyright violations.  Subsequent discovery has revealed the number of instances in which Market Securities has illegally copied Capitol Forum's copyrighted publications, and illegally distributed Capitol Forum's copyrighted publications.  These additional instances of infringement were set forth in Exhibit C to the Second Amended Complaint.  Since the filing of the Second Amended Complaint, Capitol Forum learned that Market Securities had engaged in discovery abuse.  It had truncated many of the Capitol Forum publications that were contained in Exhibit C.  It had also failed to disclose many other Capitol Forum publications that it had copied.  Exhibit C to this Third Amended Complaint now contains the full version of those articles.  Exhibit D contains the additional instances of direct copyright infringement.

7.    These copyright violations are willful.  Market Secuirites know: (1) that the Capitol Forum publications are copyrighted; (2) that it is a direct copyright violation for Capitol Forum's subscribers to transmit copyrighted material to a non-subscriber; and (3) that it is a contributory copyright violation to solicit, encourage, induce, aid, or abet direct copyright violations.  Market Securities also knows that its subsequent summarization and publication of Capitol Forum's material is prohibited by the copyright laws—and not excepted from copyright protection by the "fair use" doctrine.  Market Securities warns its subscribers—and the public— that its own publications are protected by the copyright laws.  Its website states that it is "the owner or the licensee of all intellectual property rights in this website and in the material published on it. Those works are protected by copyright laws and treaties around the world." Market Securities is also aware that the Capitol Forum publications bear a similar copyright notice: "Direct or indirect reproduction or distribution of this article without prior written permission from the Capitol Forum is a violation of Federal Copyright Law."

8.    Through these violations, Market Securities has caused significant injury to Capitol Forum, entitling Capitol Forum to compensatory damages and equitable relief, injunctive relief, punitive damages, and statutory damages in the amount of $150,000 per violation, as well as an award of attorneys' fees.

**PARTIES**

9.    Plaintiff DBW Partners LLC is a District of Columbia limited liability company, doing business as The Capitol Forum.  Capitol Forum maintains its principal place of business at 1629 K Street, N.W., Suite 300, Washington, D.C. 20006.

10.    Defendant Market Securities L.L.C. is a Delaware limited liability company and maintains its principal place of business at 85 Broad Street New York, New York 10004.

4

11.    Defendant  Market Securities LLP is a London based affiliate of Market Securities LLC and maintains its principal place of business at 55 Baker Street , London United Kingdon WIU 8EW

12.    Defendant Market Securities Holdings, Inc. is the sole member and 100% owner of Market Securities LLC and directs the management and policies of Market Securities LLC,  It maintains its principal place of business at 85 Broad Street New York, New York 10004.

13.    All defendants are subject to personal jurisdiction in this court.  Pursuant to the Long Arm Statute of the District of Columbia, D.C. Code Section 13-423, Market Securities and BTG Pactual have regularly transacted business in the District of Columbia by soliciting and serving clients in this jurisdiction, have caused tortious injury in this jurisdiction, and have derived substantial revenue from services provided in this jurisdiction.  The conduct of the defendants at issue in this litigation has had an effect in the District of Columbia because its copyright infringement has been expressly aimed at this jurisdiction, which is the place where the copyrights are held.

## JURISDICTION AND VENUE

14..    This action for copyright infringement arises under the Copyright Act of 1976, as amended, 17 U.S.C. § 101 *et seq.* This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 (federal question), 1338 (copyrights), and 1367 (supplemental).

15..    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c), and 28 U.S.C.  Section 1400 (copyright venue).  A substantial part of the events giving rise to the claims occurred in this district, the harm occurred in this district, and defendants are subject to personal jurisdiction in this district.

## STATEMENT OF FACTS

16.    Capitol Forum is an investigative news and legal analysis company dedicated to informing policymakers, law firms, investors, and industry stakeholders on the effect of government policy on publicly traded corporations and market competition.  Plaintiff invests substantial financial and human resources in generating original and high-quality content for its reports relating to various sectors of the economy.  The value of these reports to Capitol Forum's paid subscribers lies in the high quality of the investigative reporting and analysis and the timeliness with which that analysis reaches its subscribers.

17.    Capitol Forum's independent reporting is the product of the full-time effort, skill, and judgment of, among others, analysts, journalists, and lawyers assigned to follow developments in particular markets.    A typical report, for example, may include an in-depth analysis of the market impact of a significant policy or detail a parallel investigation of a major antitrust review.

18.    The reports constitute proprietary and economically valuable analysis, and are presented in a manner that is intended to inform, among other things, a subscriber's investment decisions and provide guidance on a myriad of issues.  The high quality and timeliness of Capitol Forum's reporting is also a means of attracting new clients and contributes to Capitol Forum's outstanding reputation in the financial, business, and legal worlds.

19.  Plaintiff's reports, intended for its paid subscribers, contain copyright notices and state that they may not be reproduced or distributed without Plaintiff's permission.  All reports and emails issued by Plaintiff contain a copyright notice that states that "Direct or indirect reproduction or distribution of this article without prior written permission from the Capitol Forum is a violation of Federal Copyright Law."

20.  Capitol Forum applied for, obtained, and owns valid copyright registrations

in its reports.  The relevant copyright registration numbers are as follows:

TX0008939090, TX0008941939, TX0008953721, TX0008993172, TX0008996171, TX0009025

943, TX0009070990, TX0009032436, TX0009032413, TX0009032843, TX0009031554, TX000

9033043, TX0009108744, TX0009094440, TX0009071495,  TX0009082488, TX0008828873,

TX0008870337,TX0008879226, TX0008873304, TX000882202, TX000885367, TX000889431,

TX0008898423, TX0008904787, and TX0008940334.

21. Plaintiff's reports are distributed by Plaintiff only to paid subscribers, or to otherauthorized recipients.  All subscribers must execute The Capitol Forum Subscription Agreement ("Subscription Agreement"), which prohibits redistribution of Capitol Forum's content.

22.Capitol Forum's reporting has market impact.  It is therefore important to Capitol Forum that the distribution of its reports be limited to its authorized recipients, as distribution of the information to non-authorized recipients would reduce the value of the information to its subscribers.

23. BTG Pactual is a financial services company, involved in asset management, sales and trading, and investment banking.  It is a division of Banco BTG Pactual, one of the largest financial organizations in Latin America.

24. Market Securities is a financial services broker.  According to its website, it provides a "wide range of cross-asset execution and advisory solutions to institutional clients including Banks, Asset Managers, Hedge Funds and sell-side firms."  In providing its advisory solutions, Market Securities acquires timely market information from various sources and then publishes this information to its clients through the internet, one of which is BTG Pactual. Capitol Forum did not become aware of the illegal conduct of BTG Pactual until obtaining discovery in this case.

25. Cristina Suarez is a portfolio manager with BTG Pactual. Jennifer Donaker is Head of US Operations with Market Securities. Ms. Donaker's role at Market Securities is to acquire market information from various sources and to transmit that information to the Market Securities clients. Ms. Suarez and Ms. Donaker are personal acquaintances, having met during a prior employment.

26. Shortly after BTG Pactual began receiving the Capitol Forum reports, Ms Suarez and Ms. Donaker entered an arrangement by which Ms. Suarez would send the Capitol Forum reports to Ms. Donaker. Ms. Donaker agreed to provide Ms. Suarez with her views and advice on the Capitol Forum analyses if the publications would be sent to her. Ms. Donaker also agreed that upon transmission of the Capitol Forum reports, she would agree not to share them further, and would not use or republish the copyrighted material in any fashion. Ms. Donaker's actions and expressions in this regard induced, enticed, and promoted BTG Pactual's direct infringement.

27. Ms. Donaker and Ms. Suarez knew their conduct was illegal and thus took affirmative steps to conceal their unlawful activity. First, they agreed that the Capitol Forum reports would be transmitted over their WhatsApp applications on their personal cellular telephone devices, a method by which they could escape detection from their internal compliance departments and the regulators. They did so despite their awareness that the use of such personal communications devices to send and receive messages that their firms cannot capture and monitor is prohibited by the regulations of the Financial Regulatory Authority (FINRA), regulations which they are required to obey. Second, they agreed to delete all communications between themselves over the WhatsApp system—although FINRA regulations require all regulated persons and entities to preserve all records of client communications for at least three years.

28. Based upon Ms. Donaker's agreement that she would provide Ms. Suarez with investment advice, and that she would not use, share, or republish the Capitol Forum material, and that she would delete or destroy the Capitol Forum publications she received, Ms. Suarez began to send the reports to her in early 2020. Between March 2020 and November 2021, Ms. Suarez sent over 100 Capitol Forum copyrighted publications to Ms. Donaker, including the following publications that escaped destruction: dated April 24, 2020, September 23, 2020, September 7, 2021, and November 13, 2020. At no time has Capitol Forum provided its subscribers permission to transmit its material to Market Securities. Nor has Capitol Forum provided Market Securities with permission to obtain its copyrighted material or to copy and republish its protected works.

29. Upon receiving the Capitol Forum material, Ms. Donaker would repackage, copy, and quote the most creative and original aspects of those publications in Market Securities' own format and would then distribute this repackaged information to its clients (despite her agreement not to do so). Over time, the Capitol Forum reports received from Ms. Suarez would be shared with two other Market Securities content providers, Eddie Lee and Stephen Grahling, who would similarly copy, and quote the most creative and original aspects of the Capitol Forum publications to the Market Securities clients.

30. In so doing, Market Securities did not undertake any creative or journalistic efforts of its own to transform Plaintiff's work into something new or different from Capitol Forum's original report. Nor does it add any of its own analysis or contribute any meaningful reporting to Plaintiff's work. Market Securities would simply extract the key information from Plaintiff's reports and repackages that work in a shorter form for a quicker read. The purpose of the Capitol Forum analyses, and the Market Securities' reports are precisely the same: to inform their readers of Capitol Forum's copyrighted and proprietary reporting. This conduct constitutes a

direct infringement of Plaintiff's exclusive right under the Copyright Act to reproduce, use, and control its copyrighted works.

31. A comparison of the Capitol Forum publications and the Market Securities Publications addressed in the initial Complaint demonstrates the substantial similarity between the protectable material in the Plaintiff's work and the infringing nature of the Defendant's work. It further demonstrates that the Defendant's publications add little, if any, original information or analysis to Capitol Forum's protectable work. These Capitol Forum publications are attached as Exhibit A. The Market Securities publications are attached as Exhibit B.

32. On October 18, 2021, Capitol Forum released a publication regarding the Qualcomm/Veoneer/Arriver acquisition, beginning with an analysis of whether certain foreign regulatory agencies might "have some latitude" in asserting jurisdiction over the deal. According to Capitol Forum: "the European Commission (EC), national European authorities, and China's State Administration for Market Regulation (SAMR) do have some latitude to assert jurisdiction over the first or second steps of the transaction."

33. Shortly after the Capitol Forum analysis was released, Market Securities issued an excerpt of the Capitol Forum article, specifically noting that the foreign agencies had such "latitude" in asserting their jurisdiction: "Cap Forum has posted a 9-page article commenting EC, EU-member state regulatory bodies, SAMR and HSR, EC, EU-member states and SAMR might have some latitude to assert jurisdiction over the first or second step of the merger per some lawyers."

34. The October 18th Market Securities publication then proceeded to excerpt and repeat each of the principal analytical factors relating to the potential transaction as addressed in the Capitol Forum article, and in the same order as discussed in the Capitol Forum article. Set

forth below are the quotations from the Capitol Forum publication (in bold), followed by the quotations from the Market Securities publication (in italics) regarding these other deal factors:

A.  "Vertical" Issues

**Capitol Forum: "The deal to combine Qualcomm's automotive system on a chip (SoC) platform with Veoneer's Arriver software stack would cement an existing vertical relationship**."

*Market Securities: "The merger between QCOM and Arriver touches on verticals."*

B.  "Perceived Independence" of SSW Partners

**Capitol Forum: "Whether global antitrust agencies will seek to assert jurisdiction over the first-step deal, and review it as effectively a Qualcomm acquisition of Veoneer—or at least an acquisition of Arriver—will depend in large part on SSW Partners' perceived independence from Qualcomm."**

*Market Securities: "SSW Partners perceived independence from QCOM would drive some regulators to assert jurisdiction or not."*

C.  Extent of Relationship with SSW Partners

**Capitol Forum:  "The firm's partners filed incorporation paperwork in Delaware in October 2020, and began talking to potential investors late last year."**

*Market Securities: "SSW was formed in October 2020 and began talking to investors for fund raising late last year."*

D.  Qualcomm Responsible for SSW Partners' "Obligations"

**Capitol Forum: "If SSW Partners fails to do so, Qualcomm must satisfy those obligations, including by 'making any necessary payments in satisfaction of the required merger payments…and delivering the merger consideration…on behalf of SSW,' the agreement says."**

*Market Securities: "QCOM is on the hook if SSW fails certain obligations to the merger, a backstop, which could make two firms possibly viewed as linked."*

E.  "Backstop Arrangement Typical" [**Verbatim Quote**]

**Capitol Forum: "To be sure, the parties could describe that backstop arrangement as typical of a public company deal without financing contingencies to close."**

*Market Securities: "To be sure, the parties could describe that backstop arrangement as typical of a public company deal without financing contingencies to close."*

F.  Regulators May Consider a "Two-Step Transaction"

**Capitol Forum: "In one reading, the two-step transaction could be considered a 'warehousing' arrangement described in paragraph 35 of the notice, where an interim buyer acquires the target's shares 'on behalf' of and is 'directly linked' to the ultimate acquirer, which in turn 'often bears the major part of the economic risks,' on the deal. If that's the case, the first-step merger can't close until the commission approves the second step."**

*Market Securities:  "EC might consider the two-step transaction as a warehousing arrangement that only allows the first step to close with the 2nd step approved if they see two as one-related party."*

G.  Filing in Germany Possible

**Capitol Forum: "EC questions aside, the first-step transaction—as well as the second-step transfer of Arriver—could also trigger national filings, most notably in Germany."**

*Market Securities:  "A filing to Germany is a possibility given Arriver's deal valuation"*

H.  CMA May Play a Role

**Capitol Forum: "But because SSW Partners has no share of supply of any market, even the CMA's highly flexible jurisdictional test could probably capture only the deal's second step, provided the CMA doesn't view SSW as acting on Qualcomm's behalf."**

*Market Securities:  "CMA also can possibly step in if SWW is viewed acting on QCOM's behalf."*

I.  SAMR Reviews "Driven by Industrial Policy"

**Capitol Forum: "SAMR reviews are often driven by industrial policy, rather than traditional antitrust considerations."**

*Market Securities:  "SAMR, often driven by industrial policy, may have some flexibility to review deals that are not meeting the reporting threshold".*

J.  Potential "Lockout" Could Raise Vertical Integration Issues

**Capitol Forum: "But that integration could also leave the combined firm's rivals, or even downstream OEMs, increasingly locked out of Qualcomm's SoC platform or Arriver software stack."**

*Market Securities:  "While Arriver and QCOM had prior collaborations, HSR can raise some vertical issues under Khan due to the possibility of Arriver rivals being locked out by QCOM."*

K.  Parties May Argue Pro-Competitive Aspects

**Capitol Forum: "the companies may pitch the deal as increasing competition by creating a new, stronger—and crucially, more open—rival to Intel."**

*Market Securities: "But parties can also argue it strengthens competition in Advanced driver-assistance systems given other dominant players like Intel/Mobileye."*

35.  On October 25, 2021, Capitol Forum released a publication reporting that the staff of the Federal Trade Commission was examining a potential "labor monopsony" issue in Camden, Arkansas, entitled "*FTC Staff Examines Possible Labor Monopsony Issue in Small Arkansas City.*"  Market Securities immediately received a copy of this article, and within hours advised its clients that "CapForum is out commenting on FTC staff examining a possible labor monopsony issue in Camden Arkansas." The Market Securities publication then proceeded to excerpt and repeat each of the principal analytical factors relating to the potential transaction as addressed in the Capitol Forum article, and in the same order as discussed in the Capitol Forum article.

36.     The October 25 Capitol Forum article reported that: (1) "the FTC staff is poring over employment data supplied by a third party to determine whether the merger would lessen competition to hire those workers in the Camden area;" (2) that in the past 40 days the staff has deposed Lockheed and Aerojet executives; and (3) that the FTC Bureau of Economics has requested industry data.  Market Securities then repeated this material virtually word for word: "FTC staff is poring over employment data by a third party to determine if the merger would lessen competition for workers… In the past 40 days staff attorneys have deposed AJRN and LMT execs and FTC economists continue to request data from industry players."   Capitol Forum also reported that it had been informed that the Department of Defense has provided an "all important recommendation on the deal," which was again copied almost verbatim by Market

Securities: "The D of D has given the FTC's leadership its all important recommendation on the deal."

37.    The Market Securities article (in italics) then proceeded to excerpt and repeat each of the principal analytical factors relating to the potential transaction that were discussed in the Capitol Forum article (in bold), including the following:

A. Labor Monopsony Issues: "A Top Enforcement Priority"

**Capitol Forum: The FTC's "theory of anticompetitive harm—labor monopsony— has in recent years emerged as a growing bipartisan concern that Chair Lina Khan has targeted as a top enforcement priority."**

*Market Securities:  "Labor monopsony has in recent years emerged as a growing bipartisan concern that Lina Khan has targeted as a top enforcement priority."*

B.    Department of Defense Influence "Isn't Assured"

**Capitol Forum: "That DOD will be as influential this time isn't assured."**

*Market Securities:  "However, that the DOD will be as influential this time isn't assured."*

C.    Monopsony Cases "Rarely Brought"

**Capitol Forum: "The U.S. agencies have only rarely brought merger cases based on labor monopsony concerns. But the Lockheed/Aerojet merger presents the FTC with a prime opportunity to delve into the issue. Lockheed and Aerojet each employ 1,000 people in the Camden region, many of whom are managers, engineers and technicians."**

*Market Securities:  "The US regulators have only rarely brought merger cases based on labor monopsony concerns, but this AJRN/LMT can be a prime opportunity to delve into the issue as each company employees about 1000 highly skilled people in Camden.*

D.  Camden Monopsony Case: Not "Clear Cut"

**Capitol Forum: "Not clear cut. The monopsony case in Camden, though, isn't clear cut. For some workers, employment options do exist with other defense contractors: General Dynamics Ordnance and Tactical Systems, ordnance provider Armtec Defense Technologies and Lockheed rival Raytheon have operations in the region, although they employ far fewer people than the merging parties."**

*Market Securities:  "However, the monopsony case is not clear cut. Other employment options do exist with other defense contractors such as GD, Armtec, and RTX.*

E.  Labor Demand "Outstrips the Supply"

**Capitol Forum: "Defense contractors' demand for workers outstrips the supply in Camden, which could also counteract any post-merger Lockheed ability to reduce salaries and benefits."**

*Market Securities: "Defense contractors's demand for workers outstrips the supply in Camden, which can counteract LMT's ability to reduce salaries."*

F.  Local Communities Do Not Foresee Adverse Effects

**Capitol Forum: "Camden's business community isn't discussing the merger adversely affecting the labor force's wages and benefits, said James Lee Silliman, the Ouachita Partnership's executive director."**

*Market Securities: "Local communities are also not seeing the merger as an adverse labor event given the two companies producing different products and possible market share gains."*

G.  FTC Has Brought Few Monopsony Cases: "FTC's Pursuit Not a Sure Thing"

**Capitol Forum: "Few cases. The FTC's pursuit of a monopsony case against Lockheed/Aerojet is far from a sure thing. Despite the recent public hand wringing by U.S. antitrust enforcers about the harm mergers can inflict on labor markets, they have brought only a few suits in recent years".**

*Market Securities: "The FTC's pursuit of a monopsony case is far from a sure thing given a very small number of actual cases."*

H.  Prior Monopsony Divestitures

**Capitol Forum: "In 2018, for example, the FTC demanded that Grifols divest blood plasma collection facilities in three U.S. cities to address antitrust concerns with the Spanish pharmaceutical company's acquisition of Biotest US. Without the divestitures, the agency said, Grifols could reduce fees for plasma donors, who usually didn't travel more than 25 minutes to collection facilities in these cities."**

*Market Securities: "In 2018, the FTC asked Grifols to divest blood plasma facilities in 3 US cities to address its only buyer status."*

**Capitol Forum: "DOJ in 2017 also demanded that Danone divest its Stonyfield Farms business to complete its acquisition of WhiteWave, after concluding that the deal as initially structured would have combined the top two purchasers of raw organic milk in the Northeast, leading to worse contract terms for dairy farmers in the region."**

15

*Market Securities:  "In 2017, the DOJ demanded Danone to divest Stonyfield Farm to acquire WhiteWave as the merger would make Danone the only purchaser of raw milk in the Northeast."*

I.   Prior Monopsony Lawsuits: "Rarely Litigated"

**Capitol Forum: "Monopsony cases are very rarely litigated. One exception is DOJ's successful 2016 suit to block Anthem's proposed acquisition of rival health insurer Cigna, where the department not only argued that the merger would harm competition in health insurance markets but also would give the merged company more bargaining leverage over hospitals and doctors in negotiating reimbursements."**

*Market Securities:  "While monopsony cases are rarely litigated, one exception is DOJ's 2016 suit to block Anthem's merger with Cigna on more bargaining leverage over hospitals and doctors."*

38.    Since discovery commenced, Capitol Forum has become aware of additional instances of Market Securities' direct copyright infringement.  Market Securities has illegally obtained and copied portions of the Capitol Forum publications for its own clients.  It has also illegally obtained and transmitted copies of the Capitol Forum publications within its organization.  At times it has prepared verbatim transcripts of the copyrighted publications and disseminated them within the organization.  These instances of infringement are set forth in Exhibit C and Exhibit D..

39.    The conduct of Market Securities is not protected by the "fair use doctrine," which is the defense that infringers routinely assert when they are caught in a willful copyright violation.  Over 40 years ago, the United States Court of Appeals for the Second Circuit, in *Wainwright Sec., Inc. v. Wall St. Transcript Corp.,* 558 F.2d 91, 95-96 (2d Cir. 1977), held that even though there can be no copyright in the news itself, such as the actions of a particular corporation, copyright law clearly protects the author's "analysis and interpretation of events," including, *as here,* the manner in which the author "structures his material and marshals facts, his choice of words, and the emphasis he gives to particular developments."  The Second Circuit held that the summarization of a copyright holder's financial reports is not protected by the fair

use doctrine and constitutes copyright infringement.  *Wainright* has been consistently and routinely followed since it was decided in 1977, including by courts in the District of Columbia.

39.    Since discovery commenced, Capitol Forum has also learned that Market Securities illegally distributed Capitol Forum copyrighted material that had been altered to remove Capitol Forum's copyright notice in violation of 17 U.S.C. Section 1202.  Between 2016 and 2019 Jennifer Donaker transmitted at least seven Capitol Forum publications with the copyright information removed.  Capitol Forum was unaware of this conduct until documents were produced by BTG Pactual in a subpoena return in this litigation.

40.    Defendants' infringement of Plaintiff's copyrights is willful.  Defendants knew that their actions would constitute copyright infringement and have otherwise acted with reckless disregard of the high probability of infringement. The agreement between Ms. Donaker and Ms. Suarez to send the articles on the condition that they would not be shared further or used or republished by Ms. Donaker demonstrates the willfulness of these violations.  So too does the agreement to send the Capitol Forum publications over their WhatsApp devices and to delete all such communications.  Further, the Capitol Forum publications that were exchanged bear a clear and copyright notice and warning.

41.    Upon information and belief, Market Securities has profited, and continues to profit, from its infringing publications.

## COUNT I
### (Direct Copyright Infringement against Market Securities)

42.    Each of the preceding paragraphs 1 through 41 is hereby incorporated herein by reference.

43.    Capitol Forum owns a valid copyright in its proprietary reports, and all of its publications transmitted to its subscribers are protected by the copyright laws.

44.    Market Securities has violated Plaintiff's copyright in its proprietary reports by

copying and distributing content from the reports to its own clients and to others in its organization without Plaintiff's consent or authorization.

45.    The copying of Plaintiff's reports is substantial in quantity and quality and reduces the economic value of the reports.  Market Securities has appropriated the most creative, original and significant portions of the reports and analyses, which represent a substantial investment of time, money and labor.

46.    Market Securities has continued to infringe Capitol Forum's copyright and has no intention to cease and desist such infringing activities.

47.  Market Securities' acts of copyright infringement, as alleged above, are causing Capitol Forum irreparable injury and will continue to do so unless restrained and enjoined.

48.    Market Securities' conduct is in violation of the copyright owner's exclusive rights of reproduction, preparation of derivative works, and distribution under 17 U.S.C. §§ 106(1), (2), and (3).

49.    Market Securities' copyright violations were willful.  It knows it has been committing copyright violations and has otherwise acted with reckless disregard of the high probability of infringement.

50..    As a direct and foreseeable consequence of these acts, Plaintiff has been and continues to be damaged, and Plaintiff is entitled to statutory damages of $150,000 per violation, or actual damages and Market Securities' profits, as well as its costs and reasonable attorneys' fees pursuant to 17 U.S.C. §§ 504, 505.

## COUNT II
### (Contributory Copyright Infringement against Market Securities)

51.    Each of the preceding paragraphs 1 through 50 is hereby incorporated herein by reference.

52.    Capitol Forum owns a valid copyright in its proprietary reports, and all of its publications transmitted to its subscribers are protected by the copyright laws.

53.    Market Securities has infringed Capitol Forum's copyright protections through its substantial participation in BTG Pactual's direct infringement. By virtue of its conduct addressed above, it has acted with an unlawful purpose in making statements and taking actions directed to promoting and inducing direct infringement. It has encouraged, induced, promoted, and aided and abetted the direct infringement activities of BTG Pactual. Despite knowing of this direct infringement and its illegality, it has made no efforts to diminish or impede the infringing activity.

54.    Market Securities, by encouraging, inducing, and causing Capitol Forum subscribers to provide such reports or the contents of those reports to it, has engaged in the contributory infringement of a copyrighted work. It has substantially contributed to the direct copyright infringement of third parties and had actual or constructive knowledge of the infringement by one or more third party recipients of Plaintiff's copyrighted reports.

55.    Market Securities has continued to infringe Capitol Forum's copyright by encouraging, inducing, and causing Capitol Forum subscribers to send it the copyrighted reports and has no intention to cease and desist such infringing activities.

56.    The contributory copyright violations committed by Market Securities were and continue to be willful. It knows it has been committing copyright violations and has otherwise acted with reckless disregard of the high probability of infringement. Its acts of copyright infringement, as alleged above, are causing Capitol Forum irreparable injury and will continue to do so unless restrained and enjoined.

57.    As a direct and foreseeable consequence of these acts, Plaintiff has been and continues to be damaged, and plaintiff is entitled to statutory damages of $150,000 per violation,

or actual damages and Defendant's profits, as well as its costs and reasonable attorneys' fees pursuant to 17 U.S.C. §§ 504, 505.

## COUNT III
### (Distribution of Copyright Material Knowing that Copyright Information was Altered or Removed)

58.    Each of the preceding paragraphs 1 through 57 is hereby incorporated herein by reference.

59.    Capitol Forum owns a valid copyright in its proprietary reports, and all its publications transmitted to its subscribers are protected by the copyright laws.

60.  Capitol Forum utilizes copyright management information that appears on its publications, including copyright notices to prevent unauthorized distribution and transmission of its copyrighted property.

61.  17 U.S.C. Section 1202 prohibits the distribution of copyrighted works with knowledge that copyright management information, including copyright notices had been removed or altered.

62..  Market Securities has transmitted and/or distributed Capitol Forum copyrighted publications that had been altered to remove copyright management information, including the Capitol Forum copyright notice.

63.  Market Securities' copyright violations were willful.    In distributing the altered publications, Ms. Donaker knew that the copyright notices had been removed.

64..  As a direct and foreseeable consequence of Market Securities' willful conduct, Capitol Forum has been and continues to be damaged in an amount to be determined at trial and is entitled, at its, election, to statutory damages in the amount of up to $25,000 per violation, as well as its costs and reasonable attorneys' fees pursuant to 17 U.S.C. Section 1203(b)(5).

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays as follows:

1.      That the Court issue a declaration that: (1) Market Securities has engaged in direct copyright infringement; (2) Market Securities has engaged in contributory copyright infringement; and (3) Market Securities has engaged in the knowing distribution of altered copyright material;;

2.      That the Court issue a declaration that Defendants' acts and conduct set forth in the above prayer were willful;

3.      That the Court issue an injunction, pursuant to 17 U.S.C. § 502 and the equity jurisdiction of this Court, directing that the Defendants, its agents, employees, or representatives, and all persons in privity therewith, are prohibited and permanently restrained from using the Capitol Forum's proprietary reports and from publishing, selling, marketing, or otherwise distributing any copies of any material which has been derived in any manner by violation of Capitol Forum's copyrighted and/or proprietary rights;

4.      That the Court award Capitol Forum compensatory damages, restitution and disgorgement, and punitive damages, as well as statutory damages for Defendants' copyright infringement and contributory copyright infringement in the amount of one hundred and fifty thousand dollars ($150,000) for each act of infringement pursuant to 17 U.S.C. § 504 and twenty-five thousand dollars ($25,000) for each violation of 17 U.S.C. § 1202.;

5.      That the Court require Defendants to pay Capitol Forum the costs of this action, pursuant to 17 U.S.C. § 505, including reasonable attorneys' fees; and

6.      That the Court award such other and further relief as this Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

DATED: February 28, 2025ber

Respectfully submitted,


HARTY
WILLIAMS__/s/_____
                JOHN B. WILLIAMS (D.C. Bar No. 257667)
                1629 K Street, N.W., Suite 300
                Washington, DC 20006
                Tel: (202) 277-8435
                jbwilliams@hartylawgroup.com


                NEIL H. KOSLOWE
                Potomac Law Group PLLC
                1717 Pennsylvania Avenue, N.W. Suite 1025
                Washington D.C. 20006
                Tel. (202) 320-8907
                nkoslowe@potomaclaw.com

                *Counsel for Plaintiff*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 28, 2025 a true and correct copy of Plaintiff's Third

Amended Complaint was served by electronic mail on Defendants' counsel:

Jason M. Dragnel
Kerry B. Brownlee
60 East 42nd St. Suite 1250
New York, New York 10165
jdrangel@ipcounselors.com
kbrownlee@ipcounselors.com
212-292-5390


John D. Mason
7315 Wisconsin Avenue
Suite 400 West
Bethesda, Maryland 20814
jmason@copyrightcounselors.com
301-760-7032

*Counsel For Market Securities, LLC*


Charles S. Baker
JP Morgan Chase Tower
600 Travis, Suite 2800
Houston, Texas 77002
cbaker@lockelord.com
713-226-1200


*Counsel for BTG Pactual Asset Management U.S. LLC*


/s/

_____

John B. Williams

**EXHIBIT A**
**Capitol Forum Articles**

THE
**CAPITOL FORUM**                    Vol. 9 No. 369        October 25, 2021

# Lockheed Martin/Aerojet Rocketdyne: FTC Staff Examines Possible Labor Monopsony Issue in Small Arkansas City

As the FTC winds down its review of Lockheed Martin's (LMT) proposed Aerojet Rocketdyne (AJRD) buyout, agency staff is examining if the $4.4 billion deal could reduce wages for engineers and other defense industry workers near the small city of Camden, Arkansas, sources familiar with the matter said.

Sources said FTC staff is poring over employment data supplied by a third party to determine whether the merger would lessen competition to hire those workers in the Camden area. That theory of anticompetitive harm—labor monopsony—has in recent years emerged as a growing bipartisan concern that Chair Lina Khan has targeted as a top enforcement priority.

The merging parties are the two biggest providers of defense jobs in the region, and both have gone on recent hiring sprees. The data show that Lockheed and Aerojet together accounted for more than half of all engineering job postings in Camden in the last two years.

The question is whether the merger would empower Lockheed to reduce wages and benefits because Camden-area workers are left with fewer employment alternatives post merger, the sources said.

Khan has instructed staff reviewing mergers to be mindful of a deal's ramifications for workers; under her leadership, sources said, the agency increasingly has required in second requests that merging parties provide information regarding their transactions' effect on employees.

"Although antitrust law in recent decades generally has neglected monopsony concerns and harms to workers, we must scrutinize mergers that may substantially lessen competition in labor markets," Khan wrote in a letter last month to House Judiciary antitrust subcommittee Chair David Cicilline, D-RI.

Each of her fellow commissioners has spoken about the importance of enforcing against labor monopsonies and their byproducts—non-compete and no-poaching agreements.

It's difficult to say what impact monopsony questions will have on the recommendation that FTC staff is writing on the deal. Staff already has concerns about how the transaction would affect competition to supply the Pentagon with missile systems and is preparing a lawsuit to block the deal by collecting evidence through investigational hearings and signed statements from third parties.

In the past 40 days, staff attorneys have deposed Lockheed and Aerojet executives, two sources said; the agency's Bureau of Economics continues to request data from industry players, one of the sources said.

As staff's review near its conclusion, the Defense Department has given the FTC's leadership its all-important recommendation on the deal, one of the sources said. DOD has been supportive of recent defense mergers, and its backing has proven decisive in the FTC clearing transactions such as Northrop Grumman's 2018 acquisition of missile engine manufacturer Orbital ATK.

A DOD spokesperson declined to comment about the recommendation. "The department continues to work with the Federal Trade Commission, who is the lead for the ongoing investigation," the spokesperson said in an emailed response.

That DOD will be as influential this time isn't assured: Khan has said she's skeptical "about the efficacy of behavioral remedies," which the FTC required to fix vertical problems with the Northrop Grumman/Orbital ATK deal. The agency has similar vertical concerns with the Lockheed/Aerojet merger.

The labor monopsony issue adds a new dimension to the FTC's current deal review because it's horizontal in nature. Under the theory of harm, the companies are direct competitors in Camden for workers with specialized skills, and acquiring Aerojet would give Lockheed more leverage to lower wages and determine the terms of employment to workers in the region.

In a monopsony case, the FTC would be less interested in DOD's views than the regional labor market's dynamics, and the merging parties' hiring practices and internal human resources documents.

An FTC spokesperson declined to comment. Spokespeople for Lockheed and Aerojet declined to comment, citing their companies' quiet periods before reporting earnings.

**Prime opportunity.** The U.S. agencies have only rarely brought merger cases based on labor monopsony concerns. But the Lockheed/Aerojet merger presents the FTC with a prime opportunity to delve into the issue. Lockheed and Aerojet each employ 1,000 people in the Camden region, many of whom are managers, engineers and technicians. Such highly specialized employees often are the most vulnerable to a dominant firm's abuses if they work in an area with few companies seeking their skills.

Generally, in investigating a possible labor monopsony, "the relevant geographic market is likely to be regional or local, and if the workers are specialized, they are likely to have fewer options for employment," said John Kirkwood, a former FTC official who's now a law professor at the University of Seattle.

If post-merger Lockheed cuts wages and benefits, it's unlikely a flood of workers would leave southern Arkansas: Many have earned their college degrees in the region, and tend to stay there for much of their careers.

In the past five years, Lockheed and Aerojet have tied themselves even more closely to Camden's economy. In 2019, senior Lockheed officials announced that the company would spend $142 million to expand its Camden-area plant, adding 326 new workers to its local workforce of 700. Aerojet last year opened a new 17,000-square-foot facility to aid its production of more than 75,000 solid rocket motors annually in the region.

The companies' moves are reflected in job postings data from Gartner TalentNeuron, which tracks labor markets globally. From October 7, 2020 to October 6, 2021, Aerojet advertised 114 engineering job openings in the region while Lockheed had 69, combining for 56% of the total, according to Gartner. Lockheed and Aerojet posted 194 and 60 job openings, respectively, in the year-earlier period, or 68% of all positions, Gartner said.

The data for all Camden-area job postings shows a similar pattern. Between October 7, 2020 and October 6, 2021, Aerojet posted 339 job openings and Lockheed, 168, or a combined 25% of the total listings. That compared with Raytheon's 123 job postings and security services provider Allied Universal's 92, according to Gartner.

In the year-earlier period, Lockheed had 474 job postings and Aerojet had 342, which together represented 47% of the total.

In a few cases, the companies have wooed workers away from each other, according to LinkedIn data; the deal's consummation would end this recruiting rivalry.

**Not clear cut.** The monopsony case in Camden, though, isn't clear cut. For some workers, employment options do exist with other defense contractors: General Dynamics Ordnance and Tactical Systems, ordnance provider Armtec Defense Technologies and Lockheed rival Raytheon have operations in the region, although they employ far fewer people than the merging parties.

Defense contractors' demand for workers outstrips the supply in Camden, which could also counteract any post-merger Lockheed ability to reduce salaries and benefits.

"Right now we need more students to provide more employees," said Jason Morrison, chancellor of Southern Arkansas University Tech, a two-year school that's one of the primary educational institutions funneling prospective workers to defense contractors in the region.

Lockheed's and Aerojet's importance to the Camden region also is evident in LinkedIn profiles tied to the city of 11,000. Lockheed employs 239 LinkedIn members in the Camden area; another 198 work at Aerojet. The third-largest employer is Southern Arkansas University, which is listed on 84 profiles, while No. 4 Camden Fairview School District employs 75, according to LinkedIn.

Lockheed and Aerojet also were the Nos. 1 and 2 employers of Camden engineers listed on the site. Sixty-two engineers work for Lockheed and 41 for Aerojet, representing 51% of the 202 Camden-area engineers on the site. In contrast, six Camden residents' profiles list ordnance and munitions manufacturer Spectra Technologies as their employer; three, Raytheon; and two, General Dynamics.

Most of these jobs are at the 18,000-acre Highland Industrial Park, a former naval munitions base in nearby East Camden that's billed as one of the largest privately owned facilities of its kind in the U.S. Since the 1960s, defense contractors have used the 5.5 million square feet in the park's more than 1,000 buildings to manufacture, test and store some of the most sophisticated weapons systems on the planet.

Currently, those include Aerojet's solid rocket motors; Lockheed's PAC-3 missiles, and mobile artillery and rocket systems; Raytheon's SM-2, ESSM and missiles; and General Dynamics Ordnance and Tactical Systems' rockets, shells, and Hellfire and Javelin warheads.

About 3,000 people work at the facilities, said James Nixon, manager of business development for Highland Industrial Park.

Defense contractors have been especially good for the Camden region: Calhoun County, where Highland Industrial Park is located, and neighboring Ouachita County, where many defense workers live, had unemployment rates of 3.2% and 3.8%, respectively, in August, well below the national average of 5.2% that month.

The jobs Lockheed, Aerojet and other defense contractors provide are relatively high paying. Last year, the average aerospace worker in Arkansas earned $62,143 compared with the average state residents' salary of $44,780.

A small sample of Camden-area LinkedIn members have switched between the two employers. Among the former Aerojet employees that Lockheed cherry-picked are an operations engineering manager; a team leader; a test engineer and a product inspector. Aerojet hired away from Lockheed quality and program managers.

**Study, live locally.** The overwhelming majority of Camden workers on LinkedIn earned their diplomas in the region. The schools that graduated the most of them are Southern Arkansas University; its sister institution Southern Arkansas University Tech; Camden Fairview High School; Henderson State University; and the University of Arkansas.

A preference for local schools also is clear among Camden-area engineers on the site: Louisiana Tech University was the only out-of-state college that produced a substantial number of graduates in the region.

About 20% of Southern Arkansas University's engineering graduates in the past two years have gotten jobs at Lockheed and Aerojet, according to SAU President Trey Berry. The companies also employ the school's engineering graduates in industrial technology, accounting, supply chain management, financial services and production management, he said.

The area's universities have nurtured this relationship by coordinating closely with Lockheed, Aerojet and other businesses to tailor their academic programs to the employers' needs. SAU Tech is actually located on the Highland Industrial Park's grounds; senior Lockheed Martin and Aerojet executives serve on the board of SAU's College of Science and Engineering in nearby Magnolia.

"Relying on industry leaders to help shape curriculum, our engineering program is aligned to meet workforce needs," Berry said in an email.

These workers tend to live close to Camden, too. More than three-quarters of the region's manufacturing workers—77%—live less than a 25-minute drive from work, and an additional 18% are within a 45-minute commute, according to the Ouachita Partnership for Economic Development, the area's biggest business booster.

Defense workers' loyalty to the region might indicate a problem found in labor monopsonies: Employees unwilling or unable to move to higher-paying jobs elsewhere have less leverage to demand better salaries and benefits from their current employers.

**Hypothetical monopsonist test.** To get a better sense of Camden's labor situation, FTC staff will need to go beyond the intriguing LinkedIn and Gartner data, antitrust attorneys said.

The agency can rely on many of the same analytical tools it does when evaluating seller market power in merger cases. After identifying the employees most likely affected, FTC staff could require the companies to disclose how many of these workers they employ and their compensation, said Kirkwood, the University of Seattle professor.

The agency then will need to define the labor market in question by applying the hypothetical monopsonist test—a slight variation on the hypothetical monopolist test typically used in merger investigations, he said.

"You'd be trying to determine whether the putatively vulnerable workers would turn to other employers or move to other geographic areas if the hypothetical monopsonist reduced wages," Kirkwood said.

The FTC could interview or even depose the companies' managers as well as their workers, and also seek comparable information from other employers, Kirkwood said.

Staff would need to factor in barriers to entry for other employers like non-compete agreements that the companies force their employees to sign.

The agency also would have to consider efficiencies in manufacturing or other business activities that could compensate for a deal's anticompetitive effects.

Educators in the Camden area said that their services would be in even more demand because they expect the merger to lead to more, not fewer, jobs in the region.

Synergies resulting from the Lockheed/Aerojet merger could create even more jobs in the Camden area, said Mahbub Ahmed, interim chair of SAU's Department of Engineering and Physics.

"When two companies with different offerings merge, they will maintain their same product offerings but will most likely be able to expand on the products that they manufacture, which will require more engineers and workers," he said.

Camden's business community isn't discussing the merger adversely affecting the labor force's wages and benefits, said James Lee Silliman, the Ouachita Partnership's executive director.

"It's not necessarily on my radar screen and I haven't heard it talked about in the circles I'm in," he said.

It's possible FTC staff might look at other factors in examining the labor data. Efficiencies considerations, which are adapted from traditional merger analysis, have come under fire from antitrust hawks.

In signing an executive order tasking the executive branch with instilling more competition in the U.S. economy, President Joe Biden in July called four decades of relying on this analysis a "failed" experiment.

"Forty years ago, we chose the wrong path," he said. Under the executive order, there will be "no more tolerance for abusive actions by monopolies. No more bad mergers that lead to mass layoffs, higher prices, fewer options for workers and consumers alike."

**Few cases**. The FTC's pursuit of a monopsony case against Lockheed/Aerojet is far from a sure thing. Despite the recent public hand wringing by U.S. antitrust enforcers about the harm mergers can inflict on labor markets, they have brought only a few suits in recent years.

In 2018, for example, the FTC demanded that Grifols divest blood plasma collection facilities in three U.S. cities to address antitrust concerns with the Spanish pharmaceutical company's acquisition of Biotest US. Without the divestitures, the agency said, Grifols could reduce fees for plasma donors, who usually didn't travel more than 25 minutes to collection facilities in these cities.

DOJ in 2017 also demanded that Danone divest its Stonyfield Farms business to complete its acquisition of WhiteWave, after concluding that the deal as initially structured would have combined the top two purchasers of raw organic milk in the Northeast, leading to worse contract terms for dairy farmers in the region.

Monopsony cases are very rarely litigated. One exception is DOJ's successful 2016 suit to block Anthem's proposed acquisition of rival health insurer Cigna, where the department not only argued that the merger would harm competition in health insurance markets but also would give the merged company more bargaining leverage over hospitals and doctors in negotiating reimbursements.

These cases provide a rough guide for the FTC in their current deal review. The question now is how far staff will go in investigating Camden's labor market before turning in its highly anticipated recommendation.

THE CAPITOL FORUM

Vol. 9 No. 359    October 18, 2021

## Qualcomm/SSW Partners/Veoneer: Jurisdictional, Substantive Questions Loom Over Autonomous Driving Tech Proposal

A $4.5 billion bid from Qualcomm (QCOM) and investment firm SSW Partners to acquire Swedish auto tech company Veoneer (VNE) raises a host of jurisdictional and substantive issues that together create timing and outcome questions around the deal, industry sources said.

SSW Partners through the October 4 agreement will acquire Veoneer, and shortly thereafter divest the company's Arriver software unit to Qualcomm. The investment firm will then seek a buyer for Veoneer's active safety and restraint control automotive components segments, which are the company's sole revenue-generating businesses.

One reading of the deal's novel structure is that it's geared toward preventing Qualcomm from acquiring legacy auto components businesses it has no interest in owning. But there's another explanation—it's a strategy to avoid the global merger notifications that would be required if Qualcomm were to acquire Veoneer outright. That would be a boon to Qualcomm, which has faced monopolization charges in most major jurisdictions, and has an otherwise checkered reputation amongst global competition agencies.

Nonetheless, the merging parties see the first-step SSW Partners acquisition of Veoneer as requiring only U.S. antitrust and certain European foreign direct investment clearances, sources said. And Qualcomm's follow-on acquisition of Arriver is also well-positioned to avoid non-U.S. competition filings, as the software unit doesn't generate any revenue, the sources said.

Nonetheless, the European Commission (EC), national European authorities, and China's State Administration for Market Regulation (SAMR) do have some latitude to assert jurisdiction over the first or second steps of the transaction, lawyers told *The Capitol Forum*. And if SAMR, in particular, moves to do so, it could lead to a lengthy, geopolitically tinged review of a deal that would see a U.S. firm acquiring non-U.S. technology that could ultimately play a meaningful role in the future of autonomous driving.

Chinese industrial policy questions aside, the deal to combine Qualcomm's automotive system on a chip (SoC) platform with Veoneer's Arriver software stack would cement an existing vertical relationship, and in turn raise innovation and foreclosure questions. And because both the first and second-step transactions require HSR notifications, those questions could face close scrutiny at the FTC, where Chair Lina Khan has implemented an aggressive approach to merger review characterized by renewed interest in non-horizontal theories of harm in dynamic markets.

Perhaps speaking to some uncertainty around the deal's path, Qualcomm said in the press release announcing the transaction that it expects to close the deal only sometime in 2022.

Nonetheless, the deal partners are targeting a close to the first-step transaction as soon as the merger agreement's inside date—April 4, 2022—sources said. The agreement's outside date, however, can be extended up to 12 additional months, to April 4, 2023.

**Deal structure.** Qualcomm inked its deal for Veoneer after winning a bidding war with Canadian auto parts supplier Magna (MGA), which agreed on July 22 to purchase the Swedish company for $31.25 per share in cash. Qualcomm on August 5 submitted its own $37 per share offer, and Veoneer accepted that proposal on October 4.

The lead-up to the deal could provide some insight into its structure.

Qualcomm CEO Cristiano Amon said in an August 5 letter detailing his proposal to acquire 100% of Veoneer's outstanding shares that the offer didn't raise "material regulatory clearance concerns." But during the diligence period, Amon said, Qualcomm would "work with Veoneer and its advisors to explore

ways to minimize the timetable associated with regulatory filings and to limit the number of [required] worldwide filings."

An outright Qualcomm acquisition of Veoneer would have triggered a bevy of global merger control notifications—the companies in 2020 generated $23.5 billion and $1.37 billion in revenue, respectively, and both have significant sales in Europe, China, and the Americas.

But enlisting SSW Partners changed the equation—the investment firm generates no revenues, meaning that its acquisition of Veoneer shouldn't trigger EC and SAMR notification obligations. Not only that, but because Arriver itself generates no revenue, the investment firm's subsequent sale of the business to Qualcomm could also avoid filing requirements in those jurisdictions.

Whether the deal structure is driven primarily by a desire to minimize required merger notifications—or instead that's merely its effect—the strategy could help Qualcomm duck competition reviews from European and Chinese competition agencies at which its track record is far from sterling.

The EC, for its part, fined Qualcomm $1.13 billion in 2018 for abusing its smartphone chip dominance, and $272 million in 2019 for predatory pricing. Chinese authorities in 2015 fined the company $975 million over its patent licensing practices, and in 2018 declined to approve its proposed $44 billion acquisition of Dutch chipmaker NXP (NXPI). And the FTC in 2017 sued Qualcomm for allegedly monopolizing mobile phone semiconductor markets.

Against that backdrop, any acquisition the company proposes would be expected to attract extremely close scrutiny from global competition agencies, lawyers said. The deal's structure, however, could—at least in theory—help Qualcomm avoid those reviews.

**SSW Partners.** Whether global antitrust agencies will seek to assert jurisdiction over the first-step deal, and review it as effectively a Qualcomm acquisition of Veoneer—or at least an acquisition of Arriver— will depend in large part on SSW Partners' perceived independence from Qualcomm.

The investment firm, based in New York City, is headed by three principals: Eric Schwartz, who also leads private family investment firm 76 West Holdings, Joshua Steiner, the chairman of Castleton Commodities, and Antonio Weiss, who previously served as Lazard's global head of investment banking. Weiss was also a counselor at the Treasury Department during the Obama administration—a role he took after Senator Elizabeth Warren (D-MA) opposed his nomination to be the department's third-ranking official.

The firm's website lists just one entry under its "news" section—the Qualcomm press release announcing the Veoneer deal. And the partnership's limited track record, and the fact that Qualcomm brought the firm into the transaction after it telegraphed its intent to limit its merger filing obligations, raises the prospect that global agencies could view SSW Partners as effectively acting as Qualcomm's agent.

But the story isn't quite that straightforward. Importantly, although the Veoneer deal is the investment firm's first, it wasn't created solely for purposes of the transaction—the firm's partners filed incorporation paperwork in Delaware in October 2020, and began talking to potential investors late last year, sources said.

And while its ramp-up has been gradual, the partnership has been exploring potential investments since the start of the year, the sources said. Perhaps most importantly, the firm has independent sources of financing for the Veoneer transaction, and its capital for the purchase isn't tied to Qualcomm, the sources said.

Nonetheless, there are some clear links between the two firms—perhaps most notably Qualcomm's commitment, per the October 4 merger agreement, to take all actions necessary to cause SSW Partners to perform its obligations under the contract. If SSW Partners fails to do so, Qualcomm must satisfy those obligations, including by "making any necessary payments in satisfaction of the required merger payments…and delivering the merger consideration…on behalf of SSW," the agreement says.

To be sure, the parties could describe that backstop arrangement as typical of a public company deal without financing contingencies to close. Nonetheless, Qualcomm's guarantee of SSW Partners' obligations could paint the firms as linked—a fact that may in turn raise questions at the FTC, EC, and SAMR as to whether the first-step deal is, in effect, a Qualcomm acquisition of Veoneer—or at least of Arriver.

**EC, national questions.** Of those three jurisdictions, the EC, through its Consolidated Jurisdictional Notice, has by far the most transparent guidance on evaluating the question.

In one reading, the two-step transaction could be considered a "warehousing" arrangement described in paragraph 35 of the notice, where an interim buyer acquires the target's shares "on behalf" of and is "directly linked" to the ultimate acquirer, which in turn "often bears the major part of the economic risks," on the deal.

If that's the case, the first-step merger can't close until the commission approves the second step. That scenario would apply here if the first-step transaction were viewed either as a Qualcomm purchase of Veoneer or if SSW's involvement in the onward sale of Arriver to Qualcomm is viewed as a warehousing arrangement.

That said, SSW Partners is meaningfully more independent of Qualcomm than is typical of the warehousing arrangements that have drawn past EC pushback, for example, Canon's (CAJ) 2016 purchase of Toshiba Medical Systems.

On that front, the merging parties could present their deal as consistent with paragraphs 30 to 32 of the notice, which considers the first step of a two-step transaction non-notifiable—meaning it can close even if the second step is notifiable—provided the subsequent sale is "agreed between the different purchasers in a legally binding way," and there's no uncertainty about the second-step division of assets occurring "within a short time period."

EC questions aside, the first-step transaction—as well as the second-step transfer of Arriver—could also trigger national filings, most notably in Germany, where a deal is notifiable provided it's valued at more than 400 million euros, the involved parties' aggregate turnover exceeds 500 million euros, at least one firm has German revenue over 50 million euros, and the target is "significantly active" in Germany.

Veoneer doesn't break out its German revenues, but in 2020 generated $559 million in European sales. Given Germany's strength in auto markets, that points toward significant Veoneer revenue in the country. The company also employs 466 associates across four German engineering sites. And Germany's FCO

could have a real substantive interest in the deal, as domestic OEMs like Volkswagen and Daimler have significant stakes in the ultimate transition to autonomous driving.

Then there's the UK CMA, which has been ambitious in asserting jurisdiction over deals using its notoriously flexible share of supply test, and has otherwise established itself as one of the world's most aggressive antitrust enforcers. But because SSW Partners has no share of supply of any market, even the CMA's highly flexible jurisdictional test could probably capture only the deal's second step, provided the CMA doesn't view SSW as acting on Qualcomm's behalf.

In any event, the CMA can't, post-Brexit, refer the deal up to the European Commission for review under Article 22. But—where the EC can't establish original jurisdiction—Germany should be able to, bringing into play a possible review transfer to Brussels.

Not only that, but due to a recent guidance change the bloc's member states—even if they lack jurisdiction—can ask the commission to investigate deals that don't meet their notification thresholds but threaten to "significantly affect competition." That means that competition authorities in member states like Italy and France, which represent domestic auto OEMs and are clearly open to using that procedure, could seek to refer either step of the transaction upwards.

Those referrals don't happen in a vacuum: if the EC is interested in a deal, it can lobby national agencies to do so. That's what led to France's Article 22 referral of Illumina's $8.1 billion acquisition of Grail earlier this year. And here, the two-step transaction could pique the EC's interest, given not only Qualcomm's track record, but also the commission's ongoing review of Arm's proposed acquisition by Nvidia (NVDA), a key Qualcomm rival in the automotive SoC market.

**SAMR flexibility.** Although avoiding EC jurisdiction would be a win for the merger partners, the more pressing threat is probably SAMR, given Qualcomm's history in China, not to mention the agency's typically lengthy and geopolitically tinged reviews of U.S. outbound investments.

SAMR reviews are often driven by industrial policy, rather than traditional antitrust considerations. And recent U.S. sanctions preventing Chinese companies from buying vital American-made tech components have led to even greater SAMR scrutiny of deals that could extend U.S. leadership in dynamic markets or thwart China's efforts to evade U.S. export controls.

Those concerns are especially pronounced where U.S. firms like San Diego-based Qualcomm—or for that matter, New York City-based SSW Partners—acquire non-U.S. tech firms like Stockholm-based Veoneer, or when deals implicate a key arena of U.S.-China competition like autonomous driving.

SAMR had already commenced its review of Magna's bid for Veoneer, and on September 27 publicized the filing under its simplified review process. That deal seemingly qualified for simplified review because the companies had only a small horizontal overlap in the global advanced driver-assistance systems (ADAS) sensor market, the authority said.

That means the agency is well aware of the recently announced Qualcomm transaction. But because neither SSW Partners nor Arriver generate revenue in China, neither the first nor the second step of the new deal is obviously notifiable.

SAMR also typically follows—although not necessarily to the letter—European tests for merger reportability. And if the EC doesn't view either step of the deal as reportable, SAMR may gain comfort that they're similarly non-notifiable in China.

That said, SAMR does have some flexibility to review deals that don't meet its reporting thresholds: Article 6 of its Merger Review Interim Provisions provide that the agency can review those mergers "if the facts and evidence…show that the concentration…may have the effect of excluding or restricting competition."

To be sure, SAMR has always been cautious in asserting jurisdiction over transactions falling below its formal thresholds, Beijing-based antitrust lawyers said. But this situation—especially in light of questions around whether the companies structured their deal at least in part to avoid Chinese notification obligations—does create at least some uncertainty, they said.

"Given Qualcomm's antitrust history with Chinese regulators, it will be difficult for them to skip SAMR's eyes," one of the attorneys said.

**HSR uncertainty.** Although it's not clear whether the first or second step deals will draw European or Chinese reviews, the merger agreement explicitly identifies HSR clearance as a condition to the first-step transaction's close.

That should send the deal to the FTC, which will in turn face a threshold question: whether to review the first step as a functional equivalent of Qualcomm acquiring Arriver—or Veoneer outright—or instead simply as SSW Partners acquiring Veoneer.

The latter deal, of course, raises no antitrust issues, as SSW Partners is a financial buyer with no current investments. But when confronted with a two-step transaction in which the second step raises competition questions, the agency often reviews the two steps in tandem, and won't clear the first transaction until it's comfortable with the second, lawyers said. The commission could be even more likely to take that position here, in an environment where Chair Khan has increasingly pulled out various stops to make dealmaking more difficult.

In that same respect, unlike the typical intertwined transaction, the first step transaction here isn't contingent on the second receiving HSR clearance. And unless the FTC views SSW Partners as effectively acting as Qualcomm's agent, there's little obvious harm that comes from the investment firm acquiring Veoneer. Not only that, but allowing the first step of the deal to close won't preclude the FTC from conducting a substantive investigation into the follow-on Qualcomm/Arriver transaction, which requires its own separate HSR filing.

One other factor: Qualcomm needn't wait until the SSW Partners/Veoneer tie-up closes before notifying the Arriver transaction to the FTC. In fact, the company almost certainly won't do so.

To be sure, there's limited incentive to file it in the very near term, given the April 4 inside date for the first step deal's close. But Qualcomm could file its notification either simultaneously with or at some point after SSW Partners files HSR for Veoneer—but well before that first-step deal could close—which could in turn allow the FTC to investigate the second step while allowing the HSR waiting period to expire on the first.

**Substantive questions.** The FTC's approach to that question will rest in part on whether it views the Qualcomm/Arriver transaction as raising meaningful antitrust questions. The deal is vertical in nature, and would combine Snapdragon Ride, Qualcomm's autonomous driving system on a chip (SoC) platform, with the Arriver software stack, which includes perception and drive policy software.

Qualcomm and Veoneer have an existing relationship on that front, after in August 2020 announcing an autonomous driving collaboration powered by Veoneer's software stack and Qualcomm's SoC platform that's targeting customer production launches by 2024. The companies memorialized their agreement in January 2021, which formally established Veoneer's Arriver software brand.

That existing collaboration means that the deal wouldn't radically alter the pre-merger status quo, or the vertically linked products' development paths. Nonetheless, the merger would cement the partnership, and allow Qualcomm to more tightly and durably integrate Arriver into its Snapdragon Ride platform.

That could lead to a host of benefits, by incentivizing investment and creating a stronger, more efficient platform. But that integration could also leave the combined firm's rivals, or even downstream OEMs, increasingly locked out of Qualcomm's SoC platform or Arriver software stack. Those potential concerns could draw extra scrutiny in the FTC review, given Qualcomm's alleged history of using its market power to exclude smartphone chip rivals.

**Competitive landscape.** Qualcomm's ability and incentive to meaningfully foreclose competitors and harm competition rests largely on whether it has—or in the future is likely to have through the merger or otherwise—market power at either level of the SoC/software stack.

That certainly seems the goal: the companies said in a joint August 2020 investor presentation that their collaboration "establishes a main challenger for the next generation automobiles, *aiming for long-term market leadership*" [emphasis added].

At the moment, however, the companies' integrated solution is years away from actually entering the market. And in the interim, both firms face significant competition.

In perception and drive policy software, Arriver competes with Continental (CON: ETR), as well as suppliers with existing chip expertise like Bosch and Intel (INTC), which in 2017 acquired autonomous driving leader Mobileye. Nvidia is also set to introduce its own software, and in-house OEM development is another potential competitive constraint, Veoneer said in its most recent annual report.

For its part, Qualcomm's Snapdragon Ride competes with SoC platforms from Nvidia and Intel, as well as other automotive chipmakers like Xilinx (XLNX), NXP, and Renesas (6723:TYO).

Nonetheless, when it comes to the existing vision-based ADAS market, the combined Intel/Mobileye is dominant, and has been "criticized as a closed platform where its clients are supposed to take Mobileye's full suite of software without having an opportunity to write their own," said Danny Kim, a director and senior advisor at VSI Labs, an autonomous driving consultancy.

Against that backdrop, the companies may pitch the deal as increasing competition by creating a new, stronger—and crucially, more ope—rival to Intel. That could lead to some customer support for the deal, said Kim.

"Almost all OEMs are looking for alternatives to Mobileye to break the monopoly and to be less dependent on a single software-hardware vendor solution," he said.

In that same respect, the FTC under Khan isn't an easy audience for the argument that vertical mergers are necessary to more effectively take on a dominant rival—especially when that rival may be currently using its vertical integration to purchasers' detriment.

And even if the merger does create a stronger competitor to Intel/Mobileye, it could in the worst-case lead to an entrenched duopoly in which the two vertically-integrated ecosystems leave competitors—or OEMs—increasingly locked out. That's a potentially unappetizing prospect for automakers who are more and more seeking to mix and match hardware and software providers, Kim said—a preference he described as the "aftermath of the dominant black box-solution provider Mobileye."

To be sure, that anticompetitive narrative isn't a slam dunk, especially because Arriver is already closely linked with Qualcomm through an existing collaboration agreement. From a market structure perspective, the companies' respective shares are also small enough that the foreclosure story is far from straightforward.

Nonetheless, Arriver could, but for the merger, evolve in a more open direction, and be more likely to partner with non-Qualcomm chipmakers. And acquiring ownership of the software stack may give Qualcomm an incentive and ability to close it off into its own vertically integrated offering, heightening rivals' barriers to entry, and otherwise creating a significant competitive moat.

Given the FTC's current approach to nascent tech questions, those potential concerns about the acquisition by Qualcomm—a firm the FTC in 2017 alleged had used exclusivity agreements to harm competitors and competition—could in turn lead to a close commission look at the deal.

# EXHIBIT B

## OCTOBER 18, 2021 MARKET SECURITIES PUBLICATION

\*\*\*VNE/QCOM - CapForum has posted a 9-page article commenting EC, EU member state regulatory bodies, SAMR and HSR. EC, EU-member states and SAMR might have some latitude to assert jurisdiction over the first or second step of the merger per some lawyers. The merger between QCOM and Arriver touches on verticals.

SSW Parners perceived independence from QCOM would drive some regulators to assert jurisdiction or not. SSW was formed in October 2020 and began talking to investors for fund raising late last year. QCOM is on the hook if SSW fails certain obligations to the merger, a backstop, which could make two firms possibly viewed as linked. EC might consider the two-step transaction as a warehousing arrangement that only allows the first step to close with the 2nd step approved if they see two as one-related party. A filing to Germany is a possibility given Arriver's deal valuation. CMA also can possibly step in if SWW is viewed acting on QCOM's behalf. SAMR, often driven by industrial policy, may have some flexibility to review deals that are not meeting the reporting threshold. While Arriver and QCOM had prior collaborations, HSR can raise some vertical issues under Khan due to the possibility of Arriver rivals being locked out by QCOM. But

parties can also argue it strengthens competition in Advanced driverassistance systems given other dominant players like Intel/Mobileye.

## OCTOBER 25, 2021 MARKET SECURITIES PUBLICATION

***AJRD/LMT - CapForum is out commenting on FTC staff examining possible a labor monopsony issue in Camden Arkansas. FTC staff is poring over employment data by a third party to determine if the merger would lessen competition for workers as labor monopsony has in recent years emerged as a growing bipartisan concern that Lina Khan has targeted as a top enforcement priority. In the past 40 days staff attorneys have deposed AJRN and LMT execs and FTC economists continue to request data from industry players. The D of D has given the FTC's leadership its all important recommendation on the deal per one of the sources. However, that the DOD will be as influential this time isn't assured.

The US regulators have only rarely brought merger casese based on labor monopsony concerns, but this AJRN/LMT can be a prime opportunity to delve into the issue as each company employees about 1000 highly skilled people in Camden. However, the monopsony case is not clear cut. Other employment options do exist with other defense contractors such as GD, Armtec, and RTX. Defense contractors's demand for workers outstrips the supply in Camden, which can counteract LMT's ability to reduce salaries. Local communities are also not seeing the merger as an adverse labor event given the two companies producing different products and possible market share gains.

The FTC's pursuit of a monopsony case is far from a sure thing given a very small number of actual cases. in 2018, the FTC asked Grifols to divest blood plasma facilities in 3 US cities to address its only buyer status. In 2017, the DOJ demanded Danone to divest Stonyfield Farm to acquire WhiteWave as the merger would make Danone the only purchaser of raw milk in the Northeast. While monopsony cases are rarely litigated, one exception is DOJ's 2016 suit to block Anthem's merger with Cigna on more bargaining leverage over hospitals and doctors.

# EXHIBIT C
## LIST OF 44 ADDITIONAL INFRIGEMENTS NOT INCLUDED IN COMPLAINT
*Note: Given length of Capitol Forum articles, ellipses are used at times throughout to indicate omitted text*

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 7 No. 429 | Nate Soderstrom | JENNIFER DONAKER | 2019-12-02 13:30:00 | 2019-12-03 16:43:50 |

| The Capitol Forum (TCF) Language | Market Securities (MS) Language |
|---|---|
| Merger Monthly: Trump Administration, California Conflict Moves to Antitrust; Outlook for Key Transactions Including AbbVie/Allergan, Google/Fitbit and Roche/Spark<br>…<br>Roche/ Spark: Consensus is reasonable. FTC staff attorneys reviewing Roche's proposed acquisition of Spark Therapeutics recommended in October that the commission close its investigation into the $4.3 billion tie-up, The Capitol Forum reported on October 24.<br><br>Although the commission typically dispenses with staff recommendations to close fairly quickly, the deal's intersection with sensitive drug pricing and potential competition issues—and the prospect that one or more commissioners could dissent from the decision—could affect this timeline. A commission vote, however, is expected any day, sources familiar with the matter said.<br><br>The UK's Competition and Markets Authority (CMA) is also investigating the transaction, with a phase 1 review set to conclude December 16. Since serving an initial enforcement order on June 6, the CMA has been conducting an inquiry into the deal that has included Q4 2019 resolution likely. The CMA faces a December 16 deadline for its phase 1 decision.… | MARKET SECURITIES LL Says Btw, CapForum came out with this yesterday on ONCE but seems like it got missed by a lot of folks. "Although the commission typically dispenses with staff recommendations to close fairly quickly, the deal's intersection with sensitive drug pricing and potential competition issues - and the prospect that one or more commissioners could dissent from the decision - could affect this timeline. A commission vote, however, is expected any day, sources familiar with the matter said" |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 8 No. 90 | Jeff Bliss | JENNIFER DONAKER | 2020-03-11 08:30:00 | 2020-03-11 09:52:08 |

| TCF Language | MS Language |
|---|---|
| AB InBev/Craft Brew Alliance: Beer Tie-up Draws DOJ Probe Into Hawaii Overlap, Distribution Issues<br><br>DOJ staff attorneys investigating AB InBev's (BUD) $221 million deal to acquire total ownership of rival beer conglomerate Craft Brew Alliance (BREW) are focused on the deal's impact on Hawaiian beer drinkers, sources familiar with the matter said.<br><br>Staff has in recent weeks queried market participants on the closeness of competition between ABI's beers, including Bud Light, and Kona, CBA's leading brand and a top-seller in Hawaii, and is also examining how the deal would affect distribution and rivals' market access in the state, the sources said.<br><br>The companies announced their deal on November 11, and DOJ issued both parties second requests on February 5. Staff deepened its investigation into the Hawaiian beer market in the past few weeks by issuing civil investigative demands to third parties for brand, consumer, and channel data, among other items, the sources said.<br><br>ABI currently owns 31.2% of CBA, and through the deal would acquire full control of a portfolio that includes Omission, Redhook, and Widmer Brothers. But Kona is the alliance's crown jewel, and accounted for 63.5% of the company's 2018 shipments. Kona is especially prominent in its home territory—the brand generates a full quarter of its revenue from sales in Hawaii, where its market share exceeds 10%, per a 2016 CBA filing.<br><br>ABI dominates the U.S. beer market through its Bud Light, Michelob Ultra, and Budweiser brands, and the merger could push its share to above 40% in the Aloha state. And if DOJ objects to the overlap, it may not be amenable to an easy structural fix—Kona's sales in Hawaii alone are probably material to CBA's overall business, and even if ABI were open to a Hawaii-only remedy, such a fix would be complicated, if not outright unworkable…. | UTC MARKET SECURITIES LL:<br>***BREW/INBEX - CapForum is out stating DOJ is focused on deal's impact on Hawaiian beer drinkers, and how deal would affect distribution and rival's market access in the state. Kona has an 10%+ market share in Hawaii. With Kona, ABI's market share could go over 40% in Hawaii. If DOJ objects to the overlap, it Amy not be amenable to an easy structural fix as its complicated and Kona sales are probably material to Brew's overall business.<br>==> Per our feedback in the past, we have been conservative on this one. The DOJ has a lot of skepticism for further consolidation in this industry and have watched beer prices rise post consolidation. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 8 No. 95 | Jeff Bliss | JEREMY CIVRE | 2020-03-17 17:15:00 | 2020-03-17 19:10:11 |

| TCF Language | MS Language |
|---|---|
| Charles Schwab/TD Ameritrade: DOJ Staff Probes Deal's Impact on Innovation, Services, Custodial Options<br><br>Charles Schwab's (SCHW) proposed TD Ameritrade (AMTD) acquisition has sparked DOJ staff questions about how the $26 billion deal could affect innovation, prices and quality for registered investment advisors (RIAs) seeking custodian and trade clearing services, industry participants said.<br><br>In interviews over the past four weeks, department attorneys asked if the ==transaction would leave RIAs with too few custodians== to hold the $83.7 trillion in assets they collectively manage and whether the merger would ==harm their customer service==, the industry participants said.…<br><br>==DOJ attorneys asked why more RIAs didn't use half dozen or so rival custodians,== the industry participants said. Those alternatives include such prominent names as Pershing, LPL Financial and Wells Fargo, which plans to aggressively expand its RIA services business this year.…<br><br>TD Ameritrade as a maverick. In their interviews, department attorneys focused on how ==TD Ameritrade has been a market maverick,== the industry participants said. ==The company pioneered open application program interfaces (API),== allowing third-party developers to easily integrate their products with TD Ameritrade's platform.… | MARKET SECURITIES LL Says ***AMTD/SHB - CapForum out stating DOJ conducting interviews the last 4 weeks questioning if the ==transaction would leave too few custodians== and ==harm customer service==. Critics suggest its a 3-2, and ==DOJ has asked why RIAs do not use other rival custodians==. Interviews focused on how ==TD is an industry maverick==. ==TD pionoeerd Application Program Interfaces (API).== Questions touched on any outsized concerns for smaller RIAs. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 8 No. 145 | Jeff Bliss | JENNIFER DONAKER | 2020-04-20 15:50:32 | 2020-04-21 16:23:04 |

| TCF Language | MS Language |
|---|---|
| Google/Fitbit: Deal Critics Raise Fitness Tracker Android-Compatibility Concerns to DOJ<br><br>Google's (GOOGL) proposed Fitbit (FIT) acquisition has spurred third-party complaints to DOJ that the $2.1 billion deal would incentivize the tech giant to disrupt rival fitness trackers' ability to sync with Android-based smart phones, sources familiar with the matter said….<br><br>The data concern, though, is a relatively novel antitrust argument that would face challenges in U.S. courts. Fear that Google would interfere with fitness trackers' Android compatibility, however, is a more traditional antitrust concern rooted in the classic vertical input foreclosure theory of harm….<br><br>But Android is open source, meaning vendors are free to modify its APIs, which could complicate any Google plans to harm Fitbit's competitors, industry sources said….<br><br>Samsung, in particular, likely could thwart any Google interference. In addition to being a Fitbit rival, Samsung is the second-largest U.S. smartphone manufacturer and uses a modified Android OS on its handsets….<br><br>But it's an open question whether the DOJ or EC has an appetite for clearing the deal subject to behavioral remedies…. | UTC MARKET SECURITIES LL:<br>***FIT/GOOG - Per Capforum third parties complaints state Google would disrupt rival fitness trackers (Samsung, Farmin and Fossil) ability to sync with Android based smart phones. This is a more classical vertical input foreclosure theory of harm than novel antitrust arguments of data concern. The article addresses Google's foreclosure ability via Android but notes Samsun could thwart Google interference and that Android is open source, allowing vendors to freely modify its APIs. They state its an open question whether the DOJ or EC would be open to behavioral remedies.<br>==> We little new information in this article. |

43

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 8 No. 149 | Nate Soderstrom | JENNIFER DONAKER | 2020-04-24 10:15:00 | 2020-04-24 10:53:52 |

| TCF Language | MS Language |
|---|---|
| Simon Property Group/Taubman Centers: Shopping Center Tie-up Raises Outlet Center, Shopping Mall Overlap Questions<br><br>Simon Property Group's (SPG) proposed $3.6 billion buy of high-end shopping mall rival Taubman Centers (TCO) could increase the company's leverage to raise rents and impose onerous contract terms on mall and outlet center tenants, industry sources said.<br><br>Simon is the largest U.S. owner of shopping centers, with interests in 106 malls and 69 outlet centers. Although Taubman operates just 21 U.S. properties, what it lacks in quantity it makes up for in quality: the company in 2019 led all mall landlords in average sales per square foot.… | MARKET SECURITIES LL Says ***TCO/SPG - CapForum is out stating the tie up could increase leverage to raise rents and impose onerous contract terms on mall and outlet centers. While TCO owns only 21 property, it has quality. They note overlaps in Detroit and Miami. ------------------ |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 8 No. 174 | Eliot Gao | STEPHEN GRAHLING | 2020-05-12 13:35:00 | 2020-05-12 14:10:00 |

| TCF Language | MS Language |
|---|---|
| LVMH/Tiffany: Proposed Luxury Goods Merger Enters Phase II Review in China | CF on TIF |
| French luxury-goods giant LVMH's (EPA: MC) proposed $16.2 billion acquisition of iconic U.S. jeweler Tiffany (TIF) recently triggered a Phase II investigation by Chinese antitrust enforcers, sources familiar with the matter said. | LVMH/Tiffany: Proposed Luxury Goods Merger Enters Phase II Review in China |
| Despite initiating the in-depth investigation, the State Administration for Market Regulation (SAMR) isn't likely to raise major competition concerns with the deal, the sources said. SAMR in the past has done little to intervene in luxury consumer businesses, local legal practitioners said. | French luxury-goods giant LVMH proposed 16.2 billion acquisition of iconic US jeweler Tiffany recently triggered a Phase II investigation by Chinese antitrust enforcers, sources familiar with the matter said. |
| The companies in March notified their deal to SAMR, which accepted it for review last month. | Despite initiating the in-depth investigation, the SAMR isn't likely to raise major competition concerns with the deal, the sources said. SAMR in the past has done little to intervene in luxury consumer businesses, local legal practitioners said. |
| But LVMH, the world's largest luxury-goods provider, has generated some controversy in the country recently. Last week, several Chinese newspapers ran stories criticizing LVMH for increasing prices substantially in March and May. | The companies in March notified their deal to SAMR, which accepted it for review last month. |
| LMVH brand stores, such as those selling Sephora beauty products, experienced steep sales declines earlier this year due to the country's pandemic-related lockdown. | But LVMH, the world's largest luxury-goods provider, has generated some controversy in the country recently. Last week, several Chinese newspapers ran stories criticizing LVMH for increasing prices substantially in March and May. |
| China accounts for more than a third of worldwide luxury sales and is Tiffany's second-largest market. The company operates 35 stores in mainland China. | LVMH brand stores, such as those selling Sephora beauty products, experienced steep sales declines earlier this year due to the country's pandemic-related lockdown. |
| Australian, EC reviews. The deal also has sparked an extended review from the Australian Foreign Investment Review Board (FIRB), to which the companies submitted their initial filing on March 5, Tiffany said in an April securities filing. | China accounts for more than a third of worldwide luxury sales and is Tiffany's second-largest market. The company operates 35 stores in mainland China. |
| FIRB initially faced an April 8 deadline for a decision, but the government subsequently requested six-month extensions on business applications due to the novel coronavirus outbreak, postponing FIRB's deadline to October 6. | Australian, EC reviews. The deal also has sparked an extended review from the Australian Foreign Investment Review Board (FIRB), to which the companies submitted their initial filing on March 5, HF said in an April securities filing. |
| The advisory board, which investigates Australia-related transactions that involve foreign companies, can approve the transaction in advance of the October deadline, Tiffany said in the filing. | FIRB initially faced an April 8 deadline for a decision, but the government subsequently requested 6-month extensions on business applications due to the novel coronavirus outbreak, postponing FIRB's deadline to October 6th. |
| Tiffany operates 13 stores in Australia, and LVMH brands also run a number of outlets in the country. The European Commission is reviewing the transaction, as well. The companies submitted a draft filing to the EC on March 4 but remain in pre-notification talks, Tiffany said. | The advisory board, which investigates Australia-related transactions that involve foreign companies, can approve the transaction in advance of the October deadline, TIF said in the filing. |
| The companies didn't anticipate the regulatory snags, predicting on November 25 when they unveiled the deal that it would close by the middle of 2020. | TIF operates 13 stores in Austraila, and LVMH brands also run a number of outlets in the country. |
| SAMR doesn't comment on ongoing cases. Spokespeople for LVMH and Tiffany declined to comment. | The European Commission is reviewing the transaction, as well. The companies submitted a draft filing to the EC on March 4 but remain in pre-notification talks, TIF said. |
|  | The companies didn't anticipate the regulatory snags, predicting on Nov 25 when they unveiled the deal that it would close by the middle of 2020. |
|  | SAMR doesn't comment on ongoing cases. Spokepeople for LVMH and TIF declined to comment. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 8 No. 184 | Eliot Gao | JENNIFER DONAKER | 2020-05-22 13:50:00 | 2020-05-22 14:21:07 |

| TCF Language | MS Language |
|---|---|
| Cisco/Acacia: ZTE Concerns Resolved, But Trade Tensions Complicate Review<br>…<br>But sources close to ZTE said that the Chinese networking and handset maker now has no major concerns with the transaction, and believes it can reach agreement with Cisco to continue supplying it with Acacia components post merger.…<br><br>SAMR review update. Amid the tensions, Cisco, Acacia and SAMR are now engaged in negotiations over remedy proposals the companies first submitted in the past few months, sources said.…<br><br>The Acacia deal could attract that retaliation because Cisco has drawn unique scrutiny from the Chinese government, which at points stopped buying the company's networking gear due to security concerns. At least in part due to the government's moves to restrict its business opportunities in the country, Cisco now generates just 3% of its revenue in China. | UTC MARKET SECURITIES LL:<br>***ACIA/CSCO - CapForum out, ZTE concerns resolved but trade tension complicate review. ZTE has no major concerns and believes it can reach a supply agreement. Parties and SAMR are now engaged in remedy negotiations, the companies first submitted in the past few months. It notes backdrop of new US/China relations, and that CSCO only generates 3% of revenue in China. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 8 No. 244 | Dafydd Nelson | JENNIFER DONAKER | 2020-07-16 15:25:00 | 2020-07-16 15:26:35 |

| TCF Language | MS Language |
|---|---|
| Google/Fitbit: EC Phase I Approval Not a Foregone Conclusion as Regulator Awaits Market Feedback<br>…<br>Typically, a phase I market test is a strong indicator that the European Commission is willing to approve a deal quickly rather than subject it to an in-depth phase II probe lasting some four or more months.<br><br>But the Google remedy proposal is far from typical. The commitment to separate Fitbit's health data from Google's own dataset is a rather novel approach to an EC remedy in such a case. For that reason, the commission's market test takes on special significance.<br><br>The commission is said to be particularly open to the responses it receives from third parties during the market test, indicating that the authority wouldn't hesitate to launch an in-depth review in the face of widespread criticism of the remedy. The uniqueness of the pledge offered by Google means that in this instance the regulator is especially keen to hear what third parties think.… | UTC MARKET SECURITIES LL:<br>***FIT/GOOG - CapForum is out stating Phase 1 is not foregone closure until Market Test feedback returns.<br><br>19:48:56 UTC JENNIFER DONAKER, MARKET SECURITIES LL:<br>***FIT/GOOG - Additional feedback on CapForum note - the article is an opinion piece. They note Phase 1 market test is a strong indicator the EC is willing to approve a deal quick but the remedy proposal here is far from typical. They note the EC is open to responses from Third Parties and would not hesitate to launch a in-depth review in face of widespread criticism. They list prior deals such as Whirlpool/NIDEC, DEMB/Modelez and Bonnier where Phase IIs were still launched despite Phase 1 market testing. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 8 No. 276 | Dafydd Nelson | JEREMY CIVRE | 2020-08-07 13:15:00 | 2020-08-07 13:44:39 |

| TCF Language | MS Language |
|---|---|
| Google/Fitbit: Data, Remedy Questions Shadow Deal After EC Opens Phase II Review<br>…<br>From a legal perspective, the commission's misgivings about a Google takeover of Fitbit appear straightforward. It's therefore perhaps <mark>no surprise that the EC opened a phase II investigation</mark> into the transaction.<br><br><mark>Didn't go far enough.</mark> But that outcome wasn't guaranteed, after Google offered a formal pledge during the phase I review to create a data silo, keeping certain information collected through Fitbit wearable devices separate from Google's other datasets.<br>…<br>The EC's statement <mark>leaves the door ajar for Google;</mark> by buttressing the offer to include that data, the search giant could conceivably secure a green light in Brussels. That <mark>Google didn't take that step during phase I suggests either the solution isn't so easy or that Google is resistant to going any further.</mark> If Google's approach is the latter, a simple scenario will play out: fight the commission with the aim of securing an unconditional approval. Winning that battle could be far from simple. Yet Google might fear that giving further ground on the Fitbit remedy could make it vulnerable in other areas where it's either facing, or might face, future regulatory scrutiny.<br>…<br>It's no secret that <mark>the commission typically frowns on behavioral commitments.</mark> A promise to keep datasets separate could be difficult to implement, let alone to monitor—especially when it involves Google, one of the globe's largest and most technically sophisticated companies.<br>…<br>But <mark>product development isn't a bone of contention for the commission.</mark> Instead, the EC is concerned that the acquisition will allow Google to strengthen its dominance in "the personalisation of the ads it serves via its search engine and displays on other internet pages." Rivals, the commission says, would find it more difficult to match Google's advertising services.<br>… | MARKET SECURITIES LL Says<br>***FIT/GOOG - CapForum states EC contends FIT purchase would further entrench GOOG's market position in online advertising markets. <mark>No surprise opened a Phase II.</mark> EC ultimately stated Google's offer <mark>didn't go far enough.</mark> EC <mark>left the door ajar for Google</mark> but <mark>Google didn't take the step during Phase 1 suggesting the solution isn't so easy or Google is resisting going further.</mark> It lays our scenarios how Google can try for unconditional approval or improve its remedy, but notes <mark>EC frowns on behavioral commitments. Product development is NOT a bone of contention.</mark> They summarize Looker/GOOG at CMA, but state Looker didn't add to GOOG's data trove. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 8 No. 299 | Dafydd Nelson | JENNIFER DONAKER | 2020-08-31 08:45:00 | 2020-08-31 09:00:00 |

| TCF Language | MS Language |
|---|---|
| LVMH/Tiffany: EC Filing Still Some Weeks Away Following Fresh Information Request … Commission case handlers issued the latest request late last week, a source familiar with the matter said. The request came as EC officials continue exploring the difference between branded and unbranded luxury goods.<br><br>The transaction would reduce the number of branded luxury-jewelry participants, which might find it profitable to coordinate their activities, according to the possible theory of harm. The $16.2 billion acquisition is the biggest ever in the luxury industry, and it is said commission officials still have questions about possible coordinated effects.…<br><br>If LVMH thinks it can secure an unconditional phase I approval for the Tiffany deal, it could notify the EC as late as October 19 and still achieve a decision by close of business on November 24. If the commission is likely to require phase I remedies, LVMH would need to notify the commission by October 5.… | UTC MARKET SECURITIES LL:<br>***TIF/LVMH - CapForum is out stating EC filing still some weeks away following EC's new request for more information. Late last week a new request was issued by the EC. The EC is exploring difference btwn branded and unbranded luxury goods. The EC still has questions on possible coordinated effects. If LVMH thinks it can secure an unconditional Phase 1 approval for TIF deal, it could notify as late as October 19, and still achieve a decision by Nov 24. |

49

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 8 No. 315 | Dafydd Nelson | JENNIFER DONAKER | 2020-09-10 11:55:00 | 2020-09-10 11:59:25 |

| TCF Language | MS Language |
|---|---|
| LVMH/Tiffany: LVMH Plans to File EC Notification Next Week, Despite Move to Shelve Tiffany Purchase<br>…<br>But LVMH expects to submit a draft notification to the EC by tomorrow at the latest—in anticipation of receiving a green light from the commission to make the definitive notification next week, a source said.<br><br>That would kick off a 25 working day phase I review, that would, barring unforeseen delays, conclude next month. LVMH said in a statement today that it was "legitimate" to expect EC approval in October.…<br><br>But Japan approved the deal today, while Mexico is expected to clear the transaction by the middle of next week at the latest, the source said. Taiwanese approval is also expected in short order.<br><br>All competition approvals are expected before the ultimate November 24 longstop date, the source said. LVMH has nevertheless expressed the view that Tiffany's business has recently suffered a "material adverse effect," prohibiting the U.S. jeweler from extending the deal's drop-dead date from August 24 to November 24.… | UTC MARKET SECURITIES LL:<br>***TIF/LVMH - Per CapForum, LVMH expects to submit a draft notification to EC by tomorrow and anticipation of a green light from EC next week. This kicks off a 25 wd Phase 1 review. Japan approved the deal today, while Mexico is expected to clear by middle of next week. Taiwanese approval is also expected in short order. Per their source, all competition approvals are expected before Nov 24. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 8 No. 318 | Jeff Bliss | JENNIFER DONAKER | 2020-09-14 12:05:00 | 2020-09-14 12:16:02 |

| TCF Language | MS Language |
|---|---|
| Waste Management/Advanced Disposal Services: DOJ Clearance Could Come as Early as This Week<br><br>Waste Management's (WM) $4.6 billion proposal to buy Advanced Disposal Services (ADSW) could win DOJ clearance as early as this week after department staff gave its blessing to a complex divestiture to GFL Environmental (TSE: GFL), sources familiar with the matter said.<br><br>The proposed divestiture is on its way to senior DOJ leadership for review, the sources said. Before recommending DOJ clear the transaction, staff attorneys spent more than two months reviewing Waste Management's updated plan to sell $835 million in assets to Canada's GFL Environmental to address the department's concerns about the deal. The assets include 18 landfills, 36 transfer stations and 32 hauling operations generating annual revenue of $345 million across 10 states, according to GFL…. | UTC MARKET SECURITIES LL:<br>***ADSW/WM - CapForum is out stating DOJ clearance could come early as this week per sources familiar. Staff attorneys spend more than 2 months reviewing divestiture to GFL.<br>==>It goes into some history, some critiques but overall is a a short article and doesn't say much else. The divestiture is on its way to Senior DOJ leadership for review. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 8 No. 321 | Dafydd Nelson | JENNIFER DONAKER | 2020-09-16 10:15:00 | 2020-09-16 15:27:39 |

| TCF Language | MS Language |
|---|---|
| Google/Fitbit: Companies' Antitrust Arguments Don't Benefit from Amazon Halo Effect, Former Government Officials Say<br><br>Google's (GOOGL) antitrust arguments for its proposed $2.1 billion Fitbit (FIT) acquisition appeared to get a needed boost last month when Amazon (AMZN) introduced the Halo fitness tracker.…<br><br>Halo's introduction is unlikely to ease the main concerns of the commission or DOJ, the former government officials said. That's because enforcers fear that Google would use the acquisition to strengthen a key business—online advertising—and leverage a key technology—Android—to harm competition, and Amazon doesn't provide alternative services or products that would prevent Google from doing so, they said.…<br><br>Halo's positive impact for Google. Halo's introduction, though, isn't a total bust for Google's antitrust lawyers. The company can argue that Halo's introduction proves that barriers to entering the fitness tracker market aren't insurmountable and that Amazon, which unveiled the wearable device 10 months after the Google/Fitbit announcement, is confident Halo will be profitable.… | UTC MARKET SECURITIES LL:<br>***FIT/GOOG - CapForum is out stating Google's argument for deal got a boost last month when AMZN introduced Halo fitness. Halo's introduction is unlikely to easy the main concerns of EC or DOJ per former government officials b/c the fear that Google could use the acquisition to strengthen online advertising and use of Android to harm competition. Amazon doesn't provide alternative services or products. AMZN's entrance shows barriers to entry aren't insurmountable.<br>==> The article goes into differences btwn AMZN and GOOG, but is largely a long boring article of theories. We did not see any factually new data points. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 8 No. 334 | Nate Soderstrom | STEPHEN GRAHLING | 2020-09-23 08:30:00 | 2020-09-23 09:05:44 |

| TCF Language | MS Language |
|---|---|
| Aon/Willis Towers Watson: Health Benefits, Pension Overlaps Draw Scrutiny in DOJ Probe<br><br>DOJ staff attorneys investigating Aon's (AON) proposed $30 billion acquisition of Willis Towers Watson (WLTW) are probing a broad set of overlaps that include private retiree health exchanges, health benefits brokerage services, and pension actuarial services, sources familiar with the matter said….<br><br>The companies' overlap in insurance and reinsurance broking has also garnered significant DOJ attention, as well as complaints from some large global companies, who have told department staff attorneys that the deal would reduce from three to two the number of brokers with the sophistication, actuarial capacity, and leverage with insurance carriers necessary to meet their insurance broking needs, sources said…. | MARKET SECURITIES LL Says ***WLTW/AON - CapForum Article*** CapForum is out saying the DOJ investigations are still broad after 6 months since the deal announcement. Beyond insurance and reinsurance broking where the overlap has garnered significant DOJ attention noted, DoJ staff is also looking into retiree health exchanges, health benefits brokerage and pension actuarial services. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 8 No. 335 | Dafydd Nelson | JENNIFER DONAKER | 2020-09-24 10:00:00 | 2020-09-24 10:47:16 |

| TCF Language | MS Language |
|---|---|
| LVMH/Tiffany: Sensing Shaky Legal Ground, LVMH Appears to Back Away From French Letter in Merger Argument … <br><br> In attempting to extract itself from the deal, LVMH recently has shifted arguments. The newest statements from billionaire Bernard Arnault's company focus on an alleged "material adverse effect" caused by what LVMH said is Tiffany's mismanagement during the Covid-19 crisis. LVMH has dropped references to a curious letter sent by France's European and Foreign Affairs Minister Jean-Yves Le Drian that had drawn fire from Tiffany, which called it "unenforceable" and "legally irrelevant."… <br><br> EU rules give the commission sole jurisdiction over most merger regulation. The exception is when a member state needs to "take appropriate measures to protect legitimate interests other than those taken into consideration" in the merger regulation. Those measures must be compatible with the general principles and provisions of EU law.… | UTC MARKET SECURITIES LL: <br> ***TIF/LVMH - Capforum is out. LVMH appears to back away from French Letter in Merger Argument. They note LVMH has recently shifted its arguments to focus on MAE during Covid-19 and dropped references to the French letter. It summarizes some contents from filings. It goes into EU law, and mentions an exception that member state needs to take appropriate measures to protect legitimate interests other than those taken into consideration. <br> ==> The article does not add anything. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 8 No. 345 | Eliot Gao | JENNIFER DONAKER | 2020-10-02 08:00:00 | 2020-10-02 08:44:28 |

| TCF Language | MS Language |
|---|---|
| Cisco/Acacia: Timing Questions Take Center Stage as Remedy Package Awaits SAMR Minister's Signoff … The companies recently concluded several rounds of remedy negotiations with case handlers at the State Administration for Market Regulation (SAMR), the sources said. Securing SAMR Minister Zhang Gong's signature on the final remedy package is the deal's last remaining hurdle, according to the sources. But escalating U.S.-China tensions that—with the U.S. election just 32 days away—show no sign of abating could delay Zhang's signature, legal sources said. SAMR is typically slow in clearing high-tech deals involving U.S. acquirers, and Cisco is in many respects a particularly inviting target for hold up, given its less-than-sterling reputation in Beijing. Despite these apparent timing headwinds, the companies remain optimistic that they'll ultimately secure SAMR clearance, sources said. That outcome, however, won't likely come in the next few days: Chinese workers are out of the office from October 1-8 for the National Holiday and Mid-Autumn Festival, and SAMR officials won't return to their desks until October 9.… The company's decision is explained by perhaps the final remedy package's key feature: a Cisco commitment to continue supplying Chinese customers like ZTE with Acacia components post merger, a source said.… Zhang's entry into the job, and associated learning curve, have created new timing complications for companies with merger or conduct matters in front of the agency, local legal practitioners said…. | UTC MARKET SECURITIES LL: ***ACIA/CSCO - CapForum out stating timing questions are center stage. Companies recently concluded several rounds of remedy negotiations with case handlers. Securing Minister Zhang's sign off is last hurdle. Notes US/China tensions could delay Zhang's signature. Companies remain optimistic. Notes Golden Week and SAMR workers not returning until Oct 9. It goes through history of the remedy negotiation, how CSCO committed to continue to supply Chinese customers like ZTE but then MIIT had some concerns, then Zhang came in as a new Minister (had a learning curve). ==> The article says absolutely nothing new. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 8 No. 359 | Dafydd Nelson | JENNIFER DONAKER | 2020-10-16 10:00:00 | 2020-10-16 10:22:29 |

| TCF Language | MS Language |
|---|---|
| Aon/Willis Towers Watson: Management Comments Could Support Anti- Merger Narrative<br><br>The U.S. antitrust agencies have increasingly placed storytelling at the forefront of their merger litigation strategies, de-emphasizing economic expert and customer testimony in favor of harnessing the merging parties' own words to construct broader narratives about how a deal would harm competition.<br><br>On this front, Willis Towers Watson (WLTW) executives' statements discussing the risk and benefits brokerage markets could lend ammunition to a DOJ story about how Aon's (AON) proposed $30 billion acquisition of the company would violate the antitrust laws, a Capitol Forum review of the comments indicates.<br><br>The statements tell a story: that Willis Group's 2016 combination with Towers Watson threatened Aon and Marsh & McLennan's (MMC) control over the market's top tier by offering large corporate customers a newly created insurance and benefits broking alternative.<br><br>In fact, Willis Towers Watson executives repeatedly said that their deal to create a firm with enhanced scale, distribution, and other advantages had established a "third option" and "third viable competitor" for multinationals with global risk and benefits programs.… | UTC MARKET SECURITIES LL:<br>***WLTW/AON - Flagging CapForum is out stating WLTW management comments in pitching the merger stated it would create a #3 for global customers, which could support anti-merger narrative. We haven't seen full piece yet.<br>==> We'd note that this is not surprising to us for management to say this. However, this was also needed in the face of JLT/MMC, which the EC clearly defined as sub-markets, and shows the parties strategic rationale to compete against MMC the #1 player who is aggressive. We do not think this will move regulators to a larger broad market. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 8 No. 361 | Dafydd Nelson | STEPHEN GRAHLING | 2020-10-19 11:50:00 | 2020-10-19 12:11:32 |

| TCF Language | MS Language |
|---|---|
| Google/Fitbit: Commission Extends Deadline, Giving Itself Flexibility for Reaching Closely Watched Decision<br>…<br>The length of the latest extension—five working days instead of as many as 10 that Google and the commission could have agreed to—provides a middle ground for the EC. If only minor tweaks to the remedies are needed, the commission could decide relatively quickly to dispense with an SO. But the extension indicates the offer isn't necessarily a slam dunk and that the EC now has even more time to closely examine Google's concessions before either giving a thumbs up or proceeding towards an SO.…<br><br>Even so, the EC could choose not to conduct a further market consultation if it's convinced by the changes.<br><br>Unusual path. The odds of approval do seem to be stacked in Google's favor. The EC hasn't blocked or caused to be abandoned on competition grounds any transaction where it has conducted a pre-SO remedy market test, at least in recent years, and certainly not since Margrethe Vestager assumed the helm at the Director-General for Competition.…<br><br>Breathing space. By only extending the review by five working days, Google and the commission have given themselves some breathing space in case more time is needed prior to the EC deciding whether to issue a formal charge sheet on the Fitbit transaction.… | UTC MARKET SECURITIES LL:<br>***FIT/GOOG - CapForum out noting the 5wd extension might mean minor tweaks to remedy needed to avoid SO, but it's not necessarily a slam dunk. It notes EC choosing to not conduct further market consultation. Odds of approval do seem stacked in Goggle's favor. The article discusses how the extension gives "breathing space".<br>==> It is a lot of nothing. No new insights at all. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 8 No. 372 | Dafydd Nelson | JENNIFER DONAKER | 2020-10-26 11:30:00 | 2020-10-26 12:12:51 |

| TCF Language | MS Language |
|---|---|
| Aon/Willis Towers Watson: Companies Face Slow-Moving DOJ, EC Investigations … In fact, the agency's investigation isn't close to a resolution, as staff attorneys continue to investigate a wide range of overlaps and third parties remain in the process of responding to information requests, the sources said.<br><br>In addition to commercial risk and reinsurance broking, the companies' overlaps in health benefits brokerage, private retiree health exchanges, and pension actuarial services are drawing continued DOJ scrutiny.…<br><br>Aon is said to be focused on filing prior to the end of the year, but isn't on track to do so in the next couple of weeks, meaning that the filing timeline will fall well into November at the earliest.…<br><br>But although the current review is moving slowly, the current DOJ has turned on a dime before: witness the agency's June decision to close its investigation into Charles Schwab's $26 billion acquisition of TD Ameritrade. That abrupt move—just over five months after the companies filed their HSR notifications—surprised the parties and industry participants, who expected the review to continue at least into late summer or fall.…<br><br>In fact, there have been significant industry personnel moves even the deal was announced, with Arthur J. Gallagher, the insurance broking market's No. 4 player, in particular said to be on a poaching spree. This could provide support for the view that any excessive post-merger concentration in overlap markets would remedy itself organically.…<br><br>Such a scenario, however, would raise at least one potential complication: deal critics have told DOJ that Aon and Willis generate their power not just through their employees, but instead their ability to harvest and leverage the data they collect through their existing relationships with large corporate clients.…<br><br>Mid-tier competition. Nonetheless, the merging parties have advanced not only this entry and expansion argument, but also the idea that mid-tier brokers, and Gallagher and Lockton in particular, are already meaningful competitive constraints that have won key Fortune 500 clients in the companies' overlap segments.…<br><br>To the extent the three-to-two narrative simply describes customer preferences, rather than lack of true optionality, it breaks down. In fact, even in aviation, the global risk broking market's most highly concentrated segment, non-Big Three brokers have won business from key global firms including Embraer and Dassault.… | UTC MARKET SECURITIES LL: ***WLTW/AON - CapForum is out stating AON is facing a slow moving DOJ and EC. DOJ still investigating wide range of overlaps and third parties still involved. Commercial risk and reinsurance broking, with overlap in health benefits still drawing DOJ scrutiny. AON focused on EC filing before year end, not likely before November. Note TD/Scwhab deal has some similarities to this deal, whose outcome surprised the parties and industry. Highlights lack of barriers to entry, significant industry personnel moves with brokers and clients shifting among competitors. Discusses this in JLT/Marsh deal as well. Critics have said combined entity will have leverage from data. Parties are highlighting mid-tier broker competition from Gallagher and Lockton in particular. DOJ needs to investigate whether 3-2 narrative is simply customer preference, rather than a lack of true optionality. ==> We don't see much new here. A lot of drawing analogies to JLT/Marsh review. Main new data point to us is EC filing expected not before November. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 8 No. 402 | Conor Winters | JENNIFER DONAKER | 2020-11-13 10:35:00 | 2020-11-13 10:49:21 |

| TCF Language | MS Language |
|---|---|
| Aon/Willis Towers Watson: Health Benefits Brokerage Overlap Raises Potential Three-to-Two Dynamic, Benefits Executives Say … Large employers turn primarily to three brokerages on this front, sources said—Aon, Willis Towers Watson, and Mercer, a segment of Marsh & McLennan (MMC). This dynamic hasn't escaped DOJ, where agency staff attorneys are probing the deal's potential effects on health benefits brokerage competition, The Capitol Forum reported last month. Aon and Willis Towers Watson do face at least some competition from boutique and mid-tier brokerages. But perhaps the merging parties' strongest pro-deal argument is that health benefits brokerage is a professional services business where smaller brokerages, simply by poaching top talent, are positioned to seamlessly enter or expand into the large corporate segment and replace any post-merger competitive void.… | MARKET SECURITIES LL Says ***WLTW/AON - CapForum out stating health benefits brokerage overlap raises potential 3-2 dynamic per Benefits Executives. Large employers turn to 3 brokerages on this front sources said, AON, WLTW and Mercer (part of MMC). This hasn't escaped DOJ where staff is probing this area. There is some competition from boutique and mid-tier brokerages. Stronger pro-deal argument is health benefits brokerage is a professional service where smaller brokers can poach top talent and provide seamless entry. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 8 No. 405 | Dafydd Nelson | STEPHEN GRAHLING | 2020-11-16 08:30:00 | 2020-11-16 09:29:31 |

| TCF Language | MS Language |
|---|---|
| Aon/Willis Towers Watson: Aon Poised to File Formal EC Notification as Soon as This Week<br><br>Aon (AON) is set to file a formal merger notification with the European Commission for its proposed acquisition of Willis Towers Watson (WLTW) as soon as this week, The Capitol Forum has learned.<br><br>That is in part to avoid review by the UK's Competition and Markets Authority (CMA), which beginning January 1 will gain jurisdiction over deals meeting both EC and CMA review thresholds that haven't already been notified in Brussels….<br><br>Even as the merger appears set to avoid CMA review, Willis Towers Watson has moved to downsize its UK presence through the recently-announced divestiture of its Miller unit to private equity firm Cinven, and GIC, Singapore's sovereign wealth fund. Miller describes itself as one of the world's leading specialist insurance and reinsurance brokers, and operates in Lloyd's, the London market, and international markets…. | UTC MARKET SECURITIES LL:<br>***WLTW/AON - CapForum out stating AON expected to file EC as soon as this week. In part to avoid UK CMA review. It goes into background on the merger. It notes WLT has moved to downsize its UK presence recently with its Miller divestiture to Cinven, and GIC. ==> Short piece, point is AON expects to file EC this week. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 9 No. 5 | Ivan Kelly | EDDIE LEE | 2021-01-11 08:30:00 | 2021-01-11 08:58:07 |

| TCF Language | MS Language |
|---|---|
| Marvell/Inphi: Chipmaking Deal Likely to Stir CFIUS Concerns About Buyer's Market Share in Critical Networks, Experts Say<br>…<br>But CFIUS can be expected to comb through the deal minutely because those technologies are deemed critical to the country's economy and defense, said several security experts. CFIUS, which screens deals for security risks, may also scrutinize Inphi's role as a supplier to defense contractors including Microsoft and Cisco Systems, they said….<br><br>Defense contracts. The Marvell proposal could also face scrutiny because Inphi sells its technology to prominent defense contractors, making it a significant link in the military supply chain via the likes of Microsoft and Cisco.…<br><br>Likely fixes. In reviewing the Marvell/Inphi deal, CFIUS can be expected to seek fixes resembling those applied to the Cavium and Avera takeovers, experts said. The committee could, for example, require Marvell to move operations and data centers to the U.S. and to keep Inphi's operations in the country. These moves wouldn't necessarily affect the buyer's legal domicile.… | ***IPHI/MRVL - CapForum is out there saying IPHI's high market share in cloud computing and 5G networking going into MRVL may stir CFIUS concerns. IPHI's technologies are critical to the country's economy and defense with their products going into the military supply chain via Microsoft and Cisco. However, MRVL also successfully got approvals on Cavium and Avera and could possibly offer remedy to CFIUS, such as keeping IPHI's operations in the US in addition to its commitment to re-domicile to the US. Though that commitment alone is unlikely to convince CIFUS. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date & Time | MS Date & Time |
|---|---|---|---|---|
| Vol. 9 No. 12 | Dafydd Nelson | Eddie Lee | 2021-01-14 08:00:00 | 2021-01-14 10:06:48 |

| TCF Language | MS Language |
|---|---|
| Aon/Willis Towers Watson: Push For Unconditional Approval Comes With EC Timing Risk<br><br>The risk for Aon is that it wastes valuable time better spent constructing what might ultimately prove to be a hefty and complex remedy package. This risk is especially acute at the European Commission, which, unlike the other primary global agency reviewing the deal—the U.S. DOJ— has a formalized timing process that can severely limit merging parties' leeway in constructing remedy offers.<br><br>Buyers undergoing European Commission merger review have fallen into this potential trap before. In eight out of 10 deals blocked by the EC going back to 2011, the notifying party submitted formal remedies only after receipt of a Statement of Objections…<br><br>The bad news for Aon and Wills, though, is that most phase II reviews—a further 43 cases—were either approved with conditions, blocked or abandoned. Of those in receipt of an unconditional blessing, it's far from clear that any match the market conditions prevalent in the Willis deal…<br><br>But a decision to abstain from any serious remedy discussions with competition officials until a review's late stages can be a risky tactic, particularly if the company gets distracted fighting regulators on issues, rather than engaging on fixes. Left late, remedy discussions with the EC can present unexpected obstacles that prove insurmountable in the limited time available following an SO…<br><br>Late danger. With a May 10 EC phase II deadline, Aon will have some limited time to argue its case before having to decide whether to engage with the commission on remedies or face the prospect of an SO… | ***WLTW/AON - CapForum is out there saying WLTW/AON might be wasting time to create a complex remedy package while still hoping for unconditional clearance. In 8 of 10 deals blocked by the EC since 2011, the parties submitted remedy only after the statement of objections. Since Nov 2014, only 7 phase II deals cleared unconditionally while 43 deals were approved with conditions or blocked/abandoned. Not engaging in divestiture talks until a late stage can be a risky tactic, and remedy discussions with the EC can present unexpected obstacles. Finding a suitable buyer also takes time adding complexity if remedy offers are late. AON's main argument will be a lot of niche competitors in place in addition to innovative disruptive market entrants. However, with a May 10 EC deadline, AON will have limited time to argue its case. Usually, remedy packages with the EC require multiple iterations with market feedback can add unexpected issues. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 9 No. 78 | Dafydd Nelson | JEREMY CIVRE | 2021-03-03 14:45:00 | 2021-03-03 14:56:36 |

| TCF Language | MS Language |
|---|---|
| Salesforce/Slack: Company Still Aims to Bypass CMA Probe Despite Deeper U.S. Review<br><br>Salesforce (CRM) is said to remain confident of avoiding a UK Competition and Markets Authority probe into its planned $27.7 billion acquisition of messaging platform Slack (WORK) despite the U.S. DOJ's recent decision to open an in-depth, second request review into the transaction.<br><br>The San Francisco-based customer relationship management (CRM) company is said to have engaged closely with the CMA and told the UK watchdog that it shouldn't review the deal because it doesn't meet the test for establishing the enforcer's jurisdiction, and even if it did, there's no reason to suspect the merger would harm competition.…<br><br>But even if the CMA is considering calling in the merger—the authority's jurisdictional reach is notorious—the merging parties' relatively limited presence in the UK make establishing a viable theory of foreclosure harm all the more challenging. Yet an extended U.S. review does give the UK watchdog more time to decide whether to formally investigate the deal. In several recent transactions, the CMA only got involved some months after U.S. officials issued second requests.… | MARKET SECURITIES LL Says ***WORK/CRM - CapForum is out. Company still aims to bypass CMA probe. CRM is said to have engaged with UK CMA and told the UK it shouldn't review the deal bc it doesn't meet the test for jurisdiction. DOJ extended review gives CMA more time to decide whether to formally investigate the deal. The remainder of article is speculative, goes into CMA's PACB rigor, and notes the high premium CRM is paying for SLACK. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 9 No. 83 | Nate Soderstrom | JENNIFER DONAKER | 2021-03-05 10:15:00 | 2021-03-05 10:32:08 |

| TCF Language | MS Language |
|---|---|
| AstraZeneca/Alexion: Slaughter Statements Point to Second Request, but Horizontal Issues Could Drive Deal Timing<br><br>…<br><br>With Slaughter now leading the FTC, those theories are set to draw enhanced scrutiny. And substance aside, the agency's process could also see changes: Slaughter's written that evidence produced pursuant to a second request provides the commission "a materially different level of confidence" that it's received the information necessary to determine pharma deals' effects on innovation.<br><br>This may signal that—at least in the near-term—all significant pharma mergers will draw FTC second requests. But whether those reviews conclude with protracted remedy negotiations may ultimately depend on the commission's conclusions on product-level overlaps—the traditional focus of the agency's pharma reviews.…<br><br>AstraZeneca, however, may have a path to dispelling these concerns, Capitol Forum analysis indicates. Viela hasn't publicly objected to the manufacturing arrangement, and even if it does, the company may have various contractual and self-help options to prevent post-merger competitive harm. And the lupus nephritis pipeline is crowded, and the AstraZeneca and Alexion drugs don't share obvious similarities indicating that they're close potential substitutes.… | ***ALXTCFZN - CapForum is out highlighting Slaughter's statements in the past point to a Second Request. They talk about her prior dissents, and since she's leading FTC, those theories are set to draw enhanced scrutiny. They hypothesize that in the near term all pharma mergers will draw a second request. They talk about VIE divestiture as a path to dispelling concerns.<br><br>===> The article adds nothing. Repeats what everyone knows is a risk. We recognize this may happen but as we said in our note, we have a more constructive take based on our feedback and expect a Pull and Refile without a second. See our March 2 note. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 9 No. 95 | Nate Soderstrom | JENNIFER DONAKER | 2021-03-15 15:30:00 | 2021-03-15 15:49:50 |

| TCF Language | MS Language |
|---|---|
| Aon/Willis Towers Watson: DOJ Concerns Linger Around Comprehensive Insurance Brokerage Services<br><br>More than a year after Aon (AON) inked its $32.8 billion agreement to buy rival Willis Towers Watson (WLTW) the companies are still facing DOJ concerns that the takeover would reduce from three to two large multinational companies' options for purchasing comprehensive insurance brokerage services, sources familiar with the matter said.<br><br>DOJ staff continues to question whether the deal would leave only the merged company and Marsh & McLennan (MMC) to advise companies across a number of insurance areas, ranging from directors and officers, cargo and energy coverage to aviation and marine policies, the sources said. Large companies with multiple international locations typically rely on Aon, Marsh and increasingly Willis Towers Watson to provide advice on multiple forms of insurance and help navigate countries' different insurance and corporate laws.<br><br>At issue is whether No. 3 Willis Towers Watson competes closely with market leader Marsh and No. 2 Aon providing these services to the few thousand large clients, the sources said. Industry players have said Willis Towers Watson is becoming more of an alternative for these companies and is acting like a market maverick by building up its capabilities and lowering prices. The company has recently wooed away significant corporate customers from Aon and Marsh, they said…. | ***WLTW/AON - CapForum out stating parties still face DOJ concerns that takeover would reduce 3-2 large multinational companies' options for purchasing comprehensive insurance brokerage services, across areas including D&O, cargo and energy, aviation, marine etc. WLTW is acting more like a maverick by building up its capabilities and lowering prices.<br>==> We do not see anything new here. It basically sounds like the DOJ has not gone anywhere with their investigation, and timing is unknown as they point out. As we said in our note last week, all eyes on the EC and what the parties offer after an SO (our base case) |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 9 No. 98 | Nate Soderstrom | JENNIFER DONAKER | 2021-03-18 08:30:00 | 2021-03-18 09:42:37 |

| TCF Language | MS Language |
|---|---|
| UnitedHealth Group/Change Healthcare: In Review With Big Tech Parallels, Vertical, Data, Innovation Issues Draw DOJ Focus<br><br>DOJ staff attorneys reviewing UnitedHealth's (UNH) proposed $7.8 billion acquisition of Change Healthcare (CHNG) are exploring a host of horizontal, vertical, and innovation questions in their early-stage investigation of the deal, sources familiar with the matter said.<br><br>UnitedHealth's UnitedHealthcare segment is the nation's largest health insurer, and the company's Optum segment markets a variety of healthcare analytics and technology services. Change competes against Optum in the broadly-defined health care services market, and boasts particular strength in software and network solutions.<br><br>On the horizontal front, DOJ's investigation has zeroed in on at least two markets in which the companies overlap: risk adjustment and claims editing software, the sources said.<br><br>But that's far from the review's only focus. The claims editing software question is also drawing vertical scrutiny, largely because Change dominates that market, the sources said. That could raise concerns in the hands of the nation's largest health insurer, because the volume of data flowing through Change's claims editor, and Optum's access to—and ability to run analytics over—that data could provide UnitedHealthcare an unfair leg up over its competitors.<br><br>The deal has also drawn broader innovation effects questions, the sources said. Change is viewed as a particularly innovative firm, that by virtue of its independent status is well-positioned to drive system-wide advances. Merging with the nation's largest health insurer, however, could lessen Change's willingness to develop or share new products or services with UnitedHealthcare's rivals.…<br><br>But Change dominates the space, with an estimated 85% market share, one of the sources said. Optum controls almost all of the rest of the market, while HealthEdge's Burgess Source is a bit player that's not viewed as a viable option for large health plans.…<br><br>None of this, of course, is to say that UnitedHealth holds the entrenched market power of a firm like Google. But that fact, in and of itself, doesn't appear set to prevent DOJ from—at the very least—investigating these questions thoroughly. | ***CHNG/UNH - CapForum is out stating DOJ is exploring a host of horizontal, vertical, and innovation questions. CHNG competes against Optum in the broadly defined health care services market. DOJ has zeroed in on (i) risk adjustment, and (ii) claims editing software as overlaps. Claims software is also drawing vertical scrutiny bc CHNG dominates the market at 85% market share. Optum controls the remainder of the market, while HealthEdge's Burgess Source is a bit player not viewed as viable option for large health plans. DOJ's vertical focus is currently on ClaimsXten product where CHNG holds a near monopoly. They go through a few ways UNH will push back on vertical via incentives and firewalls. The deal has also drawn broader innovation questions. CHNG is viewed as an innovative firm. They conclude that UNH does not hold entrenched market power of a firm like Google, but that fact doesn't set the DOJ off from investigating these questions thoroughly.<br>==> A decent lay out of theories the DOJ will investigate. As we have said before, healthcare and tech deals are having the same type of theories investigated (See our WORK/CRM update today with the 4 theories). We see this as the new normal for deals in these spaces and it does not mean they will be blocked.<br>ANTITRUST THEORIES<br>• 4 theories are likely being investigated and all of them lead to a dead-end in our other contacts' views.<br>1. Buy to Kill - Regulators look at this but it makes no sense, especially in this transaction.<br>2. Potential Competition - Our contacts do not believe CRM has made any real efforts to enter this space.<br>Thus, while the DOJ will look to see if there are potential competition concerns as they always do in deals of this nature, they expect this to be a dead end.<br>3. Vertical Foreclosure - WORK is a significantly inferior product to Microsoft's Teamsters. The fact that WORK did not propel itself to popularity with COVID is an example of their inferiority as a product. It makes no sense for CRM to try to foreclose the product to others using SAP or any CRM competitor<br>product given that WORK lacks any sort of dominance.<br>4. More Data - Data accumulation for any large tech platform is a new area constantly being raised by regulators. However, there's not unique or interesting data here to add via Slack to CRM. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 9 No. 113 | Conor Winters | JENNIFER DONAKER | 2021-03-29 10:30:00 | 2021-03-29 10:39:43 |

| TCF Language | MS Language |
|---|---|
| S&P Global/IHS Markit: PRA Overlap Draws DOJ Scrutiny; Forecasting and Advisory Overlap Concerns Loom<br><br>DOJ staff attorneys investigating S&P Global's (SPGI) proposed $44 billion buy of IHS Markit (INFO) have zeroed in on the companies' overlapping energy price reporting agency businesses as a key potential antitrust concern, sources familiar with the matter said.<br><br>Staff's investigation into the overlap has included interviews with concerned third parties, both before and after DOJ issued a second request into the deal on March 10, the sources said.<br><br>S&P Global's Platts is the dominant energy price reporting agency (PRA), and accounts for roughly 60 of the top 100 energy-related benchmarks. Though IHS' OPIS is a distant no. 4 in the PRA market, the merging firms are for some commodity segments the two biggest—and in some cases the only two—competitors on market.<br><br>DOJ staff attorneys and economists have polled industry players on the companies' respective strengths, focusing in particular on the firms' leadership in reporting the spot prices and rack prices for refined products and natural gases and liquids, one of the sources said.<br><br>How the companies will go about addressing DOJ concerns on the PRA front is an open question. Antitrust division staff have asked industry participants about the viability of divesting individual benchmarks rather than OPIS as a unit, although various factors could complicate that option, sources said.…<br><br>Although OPIS is a market No. 4, it overlaps with Platts in a number of specific commodity areas, such as road fuels—gasoline, diesel, and biofuels like ethanol and biodiesel—as well as carbon and renewables like low carbon fuel standard credits and Renewable Identification Number credits.… | ***INFO/SPGI - CapForum is out. DOJ has zeroed in on overlapping energy price reporting agency (PRA) business as key potential antitrust concern. SPGI's Platt is dominant, INFO's is a distant number 4. DOJ has asked industry participants about viability of divesting individual benchmark rather than OPIS as a unit. The overlap is in commodity areas such as road fuels, gasoline, diesel and biofuels, as well as carbon and renewables. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 9 No. 138 | Nate Soderstrom | JENNIFER DONAKER | 2021-04-15 08:30:00 | 2021-04-15 09:06:15 |

| TCF Language | MS Language |
|---|---|
| UnitedHealth Group/Change Healthcare: <mark>Clearinghouse Draws DOJ Scrutiny Over Vertical, Data Questions</mark><br><br>Whether UnitedHealth Group's (UNH) acquisition of Change Healthcare's (CHNG) clearinghouse business would harm competitors—and competition—has emerged as a key issue in DOJ staff's investigation into the companies' proposed $7.8 billion merger, sources familiar with the matter said.... | \*\*\*CHNG/UNH - CapForum out stating <mark>Clearinghouse draws DOJ scrutiny over vertical/data questions</mark><br>==>NOTE: The article is a theory piece, it adds nothing new but we would actually call this a "BULLISH" piece for CapForum. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 9 No. 160 | Nate Soderstrom | JENNIFER DONAKER | 2021-05-04 08:00:00 | 2021-05-04 08:25:35 |

| TCF Language | MS Language |
|---|---|
| UnitedHealth Group/Change Healthcare: Claims Processing, Monopsony Prompt DOJ Queries<br><br>DOJ staff is investigating whether UnitedHealth Group's (UNH) proposed $7.8 billion acquisition of Change Healthcare (CHNG) would allow the company to use Change's clearinghouse to slow rivals' claims processing speeds or favor claims involving its own UnitedHealthcare subsidiary, sources familiar with the matter said.<br><br>Staff is also examining whether access to the claims data flowing through Change's clearinghouse would give UnitedHealthcare the ability to push down health care providers' reimbursement rates, the sources said. Change's clearinghouse functions as an electronic highway that connects doctors and hospitals with insurers to facilitate claims submissions and payments....<br><br>As staff's investigation deepens, some third parties have told DOJ staff that the deal's anticompetitive harms can't be mitigated with behavioral remedies such as firewalls and instead urged the department to sue to block it, sources said.... | ***CHNG/UNH - CapForum is out stating questions are being asked about UNH's ability to (i) slow down speed of rivals claims processing, and (ii)UNH's ability to pressure healthcare providers because they would be able to see competitors' reimbursement rates. There is a comment in there that some some third parties are telling DOJ there is no mitigation available and are urging the DOJ to block. The remainder of the article appears to be focused on the vertical aspects previously discussed.<br>==> We do not see much news as the crux of the deal has been on whether a firewall will work to mitigate the additional data Optum will gain from UNH to protect competitors. The questions about speed slow down appears news however, as that is more traditional to an FCC Telco review. A bit odd. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 9 No. 162 | Dafydd Nelson | JENNIFER DONAKER | 2021-05-04 12:25:00 | 2021-05-04 12:42:33 |

| TCF Language | MS Language |
|---|---|
| AstraZeneca/Alexion: EC, UK and FDI Hurdles Remain, But Deal Still Seen on Track For Q3 Close<br>…<br>AstraZeneca's merger filings with the EC and CMA could come as soon as this month, it is said. If the company files with both authorities in the next few weeks, clearances would be likely by mid to late July, with an EC decision potentially as early as June….<br><br>The deal shouldn't raise glaring competition red flags in Europe or the UK. AstraZeneca has a supply agreement with Horizon Therapeutics through which it manufactures inebilizumab, a drug that may compete with Alexion's Soliris and Ultomiris. That said, Horizon has significant reserve supplies of inebilizumab and hasn't publicly objected to the manufacturing arrangement….<br><br>Foreign direct investment approvals. The identity and timing of remaining foreign investment reviews is murkier. AstraZeneca, which is headquartered in Cambridge, England, has said the transaction is subject to approvals under "foreign investment laws of certain specified foreign jurisdictions," but hasn't provided additional detail…<br><br>Ireland doesn't have a foreign investment screening regime. But Alexion has a plethora of subsidiaries in other European nations, including Austria, Belgium, the Czech Republic, France, Germany, Ireland, Italy, Netherlands, Spain, Sweden, and Switzerland.<br><br>It's unclear which, if any, of those countries has initiated formal reviews into AstraZeneca's purchase under foreign investment rules, though conversations and engagement with certain relevant governmental departments are said to have already taken place…<br><br>The merger isn't an obvious candidate to attract significant foreign investment scrutiny. That said, acquisitions in life science and health care markets can sometimes trigger national security screenings. And although some European states exempt intra-EU transactions from their investment reviews, AstraZeneca's post-Brexit status means it might be seen as a non-EU acquirer….<br><br>It is understood that the spat so far hasn't cast a shadow over approval of AstraZeneca's takeover for Alexion, as had been feared…. | **ALXTCFZN - CapForum out that several more hurdles remain but deal still on track for Q3 close. Merger filing with EC and CMA could come as soon as this month. The deal shouldn't raise concerns from EC or CMA. Identity of foreign direct investment approvals is murkier. They note ALXN has a plethora of subsidiaries in EU and it's unclear which, if any of these countries have initiated a formal review. The merger is not an obvious candidate to attract significant foreign investment scrutiny. They note the AZN tension re: COVID vaccine has not cast a shadow over the deal.<br>===> Article ads nothing and is typical CapForum fashion of using words like "hurdles", then concluding none of these are really hurdles, and mentioning the AZN Covid vaccine which we have never even heard of as having any baring on the deal (nor should it). |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 9 No. 168 | Jeff Bliss | JENNIFER DONAKER | 2021-05-07 14:35:00 | 2021-05-07 14:46:27 |

| TCF Language | MS Language |
|---|---|
| Aon/Willis Towers Watson: ==EC Said Set to Approve Remedies, With Vestager On Board==<br><br>The European Commission is set to approve remedies proposed by Aon (AON) to secure regulatory approval for the company's $30 billion acquisition of rival Willis Towers Watson (WLTW), The Capitol Forum has learned.<br><br>EU competition chief Margrethe Vestager is said to be on board with the remedies, paving the way for EC clearance without a Statement of Objections.… | ***WLTW/AON - CapForum is out stating ==EC is set to approve remedies with Vestager on board.== |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 9 No. 173 | Jeff Bliss | JENNIFER DONAKER | 2021-05-13 14:15:00 | 2021-05-13 14:38:07 |

| TCF Language | MS Language |
|---|---|
| Aon/Willis Towers Watson: Divestitures' Impact Divides Deal Critics as DOJ Weighs Proposal<br><br>Opponents of Aon's (AON) proposed Willis Towers Watson (WLTW) acquisition and other industry participants are divided over whether the insurance brokerages' divestiture plan would address enforcers' antitrust concerns with the $30 billion deal, sources familiar with the matter said.....<br><br>The enforcers will weigh the clashing industry views about the Aon divestiture proposal, unveiled Wednesday, before deciding how they'll proceed.<br><br>The European Commission didn't buy the opponents' arguments: European competition chief Margrethe Vestager is said to be on board with the proposed remedies, paving the way for EC clearance without a Statement of Objections.<br><br>That now positions DOJ as the deal's most significant remaining antitrust hurdle, although the Australian and New Zealand competition agencies have also voiced strong reservations about the tie-up.<br><br>After Wednesday's announcement, DOJ staff was tight-lipped, simply pledging to those privy to the review that it will closely analyze the agreement between Aon and Gallagher before deciding how to proceed, a source familiar with the matter said. The department's poker-faced response keeps its options open. President Joe Biden hasn't nominated someone to head DOJ's antitrust division, likely leaving the decision on Aon/Willis to Acting Assistant Attorney General Richard Powers....<br><br>The divestiture package falls short on mitigating the harm to the reinsurance broking market, opponents said, because Aon would keep the all-important "placing brokers" who facilitate the original insurance coverage for corporate customers.<br><br>Placing brokers lack their facultative counterparts' in-depth knowledge of reinsurance, the industry participant said. Even if the client sticks with the same firm, it's likely to be dealing primarily with the reinsurance brokers and not with the placing broker.... | ***WLTW/AON - CapForum out stating industry participants divided whether divestiture plan addressed antitrust concerns. It notes clashing views. EC didn't buy the opponents' arguments. This makes DOJ the deal's most significant antitrust hurdle. DOJ remained tight lipped after divestiture announcement. Opponents say the divestiture falls shorts on facultative reinsurance business. Aon would keep all important "placing brokers" who facilitate original insurance coverage for corp customers. Placing brokers lack their facultative counterparts' in depth knowledge of reinsurance.<br>==> This article doesn't add any new facts. It gives the positions of both sides, those who favor the remedy and those who do not. This certainty is not a deal where we'd expect full unanimous support. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 9 No. 220 | Nate Soderstrom | JENNIFER DONAKER | 2021-06-21 08:30:00 | 2021-06-21 09:31:23 |

| TCF Language | MS Language |
|---|---|
| Lockheed MartiTCFerojet Rocketdyne: Tie-up Draws <mark>FTC Scrutiny of System Key to Next Generation Interceptor Program</mark><br><br>Aerojet Rocketdyne's (AJRD) tight grip on a technology crucial to missile-defense weapons is drawing scrutiny from FTC staff attorneys investigating Lockheed Martin's (LMT) proposed $4.4 billion acquisition of the rocket-engine maker, sources familiar with the matter said.<br><br><mark>Deal opponents have told the FTC that Aerojet is the sole U.S. supplier of divert and attitude control systems, which drive where missiles go and how they intercept enemy rockets hurtling toward the U.S. at incredibly high rates of speed.</mark>…<br><br><mark>The danger for the Pentagon is that it could wind up with just one bidder for the contract,</mark> as happened in a recent contest to build a Ground Based Strategic Deterrent (GBSD) to replace the Minuteman intercontinental ballistic missile system created in the 1960s….<br><br>On that front, <mark>the FTC's investigation into the deal is mid-stream, and isn't close to a final resolution</mark>, sources said…. | ***AJRD/Lockheed - CapForum is out stating <mark>FTC drawing scrutiny of system key to next generation interceptor program. Deal opponents have told FTC that Aerojet is sole US supplier of divert and attitude control systems, which drive where missiles go and how they intercept enemy rockets hurtling toward the US at high rates of speed. Danger for Pentagon is that it could wind up with just one bidder</mark> but Lockheed denies Aerojet holds a monopoly over DACS. <mark>FTC investigation is mid-stream and is not close to a final resolution.</mark> |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 9 No. 231 | Jeff Bliss | JENNIFER DONAKER | 2021-06-30 14:10:00 | 2021-06-30 15:01:50 |

| TCF Language | MS Language |
|---|---|
| FTC Issues More Second Requests to Companies, Launching In-Depth Investigations of Deals<br><br>The FTC under new Chair Lina Khan is issuing more second requests for information to merging companies, triggering extended investigations of deals that the agency previously would have cleared after an initial review, sources familiar with the matter said.<br><br>The agency is preparing to issue the second requests unless the merging parties convince it not to do so, the sources said. This reverses the longstanding practice of the FTC and its sister antitrust agency DOJ of presuming most transactions are lawful and only issuing second requests if staff attorneys uncover areas of concern in the initial review of 15 or 30 days.<br><br>One source said that the FTC, just before the initial reviews expired on two transactions, told the companies involved that they would receive second requests. Prior to the notification, the staff attorneys had given little indication they would initiate months-long investigations in these cases, asking few questions and raising no substantial concerns, said the source, who declined to identify the deals.<br><br>The additional second requests signal that Khan, in her second week as chair, has begun overhauling the standard way the FTC operates. A former academic who was a legal adviser to Democratic Commissioner Rohit Chopra, she came to prominence by advocating that the FTC abandon its traditional approach to antitrust enforcement and substantially ramp up scrutiny of proposed mergers and companies' conduct.<br><br>The uptick of second requests, though, has angered attorneys who defend deals, sources said. The attorneys have complained that their clients have been caught off guard by the second requests, which usually require the merging companies to embark upon massive information-gathering efforts, the sources said…. | MARKET SECURITIES LL Says ***FTC SECOND REQUEST** CapForum is out with an article about how under Lina Khan, the FTC is issuing more second requests than previously. The FTC is preparing to issue more second requests unless the merger parties convince it not to do so. It notes a source who had 2 transaction notified by the FTC just as the initial was about to expire that they would receive second request, but prior to notification FTC had given little indication it would issue a second. Uptick of second requests have angered attorneys, clients caught off guard. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 9 No. 263 | Nate Soderstrom | JENNIFER DONAKER | 2021-07-26 08:30:00 | 2021-07-26 08:46:17 |

| TCF Language | MS Language |
|---|---|
| Lockheed MartiTCFerojet Rocketdyne: Administration Rhetoric, FTC Staff-Up, Brown Bow-Out Complicate Deal Prospects<br>…<br>On that front, the FTC has in recent weeks staffed up the investigative team reviewing the merger, and is building an increasingly experienced, litigation-savvy team, sources said. Those additions include attorneys from outside of Mergers I, the shop that's leading the investigation, the sources said.<br><br>There's no indication that the agency's investigation is set for a near-term conclusion, and the staff additions certainly don't signal that the deal is on a glide path to a consent order. In fact, a July 16 letter from Senator Elizabeth Warren, D-MA, to Khan argued against exactly that outcome.<br><br>Further complicating matters: Michael Brown, Biden's nominee to serve as undersecretary of defense for acquisition and sustainment, on July 13 withdrew his name from consideration. That role would have positioned Brown as the Pentagon's top decision-maker on merger reviews, and his nomination seemingly presented an opening for a deal Lockheed executives have said will help the U.S. compete more effectively against China's defense industrial base.<br><br>Brown's withdrawal raises the prospect that the Pentagon won't have a Senate-confirmed acquisition chief when the review is ripe for a decision. That could in turn give anti-consolidation voices both inside DOD, like Air Force Secretary Frank Kendall, and outside of the Pentagon, like Khan, more significant influence over the deal's ultimate resolution. In response to requests for comment, Lockheed and Aerojet spokespeople referred back to their executives' previous public statements about the deal. The FTC declined to comment, and a DOD spokesperson didn't respond to a request for comment.… | ***AJRD/Lockheed- CapForum is out stating FTC has recently staffed up the review team on the merger and is building an increasingly experience litigation savvy team. There's no indication the review is set for near term conclusion. Further complicating the matter is Michael Brown, Biden's nominee to serve as undersecretary for defense for acquisition and sustainment withdrew his name for consideration. His nomination presented an opening for deal. His withdrawal could give voices to anti-consolidation from inside DOD like Frank Kendall and outside Pentagon like Khan. Article notes FTC could have greater than normal leverage to shape DOD conclusion.<br>===> Sentiment of this note is aligned to our thoughts post-Warren letter from July 20th. Quick Thoughts<br>• We have not followed this deal very closely because we have never been able to get a read on the DOD's position. As we've noted in past notes, the Head of M1 at the FTC has Security Clearance, thus they do their own review with the DOD, while the rest of Staff does the traditional discussion with third parties, competitors, customers etc.<br>• The fact is, DOD's view trumps others, as we noted in OA/NOC.<br>• We typically are dismissive of Congressional letters such as Warren's. However, the item that caught our attention is the attack on "firewalls." We noted in our Biden EO feedback note that Ms. Khan's team is looking for cases to challenge, but many felt she would like something more non-traditional, that could have a read across to tech/healthcare/pharma sectors.<br>• A test case of a deal involving firewall as a remedy came up as a possibility. The reward of re-setting precedent on firewalls as an acceptable remedy could have huge implications for non-horizontal mergers.<br>• Again, DOD's view carries the day in this deal, so we are not sure if this is a great analogy but it is what stood out to us as feedback on Khan getting the Chair seat shows her alliance to the progressive congressional members such as Warren.<br>==> Ultimately, this is a deal where we were unable to gain any edge |

| And if the FTC decides to go to the mat against the deal, it could have <mark>greater-than normal leverage to shape DOD's conclusion</mark> in the event that an acting undersecretary—who would have less of a political mandate to push back against the commission's position—is in place when the matter is ripe for decision. | into the DOD's preference. We do not think Warren represents the DOD in any way, but we certainly think there is more politics involved in this deal than other traditional deals. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 9 No. 278 | Jeff Bliss | JENNIFER DONAKER | 2021-08-10 13:25:00 | 2021-08-10 14:56:13 |

| TCF Language | MS Language |
|---|---|
| FTC Presses Merging Parties to Expand and Extend Reviews, While DOJ More Aggressively Questions Overlaps<br><br><mark>The FTC is pressuring merging parties to sign timing agreements</mark> that give the agency more flexibility in expanding and prolonging investigations of their deals, sources familiar with the matter said.<br><br><mark>DOJ for its part is pressing companies earlier in the review process to explain why their overlapping revenue streams shouldn't raise competition concerns,</mark> the sources said….<br><br>The attorney was among several who said that the agencies are being shortsighted in their enforcement push. Interactions between the government and companies have become <mark>more adversarial and distrustful,</mark> resulting in merging parties increasingly resisting agency requests for timing agreements, they said….<br><br>A <mark>backlash is building in boardrooms that will manifest itself in more companies going to court to defend their deals,</mark> the attorneys said. Some lawyers said they relished the opportunity of defeating the agencies at trial, and persuading judges to author decisions limiting future government merger challenges…. | ***FTC/DOJ - CapForum out stating <mark>FTC is pressuring parties to sign TAs.</mark> <mark>DOJ is pressing to explain why overlapping revenue streams shouldn't raise competition concerns.</mark><br>Notes <mark>increasing distrust and adversarial relationship</mark> btwn parties and agencies. <mark>Backlash in building in boardrooms that will manifest itself in more companies going to Court to defend their deals.</mark><br>==> Article is a general fluff piece of what we all already know the environment to be. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 9 No. 312 | Jeff Bliss | JENNIFER DONAKER | 2021-09-13 13:25:00 | 2021-09-13 13:27:52 |

| TCF Language | MS Language |
|---|---|
| S&P Global/IHS Markit: DOJ Staff Leans Toward Recommending Clearance With Divestiture<br><br>…<br><br>DOJ hasn't uncovered any other serious antitrust problems with the deal aside from the energy price reporting overlap, and agency staff is wrapping up its review, sources said, as European regulators kick off their own investigations of the transaction. The sources declined to say when DOJ would make its final determination on the deal, but the department sometimes delays announcing its decisions to avoid interfering with foreign regulators' reviews of the same merger.…<br><br>DOJ's investigation has also included areas beyond PRAs, such as the companies' competing energy forecasting and advisory services, and S&P's eWindow, a data repository and online communications tool that helps enable commodity trades and aggregates transaction data that can be fed into Platts' benchmarks.<br><br>But staff hasn't found that these issues, or any other parts of the deal, raise significant antitrust concerns, the sources said. | 1:27:52 INFO/SPGI - We hear positive CapForum is out. Will revert with summary.<br>1:28:46 INFO/SPGI - Per Capforum, DOJ Staff leaning toward recommending clearance with divestiture.<br>1:41:38 INFO/SPGI - Article is short, just under 2 pages. DOJ hasn't uncovered any other serious antitrust problems aside from divestitures offered. DOJ Staff is wrapping up its review as EC kicks off their own investigation. Sources declined to say when DOJ would make its final determination, possible delays to avoid interfering with foreign regulators. It notes DOJ staff did investigate areas beyond PRAs, such as competing energy forecasting and advisory services, but Staff did not find issues on these, or any other parts of the deal.<br>1:57:49 JENNIFER DONAKER: ***INFO/SPGI - QUICK COMMENTS GIVEN QUESTIONS RECEIVED<br>• CapForum is good news on back of our compliance comments.<br>• From a process point, we highlight that there is 1 Staff recommendation to the Front Office. Note that Compliance, while an adjacent team is part of "Staff".<br>• Essentially, if the parties make an offer to Staff, that Staff thinks will work, they will involve<br>Compliance to vet the divestiture (and buyers).<br>• Assuming compliance is ok, Staff will make a formal recommendation to the Front Office.<br>• The article does not state a formal recommendation has been made but that staff is "leaning toward recommending that the department leadership clear." Thus, our best guess is Compliance has likely indicated the remedy looks ok, and it's back to Staff to make a formal recommendation (since the language used says to the DOJ leadership aka Front Office). |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 9 No. 319 | Marcia Brown | JENNIFER DONAKER | 2021-09-15 11:00:00 | 2021-09-15 11:09:00 |

| TCF Language | MS Language |
|---|---|
| Continental Grain-Cargill/Sanderson Farms: In Preemptive Divestiture Move, Continental Grain Actively Exploring Sale of Laurel, Mississippi Plant<br><br>Continental Grain is actively exploring a sale of its Wayne Farms subsidiary's Laurel, Mississippi chicken processing plant in an attempt to preemptively address antitrust concerns around its proposed $4.5 billion joint venture with Cargill and Sanderson Farms (SAFM), sources familiar with the matter said….<br><br>That sets up a clear antitrust issue with the joint venture: Wayne's Laurel plant is just five miles from Sanderson's own facility in Laurel, and the deal as originally proposed would have reduced chicken growers' contract options, and potentially raised monopsony concerns, in parts of southern Mississippi…<br><br>In a statement to The Capitol Forum, Wayne Farms CEO Clint Rivers confirmed the Laurel divestiture process, which he said would help his firm combine with Sanderson to create "a best- in-class U.S. poultry company."…<br><br>Despite the divestiture move, DOJ antitrust scrutiny of the transaction to combine Sanderson, the country's third largest poultry integrator, with Wayne, the industry No. 7, will almost certainly extend to other areas.…<br><br>Nonetheless, independent farming advocates said they're closely watching the merger for signs of the administration's commitment to promoting competition in protein markets they argue are functioning sufficiently poorly that they should be barred from any further consolidation.… | September 15, 2021<br>***SAFM - CapForum is out that they are pre-emptively exploring a sale of Laurel, Missippi Plant. Laurel plant is just 5 miles from Sanderson's own facility in Laurel, and the deal as originally proposed would reduce chicken growers contract options and potentially raise monopsony concerns in southern MS. Wayne Farms CEO confirmed the Laurel divestiture process. Despite divestiture, deal will almost certainly raise concerns in other areas. They note broiler chickens as an area. Independent farmers are closely watching signs that Biden's administration will commit to promote competition. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 9 No. 321 | Dafydd Nelson | JENNIFER DONAKER | 2021-09-16 09:55:00 | 2021-09-16 10:34:04 |

| TCF Language | MS Language |
|---|---|
| S&P Global/IHS Markit: Companies Don't Anticipate Additional Behavioral, Structural Remedies<br>…<br>The companies last month announced the sale of IHS Markit's Oil Price Information Service (OPIS) and related assets to News Corp. in a $1.15 billion deal. That divestiture has led DOJ staff to lean toward recommending clearance of the deal, The Capitol Forum reported earlier this week.<br><br>In addition to the DOJ nod, the transaction requires competition clearances from the European Commission and UK Competition and Markets Authority (CMA). Both watchdogs kicked off separate assessments of the merger in recent weeks.…<br><br>That's not to say the deal doesn't involve issues the EC and CMA will investigate closely. For example, the merger partners are both significant providers of indices—S&P with its eponymous S&P 500 as well as the Dow Jones indices, and IHS with its iBoxx fixed income indices.<br><br>Some industry players are said to be urging European regulators to consider remedies that would ensure data access post merger, citing potential vertical foreclosure issues similar to those the EC grappled with in its January approval of London Stock Exchange's acquisition of financial data provider Refinitiv.…<br><br>Timing. S&P filed the IHS acquisition to the EC on September 3 following months of pre-notification discussions. That indicates the buyer was ready to notify earlier this summer but held back so the commission could conduct a comprehensive and effective market investigation once the merger partners' customers and rivals were back in full swing in September. Such investigations during August— which traditionally is when many Europeans take their summer vacations—can yield poor results, which is far from ideal in complex cases.… | ***INFO/SPGI - CapForum states the companies don't anticipate additional behavioral, structural remedies. Divestiture has led DOJ staff to lean towards recommending clearance. In addition to DOJ, the deal needs EC and CMA. That's not to say the deal doesn't involves issues the EC and CMA will investigate closely, for example merger partners are both significant providers of indices. Some industry players are said to urge European regulators to consider remedies that would ensure data access post merger, similar to EC's investigation of Refinitiv/LSE. The parties filed Sept 3 with EC, this indicated the buyer was ready to notify earlier this summer but held back so the EC can conduct comprehensive effective market investigations.<br>==> Note: See Appendix for note we sent from MRKT US Event Driven. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 9 No. 326 | Dafydd Nelson | JENNIFER DONAKER | 2021-09-22 09:25:00 | 2021-09-22 09:32:26 |

| TCF Language | MS Language |
|---|---|
| Microsoft/Nuance: EC to Conduct Review, But Filing Still Some Weeks Away<br><br>The European Commission will review Microsoft's (MSFT) $19.7 billion acquisition of artificial intelligence company Nuance Communications (NUAN), The Capitol Forum has learned—a victory for the company, which had been trying to avoid multiple investigations in separate member countries….<br><br>UK scrutiny. In addition to the EC review, Microsoft may also have to undergo an investigation by the UK's Competition and Markets Authority. Microsoft has said the deal's completion is "subject to obtaining a favorable outcome" from the CMA, which would be either the watchdog indicating it has no further questions about the transaction or concluding a formal review.<br><br>The CMA declined to comment on the merger. | ***NUAN/MSFT - CapForum is out stating EC will review, which is a victory for the company which has been trying to avoid multiple investigations in separate number of countries but filing is still some weeks away. Article is 1.5 pages, gives a summary of LNKD, and some background on NUAN. It notes, MSFT may have to undergo an investigation by CMA.<br>==> We've been chasing our contact as well, and will update accordingly. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 9 No. 327 | Ivan Kelly | JENNIFER DONAKER | 2021-09-22 13:45:00 | 2021-09-22 14:07:00 |

| TCF Language | MS Language |
|---|---|
| Wise Road/Magnachip: Extreme Mitigation Is the Only Hope to Keep Chip Deal Alive, Experts Say<br><br>Wise Road Capital's only hope of rescuing its plan to acquire Magnachip Semiconductor (MX) is to become a passive investor and accept other extreme mitigation measures to alleviate U.S. concerns about the $1.4 billion deal, national security experts said.…<br><br>To be sure, there's no guarantee that the committee would be willing to sign off on the deal even if Wise Road proposed such draconian commitments. Nonetheless, their mere discussion represents a minor victory for the Chinese buyout firm. CFIUS has already warned that its objections may be insurmountable, and it remains possible that the panel will reject the deal no matter what Wise Road offers.…<br><br>Avoiding prohibition? The decision to permit Wise Road and Magnachip to refile suggests that the panel thinks continued discussions could be fruitful, some experts said.…<br><br>CFIUS rarely recommends blocking deals outright. Since 2011, U.S. presidents have vetoed only six transactions on national security grounds. But those six have included Chinese purchases of chip and software producers such as Aixtron, Lattice Semiconductor and StayNTouch. Given that track record, the committee is unlikely to approve a Magnachip takeover without extracting significant concessions, the experts said.… | ***MX/WISE - Capforum says Wise Road's only hope is to become a passive investor and accept extreme mitigation measures to alleviate CFIUS per national security experts. Even if Wise Road proposed such draconian commitments, there's no guarantee CFIUS would sign off. Allowing the parties to refile suggests that the panel thinks continued discussions could be fruitful some experts said. CFIUS rarely recommends blocking deals outright. They give some prior deal examples. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 9 No. 339 | Jeff Bliss | EDDIE LEE | 2021-09-30 11:50:00 | 2021-09-30 12:02:56 |

| TCF Language | MS Language |
|---|---|
| UnitedHealth Group/Change Healthcare: DOJ Concerns Expand to Prescription, Reimbursement Data Access<br><br>UnitedHealth Group's (UNH) proposed $7.8 billion Change Healthcare (CHNG) buyout has raised DOJ staff concerns that the merged company could use prescription and reimbursement information to gain an unfair advantage over rival insurers, pharmacy benefit managers (PBMs) and drugstores, sources familiar with the matter said.<br><br>Sources said that DOJ staff is focused on the prescription and reimbursement information that passes through Change's eRx Network, an electronic exchange that U.S. pharmacies use to obtain reimbursements from PBMs on drug sales. Staff's fear, sources said, is that access to this information would allow UnitedHealth Group to tighten its hold on the country's health care markets and strengthen its UnitedHealthcare and OptumRx units, the nation's largest insurer and third-largest PBM, respectively….<br><br>DOJ staff attorneys have in recent weeks interviewed pharmacy executives about the deal's potential impact in prescription drug markets, and how UnitedHealth acquiring Change's pharmacy network would affect the competitive landscape, one of the sources said….<br><br>OptumRx could use the rate information to inform its future bids to health insurers or large private employers that are currently rival PBMs' clients, a second source said.<br><br>In addition, OptumRx could compare drugstores' reimbursements to those received by its own pharmacies, giving those businesses an edge in negotiating future rates with PBMs…. | ***CHNG/UNH- CapFOrum is out stating DOJ concerns expand to Prescription Reimbursement Data Access. Merger company could use prescription and reimbursement data to gain unfair advantage over rival insurers, PBMs, and drugstores. Staff's fear is that access to this info would allow UNH to strengthen its UNH and OptumRX units. It notes OptumRX operates specialty pharmacies. Staff has interviewed pharmacy executives about the deals impact. OptuRX could use rate information to inform its future bids to health insurers or large private employers, and could compared drugstore reimbursements. There is a discussion of how the "Switch" works, and the Timing Agreement but nothing new in that regard. |

| TCF Copyright Vol # | TCF Author(s) | MS Author | TCF Date/Time | MS Date/Time |
|---|---|---|---|---|
| Vol. 9 No. 374 | Jeff Bliss | STEPHEN GRAHLING | 2021-10-27 13:25:00 | 2021-10-27 13:51:00 |

| TCF Language | MS Language |
|---|---|
| Great American Outdoors/Sportsman's Warehouse: FTC, State AGs Express Significant Concerns With Retailer Tie-up | CF article |
| | Great American Outdoors/Sportsman's Warehouse: FTC, State AGs Express Concerns with Retailer Tie-Up |
| The FTC and state attorneys general have expressed significant concerns to Great American Outdoors Group and Sportsman's Warehouse (SPWH) representatives that the retailers' proposed $785 million merger would harm competition in multiple states, sources familiar with the matter said. | The FTC and state attorneys general have expressed significant concerns to Great American Outdoors Group and SPWH representatives that the retailers' proposed $785 million merger would harm competition in multiple states, sources familiar with the matter said. |
| The communications included meetings last month between the companies and individual FTC commissioners. Those meetings typically occur only after FTC staff has recommended the commission authorize a lawsuit to block a transaction, attorneys said. | The communications included meetings last month between the companies and individual FTC commissioners. Those meetings typically occur only after FTC staff has recommended the commission authorize a lawsuit to block a transaction, attorneys said. |
| The onus is now on the companies to propose a settlement that would seek to address the enforcers' concerns, although the path to any potential settlement is far from certain, the sources said. | The onus is now on the companies to propose a settlement that would seek to address the enforcer's concerns, although the path to any potential settlement is far from certain, the sources said. |
| The proposed deal would combine Great American Outdoors, which owns Bass Pro Shops and Cabela's, with Sportsman's Warehouse, which operates 112 stores across 27 states. Both retailers sell a variety of outdoor sports items, including firearms, ammunition, camping, fishing, footwear and apparel. | The proposed deal would combine GAO, which owns Bass Pro Shops and Cabela's, with SPWH, which operates 112 stores across 27 states. Both retailers sell a variety of outdoor sports items, including firearms, ammunition, camping, fishing, footwear and apparel. |
| The merging retailers have meaningful geographic overlaps: At least 20 Sportsman's Warehouse stores in 14 different states are within 10 miles of a Bass Pro Shops or Cabela's, according to Capitol Forum analysis of location data. | The merging parties have meaningful geographic overlaps: at least 20 SPWH stores in 14 different states are within 10 miles of a Bass Pro or Cabela's, according to Capital Forum analysis of location data. |
| Merging retailers often address antitrust concerns by agreeing to divest some overlap stores. But the FTC's willingness to accept those fixes might have diminished under Chair Lina Khan, who has said that divestitures sometimes aren't sufficient to remedy anticompetitive mergers, and that the commission should therefore "more frequently consider opposing problematic deals outright." | Merging retailers often address antitrust concerns by agreeing to divest some overlap stores. But an FTC willingness to accept that fixes might have diminished under Chair Lina Khan, who has said that divestitures sometimes aren't sufficient to remedy anticompetitive mergers, and that the commission should therefore "more frequently consider opposing problematic deals outright." |
| There's also no guarantee that Great American would pursue a divestiture proposal; per the merger agreement, the company isn't obligated to divest stores, or accept any other form of structural relief, if necessary to secure FTC signoff. | There's also no guarantee that GAO would pursue a divestiture proposal; per the merger agreement, the company isn't obligated to divest stores, or accept any other form of :.,tructun:11 relief, if necessary to secure FTC signoff. |
| Great American, however, must pay Sportsman's Warehouse a reverse breakup fee of $55 million if the deal fails to secure antitrust clearance. That fee represents 7% of the deal's value, and could give Great American an incentive to pursue a structural remedy, especially in light of outdoor sports retailers' broader overperformance in recent months. The companies announced their deal on December 21, and each received second requests on February 5. | GAO, however, must pay SPWH a reverse breakup fee of $55 million if the deal fails to secure antitrust clearance. That fee represents 7% of the deal's value, and could give GAO an incentive to pursue a structural remedy, especially in light of outdoor sports retailers broader overperformance in recent months. The companies announced their deal on Dec 21st, and each received second requests on Feb 5th. |
| But time for the deal is now running short—the merger agreement's initial end date was September 17, although that date was automatically extended an additional 90 days because of the companies' failure to win FTC signoff by that time. | But time for the deal is now running short the merger agreement's initial end date was Sept17th, although that date was automatically extended an additional 90 days because of the companies' failure to win FTC signoff by that time. |
| An FTC spokesperson declined to comment. Spokespeople for Sportsman's Warehouse and Great American Outdoors' Bass Pro Shops didn't respond to requests for comment. | An FTC spokesperson declined to comment. Spokespeople for SPWH and GAO' Bass Pro Shops didn't respond to requests for comment. |

**LIST OF 7 INSTANCES OF ILLEGAL DISTRIBUTION OF COPYRIGHTED MATERIAL**

1. 4/24/20 Capitol Forum Publication on SPG/TCO----MS 0537-46
2. 5/12/20 Capitol Forum Publication on LVMH/TIF----MS 0442
3. 6/4/20 Capitol Forum Publication on WLTN/AON----MS 0641
4. 11/13/20 Capitol Forum Publication on WLTN/AON----MS 0529-36
5. 3/18/21 Capitol Forum Publication on CHNG/UNH----MS 0614
6. 7/29/21 Capitol Forum Publication on AJRD/Lockheed—MS 0600
7. 10/27/21 Capitol Forum Publication on GAO/SW—MS 0440-41